No. 25-7384

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

QUEERDOC, PLLC,

*Movant-Appellee,*

v.

UNITED STATES DEPARTMENT OF JUSTICE,

*Respondent-Appellant.*

On Appeal from the United States District Court
for the Western District of Washington
No. 2:25-mc-00042-JNW

## BRIEF FOR MOVANT-APPELLEE

Harry H. Schneider, Jr.
David B. Robbins
PERKINS COIE LLP
1301 Second Avenue, Suite 4200
Seattle, Washington, 98101
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
hschneider@perkinscoie.com
drobbins@perkinscoie.com

Adrien Leavitt, WSBA No. 44451
La Rond Baker, WSBA No. 43610
AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION

Paula Ramer
Marcus A. Asner
ARNOLD & PORTER KAYE
SCHOLER LLP
250 West 55th Street
New York, New York
Telephone: (212) 836-8000
Facsimile: (212) 836-8689
paula.ramer@arnoldporter.com
marcus.asner@arnoldporter.com

Benjamin C. Mizer
Samuel D. Kleinman
ARNOLD & PORTER KAYE
SCHOLER LLP

PO Box 2728
Seattle, WA 98111
Phone: (206) 624-2184
aleavitt@aclu-wa.org
baker@aclu-wa.org

601 Massachusetts Avenue NW
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
ben.mizer@arnoldporter.com
sam.kleinman@arnoldporter.com

Jaclyn Machometa
ARNOLD & PORTER KAYE
SCHOLER LLP
500 Boylston Street 20th Floor
Boston, MA 02116
Telephone: (617) 351-8050
Facsimile: (617) 226-9199
jaclyn.machometa@arnoldporter.com

Taylor B. Graham
ARNOLD & PORTER KAYE
SCHOLER LLP
1144 Fifteenth Street Suite 3100
Denver, CO 80202
Telephone: (303) 863-1000
Facsimile: (303) 863-2301
taylor.graham@arnoldporter.com

*Counsel for Movant-Appellee QueerDoc, PLLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION .......................................................................... 1

STATEMENT OF JURISDICTION ................................................. 4

STATEMENT OF THE ISSUES ...................................................... 4

PERTINENT LEGAL PROVISIONS ............................................... 5

STATEMENT OF THE CASE ......................................................... 5

   A.   The Government's Attempt to End Gender-Affirming Care
      Through the Issuance of Criminal Administrative Subpoenas ... 5

   B.   Procedural History ...................................................... 11

SUMMARY OF ARGUMENT ....................................................... 15

STANDARD OF REVIEW ........................................................... 17

ARGUMENT .............................................................................. 18

I.   The District Court Applied the Correct, Well-Settled Legal
     Standard ................................................................... 18

   A.   Courts are Authorized to Evaluate the Purpose of an
      Administrative Subpoena ............................................. 18

   B.   The District Court Correctly Held QueerDoc to Its Burden of
      Demonstrating Improper Purpose ................................. 23

   C.   A HIPAA Subpoena May Not Be Used for a Fishing Expedition
      ............................................................................. 25

II.   The District Court Did Not Clearly Err When It Found that the
     Subpoena Was Issued for a Purpose Other Than the Investigation
     of a Federal Healthcare Offense ...................................... 29

   A.   The District Court's Finding is Well Grounded ............... 30

   B.   Public Admissions Are the *Sine Qua Non* of Bad Faith ......... 33

i

C.      There Is Ample Additional Evidence of Pretext and Improper
        Purpose in This Record and in the Public Record......................35

III.    The Purpose Articulated by DOJ is Neither Within Its Authority
        Under HIPAA Nor Otherwise Legitimate ....................................42

A.      The Conduct Alleged by DOJ Does Not Violate the FDCA........43

B.      The Investigation Is Otherwise So Vaguely Defined and
        Substantively Capacious As to Render the Subpoena
        Unenforceable..............................................................................52

IV.     Even if the Subpoena Was Issued for a Proper Purpose, It Seeks
        Irrelevant Information and Is Overly Broad and Unduly
        Burdensome..................................................................................56

CONCLUSION .........................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2025 UPMC Subpoena,*
2025 WL 3724705 (W.D. Pa. Dec. 24, 2025) .................................. 11, 36

*In re Admin. Subpoena No. 25-1431-019,*
800 F. Supp. 3d 229 (D. Mass. 2025) ..................................... 11, 32, 60

*Alberty Food Prods. Co. v. United States,*
185 F.2d 321 (9th Cir. 1950) ............................................. 45

*Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug*
*Admin.,*
13 F.4th 531 (6th Cir. 2021) ............................................. 46

*Burlington N. R. Co. v. Off. of Inspector Gen., R.R. Ret. Bd.,*
983 F.2d 631 (5th Cir. 1993) ............................................. 22

*C. F. P. B. v. Accrediting Council for Indep. Colleges & Schs.,*
854 F.3d 683 (D.C. Cir. 2017) ........................................ 25, 43

*Chambers v. NASCO, Inc.,*
501 U.S. 32 (1991) ..................................................... 34

*Chaney v. Heckler,*
718 F.2d 1174 (D.C. Cir. 1983) ......................................... 47

*Chavez-Deremer v. Amazon.com Services, LLC,*
2025 WL 2417398 (9th Cir. Aug. 21, 2025) .............................. 41

*Conant v. Walters,*
309 F.3d 629 (9th Cir. 2002) ........................................... 51

*Crystal v. United States,*
172 F.3d 1141 (9th Cir. 1999) ..................................... 1, 14, 20, 40

*Dep't of Fin. v. AT&T Inc.,*
253 A.3d 537 (Del. 2021) ............................................... 39

iii

*In re: Dep't of Just. Admin. Subpoena No. 25-1431-030*,
2026 WL 33398 (D. Colo. Jan. 5, 2026) .................................. 11, 32, 60

*Donovan v. Royal Logging Co.*,
645 F.2d 822 (9th Cir. 1981)..................................................... 29

*EEOC v. Children's Hosp. Med. Cntr. of N. Cal.*,
719 F. 2d 1426 (9th Cir. 1983)............................................... 56

*Ewalan v. Holbrook*,
2022 WL 2209621 (W.D. Wash. June 21, 2022) ................................ 37

*Fiallo v. Bell*,
430 U.S. 787 (1977)................................................................... 34

*Gonzales v. Oregon*,
546 U.S. 243 (2006).................................................................. 51

*Heckler v. Chaney*,
470 U.S. 821 (1985).................................................................. 47

*Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*,
471 U.S. 707 (1985).................................................................. 51

*Jennings v. Rodriguez*,
583 U.S. 281 (2018).................................................................. 50

*Kirshner v. Uniden Corp. of Am.*,
842 F.2d 1074 (9th Cir. 1988)................................................. 38

*Kordel v. United States*,
335 U.S. 345 (1948)............................................................ 45, 46

*Lynn v. Biderman*,
536 F.2d 820 (9th Cir. 1976)................................................... 21

*M & T Bank v. SFR Invs. Pool 1, LLC*,
963 F.3d 854 (9th Cir. 2020)................................................... 18

*McLane Co. v. E.E.O.C.*,
581 U.S. 72 (2017)................................................................... 23

*McNae v. ARAG Ins. Co.*,
  2025 WL 2579734 (W.D. Wash. Sept. 4, 2025).................................... 38

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996).............................................................................. 51

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  585 U.S. 755 (2018).............................................................................. 50

*Okla. Press Publ'g Co. v. Walling*,
  327 U.S. 186 (1946).............................................................................. 26

*Peters v. United States*,
  853 F.2d 692 (9th Cir. 1988)...................................................... *passim*

*Ponsford v. United States*,
  771 F.2d 1305 (9th Cir. 1985)...................................................... 18, 30

*Reich v. Montana Sulphur & Chemical Company*,
  32 F.3d 440 (9th Cir. 1994)................................................... 28, 29, 59

*Reisman v. Caplin*,
  375 U.S. 440 (1964).............................................................................. 19

*S. E. C. v. Arthur Young & Co.*,
  584 F.2d 1018 (D.C. Cir. 1978).................................................... 25, 34

*In re Sealed Case (Admin. Subpoena)*,
  42 F.3d 1412 (D.C. Cir. 1994)................................................. 26, 27, 28

*See v. City of Seattle*,
  387 U.S. 541 (1967).............................................................................. 26

*In re Subpoena Duces Tecum*,
  228 F.3d 341 (4th Cir. 2000)............................................................... 42

*In re Subpoena Duces Tecum No. 25-1431-016*,
  2025 WL 3562151 (W.D. Wash. Sept. 3, 2025)
  ........................................................................................ 11, 31, 32, 36

*In re Subpoena No. 25-1431-014,*
    2025 WL 3252648 (E.D. Pa. Nov. 21, 2025)
    ....................................................................................... *passim*

*Trump v. Hawaii,*
    585 U.S. 667 (2018)......................................................... 33, 34

*Tucson Woman's Clinic v. Eden,*
    379 F.3d 531 (9th Cir. 2004)............................................... 60

*United States v. 24 Bottles "Sterling Vinegar & Honey Aged
    in Wood Cider Blended With Finest Honey Contents 1 Pint
    Prod. of Sterling Cider Co., Sterling, Mass.",*
    338 F.2d 157 (2d Cir. 1964) ................................................ 44

*United States v. Algon Chem. Inc.,*
    879 F.2d 1154 (3d Cir. 1989) .............................................. 47

*United States v. Blackman,*
    72 F.3d 1418 (9th Cir. 1995)................................................ 32

*United States v. Calif. Stem Cell Treatment Ctr., Inc.,*
    117 F.4th 1213 (9th Cir. 2024) .............................. 44, 47, 48

*United States v. Caronia,*
    703 F.3d 149 (2d Cir. 2012) ........................................ 47, 50

*United States v. Church of Scientology of California,*
    520 F.2d 818 (9th Cir. 1975)............................................... 33

*United States v. Clarke,*
    573 U.S. 248 (2014)...................................................... 20, 22

*United States v. Evers,*
    643 F.2d 1043 (5th Cir. 1981)....................................... 46, 47

*United States v. Exxon Mobil Corp.,*
    943 F.3d 1283 (9th Cir. 2019)....................................... 17, 57

*United States v. Gertner,*
    65 F.3d 963 (1st Cir. 1995) ......................................... *passim*

vi

*United States v. Golden Valley Elec. Ass'n,*
  689 F.3d 1108 (9th Cir. 2012) ........................................................... 19

*United States v. Goldman,*
  637 F.2d 664 (9th Cir. 1980) ....................................................... 20, 56

*United States v. Henry,*
  491 F.2d 702 (6th Cir. 1974) ................................................. 35, 36, 39

*United States v. Jose,*
  131 F.3d 1325 (9th Cir. 1997) ............................................. 20, 21, 43

*United States v. Kaplan,*
  836 F.3d 1199 (9th Cir. 2016) ................................................... 44, 46

*United States v. LaSalle Nat'l Bank,*
  437 U.S. 298 (1978) ............................................................. 23, 26, 40

*United States v. Markwood,*
  48 F.3d 969 (6th Cir. 1995) ............................................................. 40

*United States v. Morton Salt Company,*
  338 U.S. 632 (1950) ............................................................... *passim*

*United States v. Powell,*
  379 U.S. 48 (1964) ................................................................. *passim*

*United States v. Samuels, Kramer and Co.,*
  712 F.2d 1342 (9th Cir. 1983) ........................................................ 42

*United States v. Skrmetti,*
  605 U.S. 495 (2025) ................................................................. 49, 51

*United States v. Sullivan,*
  332 U.S. 689 (1948) ........................................................................ 44

*United States v. Tan,*
  16 F.4th 1346 (9th Cir. 2021) ................................................... 18, 22

*United States v. Watkins,*
  278 F.3d 961 (9th Cir. 2002) ......................................................... 57

*United States v. Whispering Oaks Residential Care Facility, LLC,*
   673 F.3d 813 (8th Cir. 2012) ................................................................ 41

*Wyeth v. Levine,*
   555 U.S. 555 (2009) ............................................................................ 46

**Statutes**

8 U.S.C.
   § 1225(a) .......................................................................................... 54

15 U.S.C.
   § 46 .................................................................................................. 34

18 U.S.C.
   § 24(a)(2) ............................................................................................ 9
   § 3486(a)(1)(A)(i)(I) ................................................................. *passim*

21 U.S.C.
   § 321(m) ................................................................................. 7, 8, 44
   § 321(n) ........................................................................................ 7, 8
   § 331 ..................................................................................... 7, 8, 50
   § 331(a) ..................................................................................... 43, 57
   § 331(b) ..................................................................................... 43, 57
   § 331(c) ..................................................................................... 43, 57
   § 331(k) ............................................................................................ 43
   § 333(a)(1) ........................................................................................ 43
   § 333(a)(2) ........................................................................... 43, 44, 49
   § 352 ................................................................................................ 44
   § 352(a) ........................................................................................ 7, 8
   § 352(f) ......................................................................................... 7, 8

26 U.S.C.
   § 7609(f) ......................................................................................... 54

Wash. Rev. Code § 7.115.010(3) ................................................. 52

Wash. Rev. Code § 7.115.010(4) ................................................. 52

Wash. Rev. Code § 7.115.020(1) ................................................. 52

## Executive Orders

*Defending Women From Gender Ideology Extremism and
    Restoring Biological Truth to the Federal Government*, 90
    Fed. Reg. 8615, § 2 (Jan. 20, 2025)........................................5

*Protecting Children From Chemical and Surgical Mutilation*,
    90 Fed. Reg. 8771 (Jan. 28, 2025)..................................6, 30

## Other Authorities

Alex Seitz-Wald and Jo Yurcaba, *Trump Vows to 'Stop'
    Gender-Affirming Care for Minors if Re-Elected President*,
    NBC NEWS (Jan. 31, 2023), https://perma.cc/E2ZW-TRH3 ................5

F. Comite et al*., Short-Term Treatment of Idiopathic
    Precocious Puberty with a Long-Acting Analogue of
    Luteinizing Hormone-Releasing Hormone*, 305 N. Eng. J.
    Med. 1536 (1981)...........................................................49

James M. Beck, *Off-Label Use in the Twenty-First Century:
    Most Myths and Misconceptions Mitigated*, 54 UIC J.
    Marshall L. Rev. 1 (2021) ..................................................48

Oral Arg. Tr., *In Re: Administrative Subpoena No. 25-1431-
    019*, No. 1:25-mc-91324-MJJ (D. Mass. Sept. 1, 2025),
    Dkt. No. 30 ............................................................2, 11, 32

*President Trump is Delivering on His Commitment to Protect
    Our Kids*, The White House (Feb. 3, 2025),
    https://perma.cc/EN3W-R932 ........................................6, 30

*President Trump Promised to End Child Sexual Mutilation -
    and He Delivered*, The White House (July 25, 2025),
    https://perma.cc/Q8AC-WV9W ................................2, 11, 32

Simona Martin et al., *Criminalization of Gender-Affirming
    Care--Interfering with Essential Treatment for
    Transgender Children and Adolescents*, 385 N. Eng. J.
    Med. 579 (2021)...........................................................49

U.S. Dep't of Just., Off. of Pub. Affairs, *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025), https://perma.cc/BS54-RSQA.........................................2, 11, 31

## INTRODUCTION

Last year, the U.S. Department of Justice ("DOJ") issued more than twenty subpoenas to healthcare providers of gender-affirming care throughout the country. The subpoena at issue in this case is one of them. Like Movant-Appellee QueerDoc, PLLC ("QueerDoc"), several other recipients have moved to quash or limit their subpoenas—to universal success. Federal courts in Massachusetts, Pennsylvania, and Washington have quashed or limited these subpoenas, concluding that they were issued for an improper purpose, overbroad, or both. No court has ruled in DOJ's favor.

Although this Court will be the first Circuit to address whether these subpoenas were issued for an improper purpose, the law in this area is settled. Sixty years of precedent from the Supreme Court and this Court holds that a federal agency may not use an administrative subpoena for an improper purpose. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 58 (1964); *Crystal v. United States*, 172 F.3d 1141, 1144 (9th Cir. 1999). Surveying the factual record, the District Court below found that DOJ issued the subpoena for precisely such a purpose—to harass and intimidate QueerDoc into abandoning its medical practice centered on

1

gender-affirming care. ER-19. Far from clearly erroneous, that factual conclusion is amply supported by the federal government's own statements.

For example, after the subpoenas were issued, the Attorney General announced that the aim of the subpoenas is to "h[o]ld accountable" providers of gender-affirming care for what she perceives as the "mutilat[ion of] children"—not to uncover potential drug misbranding. Press Release, U.S. Dep't of Just., *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025) ("Subpoena Press Release"), https://perma.cc/BS54-RSQA. Shortly thereafter, the White House published a list of hospitals that had ceased providing gender-affirming care following an executive order directing the Attorney General to investigate providers and reiterated that the President's goal was to "end" such care. *President Trump Promised to End Child Sexual Mutilation – and He Delivered*, The White House (July 25, 2025) ("July 25 White House Statement"), https://perma.cc/Q8AC-WV9W. And, in a related case, counsel for DOJ confirmed that "th[e] investigation is about" "eliminat[ing] the medicalized gender-affirming care of minors." Oral

Arg. Tr. 25, *In Re: Administrative Subpoena No. 25-1431-019*, No. 1:25-mc-91324-MJJ (D. Mass. Sept. 1, 2025), Dkt. No. 30 ("*Boston Children's Tr.*"). The record is replete with evidence of improper purpose.

Even if the subpoena were issued to QueerDoc, in part or in whole, pursuant to a *bona fide* criminal investigation, it suffers from a variety of fatal infirmities. The Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.* ("FDCA"), does not regulate statements by healthcare providers regarding clinically appropriate off-label uses of drugs they prescribe in the course of their practice of medicine, and, even if it did, the First Amendment protects such statements by healthcare providers. And in any event, the regulation of the practice of medicine is reserved to the States. Taken to its conclusion, DOJ's interpretation of the FDCA would bring a federal prosecutor into every patient room for every conversation regarding off-label use. The FDCA does not sweep so far.

Fundamentally, this appeal has nothing to do with whether gender-affirming care ought to be available, or whether the federal government has an interest in tackling healthcare fraud. This case poses a much simpler question: May the federal prosecutorial power be used in ways

3

Congress has not authorized? Decades of precedent make clear that the answer is "no."

## STATEMENT OF JURISDICTION

Movant-Appellee QueerDoc, PLLC, agrees with the Jurisdictional Statement contained on page four of the Respondent-Appellant's Brief, submitted on December 19, 2025.

## STATEMENT OF THE ISSUES

1.     Whether the District Court's factual finding that the Subpoena was issued for an improper purpose and not to investigate a "Federal healthcare offense" was clearly erroneous?

2.     Whether the District Court abused its discretion when it quashed the subpoena based on this improper purpose?

3.     Whether the District Court's decision should be affirmed on the alternative ground that the Subpoena exceeds Congress's grant of authority based on the investigation DOJ has articulated?

4.     Whether the District Court's decision should be affirmed on the alternative ground that the subpoena sought irrelevant information, was overly broad, or was unduly burdensome?

## PERTINENT LEGAL PROVISIONS

All applicable statutes are contained in the addendum of the Respondent-Appellant's Brief, submitted on December 19, 2025.

## STATEMENT OF THE CASE

### A.   The Government's Attempt to End Gender-Affirming Care Through the Issuance of Criminal Administrative Subpoenas

The Administration has made clear its views on gender-affirming care.  Before taking office, the President promised that, if re-elected, he would direct federal agencies to "'stop' gender-affirming care for minors" and "order the Justice Department to investigate the pharmaceutical industry and hospitals" regarding the provision of gender-affirming care. Alex Seitz-Wald and Jo Yurcaba, *Trump Vows to 'Stop' Gender-Affirming Care for Minors if Re-Elected President*, NBC News (Jan. 31, 2023), https://perma.cc/E2ZW-TRH3.

The President began following through on his promise when he took office on January 20, 2025, by issuing an executive order declaring that "[i]t is the policy of the United States to recognize two sexes, male and female," and that "[t]hese sexes are not changeable." *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615, § 2 (Jan. 20, 2025).  The following

5

week, the President issued a second executive order proclaiming that the provision of gender-affirming care is "a stain on our Nation's history" that "must end." *Protecting Children From Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771, § 1 (Jan. 28, 2025) ("January 28 E.O."). The January 28 E.O. ordered DOJ to "prioritize investigations" into "violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of" gender-affirming care, which the order characterized as "chemical and surgical mutilation." *Id.* § 8(c). The next week, the White House reaffirmed that the "intended effect" of the executive orders was to "downsize or eliminate … so-called 'gender-affirming care.'" *President Trump is Delivering on His Commitment to Protect Our Kids*, The White House (Feb. 3, 2025) ("February 3 White House Statement"), https://perma.cc/EN3W-R932.

On April 22, 2025, pursuant to the President's directive, Attorney General Pamela J. Bondi issued a memorandum—entitled "Preventing the Mutilation of American Children"—that provided "guidance to all Department of Justice employees to enforce rigorous protections and hold accountable those who prey on vulnerable children and their parents."

6

ER-50. The Bondi Memo announced that "the Department of Justice will bring [gender-affirming care] to an end." ER-53. Then, in a June 11, 2025, memorandum titled "Civil Division Enforcement Priorities," Assistant Attorney General for the Civil Division Brett Shumate implemented the Bondi Memo by stating that "President Trump and Attorney General Bondi have directed the Civil Division to use its enforcement authorities to advance the Administration's policy objectives." ER-54. The Shumate Memo announced that the Civil Division "will use all available resources to prioritize investigations … consistent with these directives." ER-55–56.

Specifically, the Bondi Memo directed investigations of possible violations of the FDCA. ER-51. The Bondi Memo ordered the investigation of "manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'" ER-51 (citing 21 U.S.C. §§ 321(m)-(n), 331, 352(a), (f)). The memo claimed that such promotion, "including through informal campaigns like those conducted by sales reps … run afoul of the FDA's prohibitions on misbranding and mislabeling." ER-51. The Shumate

7

Memo, in turn, specified that DOJ's Civil Division would "advance the Administration's policy objectives" by investigating "(1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs" pursuant to the FDCA. ER-54, 55–56. In other words, the Bondi and Shumate Memos authorized FDCA investigations into manufacturers and distributors of drugs. ER-51 (citing 21 U.S.C. §§ 321(m)-(n), 331, 352(a), (f)); ER-55–56. Neither the Bondi Memo nor the Shumate Memo authorized the investigation of healthcare providers under the FDCA.

The same day he issued his memorandum, Assistant Attorney General Shumate served QueerDoc with a criminal administrative subpoena ("Subpoena") under the authority of Section 248 of the Health Insurance Portability & Accountability Act of 1996, Public Law No. 104-91 (18 U.S.C. § 3486). ER-21. Although a § 3486 subpoena may be issued to investigate a range of "federal health care offense[s]," here DOJ's authority is limited to investigations of the FDCA, as authorized by Attorney General Order Number 3591-2015. *See In re Subpoena No. 25-1431-014*, 2025 WL 3252648, at \*6 & n.56 (E.D. Pa. Nov. 21, 2025)

8

("*Children's Hospital of Philadelphia*"). A § 3486 subpoena may be issued to investigate a violation of the FDCA only if the violation "relates to a health care benefit program[,]"—that is, public or private health insurance. 18 U.S.C. § 24(a)(2).

The Subpoena sought a sweeping array of documents and data from QueerDoc, a telehealth provider of gender-affirming care (such as hormones and puberty-delaying medications) to adolescents and adults. Notably, and as the District Court found, QueerDoc does not bill insurance. ER-17. Among other requests, the Subpoena sought "[c]omplete personnel files for each employee, contractor, or affiliate of the Company"; "[a]ll documents relating to communications" with manufacturers and pharmacies providing puberty-delaying medications or hormones, as well as with "sales representatives, marketing departments, or medical science liaisons" concerning puberty-delaying medications and hormones; "[a]ll documents … concerning the use of … diagnosis codes in connection with the treatment of minor patients receiving gender-related care"; and "[d]ocuments sufficient to identify each patient" prescribed puberty-delaying medications or hormone

9

therapy and QueerDoc's medical records for each such patient. ER-27–29.

After receiving the Subpoena, counsel for QueerDoc conferred with DOJ. SER-9. The DOJ attorneys explained that they had been tasked with investigating potential violations of the FDCA and referenced the President's Executive Orders and the Bondi Memo. SER-9. When asked whether they had specific concerns regarding QueerDoc, the attorneys stated only that they were aware that QueerDoc is a "prominent" provider of gender-affirming care that prescribes puberty blockers and hormones. SER-9. The attorneys averred that was "the extent of" DOJ's motivation for subpoenaing QueerDoc. SER-9.

The government has issued more than twenty materially identical investigative subpoenas to healthcare providers around the country. *Children's Hospital of Philadelphia*, 2025 WL 3252648, at *6 & n.56. In a press release, DOJ stated that the subpoenas were issued in an effort to "h[o]ld accountable" healthcare providers "involved in performing

10

transgender medical procedures on children." Subpoena Press Release. Five challenges to these subpoenas have succeeded.[1]

Within weeks of the subpoenas' issuance, the White House publicly announced that President Trump had "delivered" on his promise to "end" gender-affirming care and listed providers that ceased providing the services. *See* July 25 White House Statement. And at oral argument in a case involving Boston Children's Hospital's challenge to the subpoena it received, DOJ confirmed that "the executive branch wants to reduce or eliminate gender-related care to minors, especially the medicalized gender-related care to minors that this investigation is about … . [T]hat's exactly what this investigation is about … ." *Boston Children's* Tr. 25 (emphasis added).

## B. Procedural History

On July 8, 2025, QueerDoc moved to quash the Subpoena, arguing that it was issued for an improper purpose—to end gender-affirming care

---

[1] *See In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *17 (W.D. Wash. Sept. 3, 2025) ("*Seattle Children's*"); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 239 (D. Mass. 2025) ("*Boston Children's*"); *Children's Hospital of Philadelphia*, 2025 WL 3252648, at *12; *In re 2025 UPMC Subpoena*, 2025 WL 3724705, at *3 (W.D. Pa. Dec. 24, 2025) ("*UPMC*"); *see also In re: Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *11 (D. Colo. Jan. 5, 2026) (Chung, M.J.) ("*Colorado Children's*") (recommending that the district court quash subpoena).

throughout the country, including by QueerDoc, rather than to investigate a potential "Federal healthcare offense." ER-84–87. In support of its argument, QueerDoc marshaled specific evidence that DOJ's purported investigation was pretextual, drawing a clear line from the President's promises to end gender-affirming care and DOJ's public declarations of intent to achieve that purpose to the issuance of the Subpoena. ER-85–86. QueerDoc further contended that the Subpoena was overly broad and unduly burdensome. ER-87–90.

DOJ responded that the District Court lacked the authority to quash the Subpoena based on a finding of improper purpose. SER-15–16. And even if the Court possessed that authority, DOJ maintained, the investigation was legitimate because there are "numerous concerning pieces of evidence" about gender-affirming care, citing Justice Thomas' assertion in a recent concurrence related to Tennessee's ban on gender-affirming care. SER-18–19. DOJ declined to offer any specific reasons for investigating QueerDoc beyond a recitation of the Bondi and Shumate Memos' directive to investigate "whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated" the FDCA. SER-12.

12

More than two months after filing its opposition to the motion to quash, and after district courts quashed materially identical subpoenas issued to Seattle Children's Hospital and Boston Children's Hospital, DOJ filed a "Praecipe to File Additional Document" to "supplement the record" with a declaration from Consumer Protection Branch Assistant Director Allan Gordus ("Gordus Declaration"). ER-58–60, 62. The declaration contended that a physician's prescription of a drug "for unapproved uses may involve violations of the FDCA." ER-65. It further stated that where "a drug manufacturer or other person distributes (or causes the distribution of) an approved drug with false or misleading labeling for an unapproved use, the manufacturer or other person could possibly be charged with misbranding the drug." ER-66. Citing a statement about puberty-delaying medications on QueerDoc's website, the declaration maintained, QueerDoc may be engaged in such "misbranding of drugs prescribed for unapproved uses through illegal labeling" in violation of the FDCA. ER-69–70.

DOJ purported to file the Gordus Declaration under the Western District of Washington's Local Rule 7(m). QueerDoc moved to strike DOJ's belated filing, explaining that it violated Local Rule 7(m) because

13

DOJ could have submitted it in connection with its earlier briefing and failed adequately to explain why it did not.

In its decision, the District Court agreed with QueerDoc that, under longstanding Supreme Court and Ninth Circuit precedent, it could "examine whether the agency is 'pursuing the authorized purposes in good faith.'" ER-14–15 (citing *Powell*, 379 U.S. at 51, 58; *Crystal*, 172 F.3d at 1144–45). Consistent with every other court to assess the purpose behind DOJ's July 2025 subpoenas targeting medical providers, the District Court found that the Subpoena was issued for an improper purpose: "to pressure providers to cease offering gender-affirming care rather than to investigate specific unlawful conduct." ER-19. Surveying the evidence, the Court reasoned that "the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating" constituted "clear[] evidence of improper purpose." ER-17. The incongruence between DOJ's authorized investigatory purposes and "QueerDoc's actual operations," as well as the fact that the subpoena was "overbroad," further revealed to the District Court the Subpoena's "pretextual nature." ER-17–19.

14

The District Court also struck DOJ's Praecipe and the Gordus Declaration. ER-19. The Court concluded that the filing was "improper" because Local Rule 7(m) does not allow parties to submit "new evidence or supplementing legal arguments after briefing has closed." ER-18 n.2.

## SUMMARY OF ARGUMENT

The authority to issue administrative subpoenas extends only so far as Congress and the Constitution permit. When the recipient of an administrative subpoena demonstrates that the subpoena has been issued for an improper purpose, the subpoena must be quashed. *See Powell*, 379 U.S. at 58. The District Court correctly applied these settled legal standards.

The government has made its improper purpose clear. Time and again, it has publicly confirmed that its purported investigations of healthcare providers in fact are in furtherance of its political desire to "end" the provision of gender-affirming care in the United States. On a careful review of this evidence, the District Court correctly found that the government issued the Subpoena not for a lawfully authorized purpose, but instead to pressure QueerDoc (and other providers of gender-affirming care) into abandoning such care. This finding, which is

15

consistent with the finding of every other district court to consider the question, has overwhelming support in the record and is therefore not clearly erroneous.

On appeal, DOJ's *post hoc* attempt to justify the Subpoena relies on an entirely novel FDCA theory—that a statute governing the "misbranding" of a drug *also* regulates a physician's speech to current and potential patients about the off-label use of that drug made in connection with the practice of medicine. In light of DOJ's clear improper purpose in issuing the Subpoena, this Court need not engage with DOJ's FDCA theories. Even if it did, those theories fail for a variety of reasons: (1) a physician does not "label" a drug by discussing it on their website, because that discussion does not "accompany" the drug within the meaning of the FDCA; (2) a physician cannot "misbrand" a drug by summarizing the medical authority for a particular off-label use; and (3) even if they could, the statement upon which DOJ seizes is an opinion that cannot be proven false as a matter of law. Furthermore, even if DOJ's novel theories found some support in the statutory text—and they do not—such a reading would infringe on a doctor's First Amendment-protected doctor-patient speech and impermissibly intrude on the

16

authority to regulate the practice of medicine that the Tenth Amendment reserves to the States.

Although the District Court did not reach the question, its ruling can alternatively be affirmed on the grounds of the Subpoena's overbreadth. The Subpoena's scope, including requests for information with no connection to an FDCA violation, demonstrates the Subpoena is nothing more than an improper fishing expedition. And QueerDoc's compliance with the Subpoena would seriously disrupt QueerDoc's operations.

The District Court made no clear error in finding improper purpose, nor did it abuse its discretion in quashing the subpoena based on bad faith. This Court should affirm.

## STANDARD OF REVIEW

This Court reviews a district court's ultimate conclusion whether to enforce an administrative subpoena for abuse of discretion. *United States v. Exxon Mobil Corp.*, 943 F.3d 1283, 1287 (9th Cir. 2019). Because a district court's inquiry into the government's "purpose for conducting an investigation under *Powell* is a predominately factual question," its finding that a subpoena was issued for an improper purpose is "reviewed

17

under the clearly erroneous standard." *Ponsford v. United States*, 771 F.2d 1305, 1308 (9th Cir. 1985); *see United States v. Tan*, 16 F.4th 1346, 1352 (9th Cir. 2021). The District Court's decision may be affirmed on any ground supported by the record, even if not relied on by the District Court. *M & T Bank v. SFR Invs. Pool 1, LLC*, 963 F.3d 854, 857 (9th Cir. 2020).

## ARGUMENT

## I. The District Court Applied the Correct, Well-Settled Legal Standard

### A. Courts are Authorized to Evaluate the Purpose of an Administrative Subpoena

DOJ first asserts that courts lack authority to quash a subpoena based on "speculation about subjective purpose." Br. 23. Both the Supreme Court and the Ninth Circuit have repeatedly held that a district court should, after a sufficient showing by the movant, quash a subpoena issued for a subjectively improper purpose.

On appeal, DOJ predominantly relies on *United States v. Morton Salt Company*, 338 U.S. 632 (1950). There, the Supreme Court endorsed "judicial review" of administrative subpoenas to "protect against mistaken or arbitrary" investigations. *Id.* at 640. To aid in the court's review, the Supreme Court required, as a first step, the government to

18

demonstrate its good faith by making a prima facie showing that the subpoena's issuance "is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *Id.* at 652.[2]

The Supreme Court subsequently confirmed that, once the government makes its prima facie case for enforcement, the burden shifts to the recipient, who then may challenge the subpoena "on any appropriate ground." *Powell*, 379 U.S. at 58 (quoting *Reisman v. Caplin*, 375 U.S. 440, 449 (1964)). To evaluate the recipient's showing at this second step of the analysis, the Court expressly directed courts to "inquire into the underlying reasons" motivating an administrative subpoena to ensure its "process" is not "abused." *Id.* "Such an abuse," the Court reasoned, takes place if a subpoena is "issued for an improper purpose," for example to "harass" the target "or for *any other purpose*

---

[2] DOJ claims that QueerDoc has not "contested" that DOJ has satisfied its prima facie burden. Br. 17. To the contrary, as QueerDoc argues in Sections III and IV *infra*, Congress has not "granted the authority" for the Subpoena based on the investigation DOJ has articulated, nor is the evidence sought "relevant" to the purported investigation, demonstrating that DOJ has not made its prima facie showing and providing bases for this Court's affirmance. *United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108, 1113 (9th Cir. 2012). QueerDoc made the same arguments before the District Court as well, explaining in its opening motion, in reply, and in its proposed response to DOJ's belated praecipe that DOJ's articulated investigation falls outside the FDCA's bounds. ER-88-89; SER-30, 43-47.

19

reflecting on the good faith of the particular investigation." *Id.* (emphasis added). The Supreme Court has since reiterated that it is incumbent on the reviewing court to ensure that a subpoena was issued "in good faith." *United States v. Clarke*, 573 U.S. 248, 254 (2014).

The Ninth Circuit has consistently endorsed this two-step framework, including *Powell*'s principle that a subpoena may be challenged "on *any* appropriate grounds, *including* … abuse of the court's process," by adducing evidence of "bad faith or improper purpose." *United States v. Jose*, 131 F.3d 1325, 1328 (9th Cir. 1997) (cleaned up); *see Crystal*, 172 F.3d at 1144. The District Court faithfully and accurately applied this long-settled precedent to conclude that QueerDoc carried its burden to demonstrate improper purpose.

DOJ's claims of legal error are unavailing. Proceeding directly to the second step of the analysis and recognizing correctly that the burden fell on QueerDoc at this stage, the District Court "examine[d] whether [the] subpoena was issued for an improper purpose or in bad faith." ER-14; *see United States v. Goldman*, 637 F.2d 664, 666 (9th Cir. 1980) ("[T]he court may inquire into the reasons for examination so as to prevent abuse from the enforcement of a summons issued for an improper

20

purpose.").  And far from engaging in "speculation," the District Court did precisely what this Court requires of it by assessing the "specific facts and evidence" adduced by QueerDoc in support of its assertion.  *Jose*, 131 F.3d at 1328.

Relying on *Lynn v. Biderman*, 536 F.2d 820 (9th Cir. 1976), DOJ seeks to invert the well-established framework that the District Court applied to argue that the government may issue a subpoena in bad faith or for an improper purpose so long as it can point to some other statutorily legitimate purpose.  *See* Br. 25.  DOJ's reliance on *Lynn* is misplaced.

To begin, *Lynn* solely considered the first *Powell* element—whether "the investigation will be conducted pursuant to a legitimate purpose"— which the government must "show" to establish its prima facie case as a threshold matter.  536 F.2d at 824.  At this initial stage, the government's "showing need only be minimal."  *Jose*, 131 F.3d at 1327 (citation omitted).  Here, by contrast, the District Court's holding was grounded not in DOJ's failure to establish the first element of its prima facie case for enforcement (an investigative purpose covered by the authorizing statute), but rather in QueerDoc's affirmative showing of bad faith and

improper purpose. *See Clarke*, 573 U.S. at 251 (explaining the difference between the government's prima facie showing of "legitimate purpose," and the subpoena target's subsequent "opportunity to … urge the court to quash … on any appropriate ground … including … improper purpose").

*Lynn* is also inapplicable because the District Court here properly found that the Subpoena was issued *solely* for an improper purpose. It concluded that DOJ did not issue the Subpoena "to investigate specific unlawful conduct," which is the only legitimate purpose for which a § 3486 subpoena may be issued. ER-19; *see* 18 U.S.C. § 3486(a)(1)(A)(i)(I). So, this case does not resemble *Lynn*, where, as the Fifth Circuit put it, "the district court found that there were two purposes for the proposed audit—one statutorily authorized and one not." *Burlington N. R. Co. v. Off. of Inspector Gen., R.R. Ret. Bd.*, 983 F.2d 631, 640 n.4 (5th Cir. 1993). Rather, the District Court here determined that the sole purpose of the Subpoena was to "pressure providers to cease offering gender-affirming care rather than to investigate specific unlawful conduct." ER-19. That factual conclusion is reviewed only for clear error. *Tan*, 16 F.4th at 1352.

22

Moreover, the Supreme Court has clarified since *Lynn* that "[t]he dispositive question in each case" is whether the government is "pursuing the authorized purposes in good faith." *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 317 n.19 (1978); *see also McLane Co. v. EEOC*, 581 U.S. 72, 77 (2017) (instructing that courts should quash where the recipient "establishes that the subpoena … has been issued for an illegitimate purpose," even where the government meets its prima facie burden of demonstrating its "charge is proper" (cleaned up)). The District Court appropriately answered that dispositive question when it concluded that DOJ's purported investigatory purpose was "pretextual." ER-17. In so finding, the District Court followed the Supreme Court's mandate to ensure investigating agencies are "at all times us[ing] the summons authority in good-faith pursuit of the congressionally authorized purposes." *LaSalle Nat'l Bank*, 437 U.S. at 318.

## B. The District Court Correctly Held QueerDoc to Its Burden of Demonstrating Improper Purpose

DOJ also distorts the District Court's opinion when it maintains that the Court required it "to make a higher showing of misconduct up front, before issuing a subpoena." Br. 34. The District Court did no such thing. Its observation that "DOJ issued the subpoena first, and searched

23

for a justification second," was not a recitation of DOJ's burden at the initial prima facie stage or otherwise. ER-17. Instead, the District Court appropriately observed that, at the time it issued the subpoena, DOJ justified its investigation solely on the basis that QueerDoc provides gender-affirming care without identifying any potential misconduct. This evidence shows a lack of predication, which, in the District Court's eye, was probative of improper purpose. *See United States v. Gertner*, 65 F.3d 963, 963 (1st Cir. 1995) (government's "bareboned" justification for issuing subpoena constituted evidence of improper purpose).

The government then invokes its power to "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not," Br. 19 (quoting *Morton Salt*, 338 U.S. at 642–43), to support its view that courts are limited to surface-level scrutiny of its motives. But *Morton Salt* and its progeny condemn rather than condone DOJ's claimed authority to issue subpoenas with only the slightest judicial oversight. In fact, *Morton Salt* expressly contemplates "judicial review" of administrative subpoenas to guard against "harsh and overzealous [Executive] action" and advises that an "investigation may be … so unrelated to the matter properly under inquiry as to exceed

24

the investigatory power." 338 U.S. at 640, 652. DOJ also ignores that *Powell* explicitly called for the inquiry that DOJ rejects. 379 U.S. at 58.

Indeed, courts are united in recognizing that, whatever "deference" an issuing agency may be owed, courts maintain an important, "independent role" in "subpoena enforcement proceedings." *CFPB v. Accrediting Council for Indep. Colleges & Schs.*, 854 F.3d 683, 689 (D.C. Cir. 2017). Courts have a "duty not to rubber-stamp" administrative subpoenas "but to adjudge their legitimacy." *Id.* And "while the court's role in subpoena enforcement" may be "narrow[,]" "*within its confines it is potent.*" *SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1024 n.39 (D.C. Cir. 1978) (emphasis added). Such review is all the more "potent" here where DOJ wields not a mere civil investigatory tool, but rather purports to pursue a criminal investigation. *Cf. Morton Salt*, 338 U.S. at 361–64 (considering agency authority to order reports to assess compliance with a decree).

## C. A HIPAA Subpoena May Not Be Used for a Fishing Expedition

Contrary to DOJ's assertion that the government need not justify its investigation for the court to enforce its subpoena, DOJ "must articulate a valid statutory basis in support of its investigatory

purposes." *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994). This is because "[t]he authority of an administrative agency to issue subpoenas for investigatory purposes is created solely by statute," *Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988), and thus the government may "exercise only that authority granted by Congress" in issuing an administrative subpoena, *LaSalle Nat. Bank*, 437 U.S. at 317 n.18; *see also Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 209 (1946) (emphasizing that administrative investigations must "be for a lawfully authorized purpose, within the power of Congress to command"). And no matter the statutory scheme, in no event may an administrative subpoena be so broad or burdensome as to run afoul of the Fourth Amendment. *See v. City of Seattle*, 387 U.S. 541, 545 (1967).

Although an investigatory agency need not spell out in painstaking detail the basis for its investigation before issuing a subpoena, the government does not have "unfettered authority to cast about for potential wrongdoing." *In re Sealed Case (Admin. Subpoena)*, 42 F.3d at 1418. When the government fails to offer a valid statutory justification, the court has nothing to rely on to ensure the subpoena is not "so unrelated to the matter properly under inquiry as to exceed the

26

investigatory power." *Morton Salt*, 338 U.S. at 652; *cf. In re Sealed Case (Admin. Subpoena)*, 42 F.3d at 1418 ("[T]he broad language used to describe this purpose makes it impossible to apply the other prongs of the *Morton Salt* test."). Under such circumstances, a subpoena is "too indefinite" and must not be enforced. *Peters*, 853 F.2d at 699.

Unlike, for example, civil administrative subpoenas used in furtherance of an agency's adjudicative proceedings, HIPAA confers narrower subpoena authority to DOJ. A HIPAA subpoena is not an all-purpose investigatory tool. Rather, a HIPAA subpoena can only be used to investigate "a Federal health care offense." 18 U.S.C. § 3486(a)(1)(A)(i)(I). And here, as DOJ has conceded, this investigatory power is further constrained by the delegation of authority to the Assistant Attorney General for the Civil Division to investigate only a specific kind of "Federal health care offense"—potential violations of the FDCA related to a "health care benefit program" (*i.e.*, public or private health insurers). *See Children's Hospital of Philadelphia*, 2025 WL 3252648, at *6 & n.56. So, far from holding DOJ to a heightened standard, the District Court, consistent with the authorizing statute, assessed whether the subpoena related to an investigation of a

27

healthcare offense. And, concluding that the evidence demonstrated no such connection existed, it properly reasoned that this fact weighed in favor of a finding of improper purpose. *See In re Sealed Case (Admin. Subpoena)*, 42 F.3d at 1419 ("In the absence of an investigatory purpose based on identifiable statutory authority, we decline to enforce this purpose.").

DOJ relies on *Reich v. Montana Sulphur & Chemical Company*, 32 F.3d 440 (9th Cir. 1994), to argue that the Ninth Circuit has authorized a subpoena-first, justify-second approach, but the opposite is true. In *Reich*, the court rejected a subpoena recipient's argument that the Occupational Safety and Health Administration issued a subpoena for an improper purpose where OSHA "declined to identify the regulations it was seeking to enforce." *Id.* at 449. The court reasoned that OSHA's failure to identify the specific regulatory basis for its investigation "creates no particular inference" of bad faith, because "OSHA is entitled to investigate to enforce the general duty clause, without prior knowledge that any specific regulations are being violated." *Id.* Under that "general duty" clause, which "applies when there are no specific standards," OSHA is authorized to investigate whether places of employment are free of

hazards. *Id.* at 445 (quoting *Donovan v. Royal Logging Co.*, 645 F.2d 822, 829 (9th Cir. 1981)).

In contrast, Congress chose *not* to include a general duty clause in 18 U.S.C. § 3486 and instead required subpoenas to be related to the investigation of "a Federal health care offense." *Cf. Reich*, 32 F.3d at 446 (distinguishing subpoenas issued by the Equal Employment Opportunity Commission because "[t]he EEOC's authorizing statute," unlike OSHA's, "specifically limits its subpoenas to the investigation of discrete charges"). Given this limitation, it was entirely reasonable for the District Court to conclude that DOJ's failure to demonstrate how its subpoena related to a healthcare offense provided evidence of improper purpose, particularly where, as the District Court noted, QueerDoc does not bill insurance.

In sum, the District Court accurately applied Supreme Court and Ninth Circuit precedent authorizing inquiry into a subpoena's purpose.

## II. The District Court Did Not Clearly Err When It Found that the Subpoena Was Issued for a Purpose Other Than the Investigation of a Federal Healthcare Offense

Because a court's review of DOJ's "purpose for conducting an investigation under *Powell* is a predominately factual question," a

29

reviewing court will not disturb a district court's finding of improper purpose unless it is clearly erroneous. *Ponsford*, 771 F.2d at 1308. The District Court's finding that the subpoena was issued "to pressure providers to cease offering gender-affirming care rather than to investigate specific unlawful conduct" is well grounded in the record. ER-19. In assessing the substantial evidence of bad faith QueerDoc adduced, the District Court did not err, much less clearly so.

## A. The District Court's Finding is Well Grounded

As the District Court appropriately observed, "[t]he timeline tells the story." ER-16. Immediately upon taking office, the President issued an executive order declaring that the provision of gender-affirming care "must end." January 28 E.O. § 1. To achieve this policy goal, the order directed DOJ to "prioritize investigations" into entities involved in the provision of gender-affirming care pursuant to the FDCA. *Id.* § 8(c). The White House made explicit that the "intended effect" of the actions directed by the January 28 E.O. was to "downsize or eliminate" all gender-affirming care. February 3 White House Statement.

In short order, Attorney General Bondi and Assistant Attorney General Brett Shumate issued memoranda directing DOJ employees to

prioritize the implementation of the January 28 E.O. and "hold accountable those who mutilate [children] under the guise of care." ER-50; *see Seattle Children's*, 2025 WL 3562151, at *11 ("Both the EO and the Bondi Memo strongly suggest that the purpose of investigating possible violations of the FDCA are to end gender-related treatment for minors."). DOJ followed through, issuing "more than 20 subpoenas to doctors and clinics," including QueerDoc, "involved in performing transgender medical procedures on children" to "h[o]ld accountable" healthcare providers "that mutilated children in the service of a warped ideology." Subpoena Press Release. The direct connection between the government's express policy aim and DOJ's actions taken in pursuit of that aim makes "quite plausible" a "conclusion that the [government's] interest lay only in" its publicly-stated goal. *Gertner*, 65 F.3d at 970.

The government's own statements about the subpoenas' purpose confirm that DOJ's purported investigation of FDCA violations is pretextual. Attorney General Bondi explicitly stated that "under [her] leadership, the Department of Justice will bring [gender-affirming care] to an end." ER-53. Within weeks of the subpoenas' issuance, the White House announced that the President had "delivered" on his promise to

31

"end" gender-affirming care, listing hospitals that had ceased providing these services. *See* July 25 White House Statement. As DOJ acknowledged, "the executive branch wants to reduce or eliminate gender-related care to minors, especially the medicalized gender-related care to minors that this investigation is about … . [T]hat's exactly what this investigation is about … ." *Boston Children's* Tr. 25.

The District Court found that "[n]o clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating." ER-17. Considered together, the government's statements confirm that the Subpoena was issued not to investigate potential misbranding offenses under the FDCA, but, as the District Court correctly found, to pressure the recipients into ending gender-affirming care. Other courts have agreed. *Seattle Children's*, 2025 WL 3562151, at *10–13; *Boston Children's*, 800 F. Supp. 3d at 237–39; *Colorado Children's*, 2026 WL 33398, at *11. Based on this evidence alone, the District Court's finding of improper purpose was entirely "plausible in light of the record viewed in its entirety." *United States v. Blackman*, 72 F.3d 1418, 1422 (9th Cir. 1995).

**B.** **Public Admissions Are the *Sine Qua Non* of Bad Faith**

Rather than meaningfully contest that these statements reveal the Subpoena's true purpose, DOJ claims that its public statements cannot serve as evidence of bad faith. Br. 27. To the contrary, where the government has a "self-proclaimed practice" at odds with an investigation's purported purpose, it evinces "pretext." *Gertner*, 65 F.3d at 969–70; *see id.* 969 (concluding that several "public statements," including a "News Release," "impl[ied]" that the agency's purported reason for issuing the subpoena was pretextual); *see also United States v. Church of Scientology of California*, 520 F.2d 818, 823 (9th Cir. 1975) (concluding that the subpoena target's allegations of improper purpose "have more substance than meets the eye" and noting as potentially problematic "evidence of White House use of IRS administrative actions against certain 'activist' organizations whose views were offensive to the White House").

DOJ's reliance on *Trump v. Hawaii*, 585 U.S. 667 (2018), is equally misplaced. *Hawaii* held that campaign statements "made before the President took the oath of office" were insufficient to invalidate the President's immigration proclamation on the theory that its true purpose

33

was to punish Muslim immigrants in violation of the Establishment Clause. *See id.* at 702. It does not come close to suggesting that government action cannot be set aside for a subjectively invalid purpose. Here, on the other hand, the *government* has repeatedly and explicitly stated that the true purpose of these subpoenas is to pressure providers of gender-affirming care to cease offering such care.[3]

This Court also should reject DOJ's argument that the District Court's reliance on public statements of DOJ's intent to end gender-affirming care as evidence of improper purpose "immunize[s] from investigation any industry or practice that an administration is opposed to as a policy matter." Br. 28. The FTC could, for instance, express concern about the dangers sports betting poses to society while initiating lawful investigations into an online betting platform it suspects of engaging in anticompetitive conduct in violation of the FTC Act. *See* 15 U.S.C. § 46. But the FTC could not announce that it would use the threat

---

[3] Additional distinctions abound. In *Hawaii*, the Court stressed that it was loathe to examine the subjective motivation of a "fundamental sovereign attribute"—immigration policy—"largely immune from judicial control." 585 U.S. at 702 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). Ensuring that a party does not abuse a court's process, however, is a core judicial function. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991); *Arthur Young & Co.*, 584 F.2d at 1024 ("The federal courts stand guard … against abuses of their subpoena-enforcement processes.").

of criminal prosecution to shut down the entire sports betting industry, and then issue subpoenas to every major company in the industry. The former is law enforcement. The latter is legislation by intimidation.

## C. There Is Ample Additional Evidence of Pretext and Improper Purpose in This Record and in the Public Record

The government's public statements are not the only evidence of improper purpose. The District Court also relied on the incongruence between DOJ's purported investigatory purpose and QueerDoc's "actual operations" as well as the subpoena's "breadth." ER-16–17. Despite DOJ's claims to the contrary, both pieces of evidence are probative of pretext. In *United States v. Henry*, for example, the Sixth Circuit concluded that the District Court's finding of pretextual purpose was "buttressed by" the fact that the government's subpoena sought "all records" pertaining to a period of time that "could not apply" to the government's purported investigatory purpose but which "could be useful" in pursuing the alleged improper purpose. 491 F.2d 702, 705 (6th Cir. 1974).

So too here. The Subpoena's sweep, as well as the disjuncture between the government's proffered purpose and QueerDoc's practice,

35

support a finding of improper purpose. The identities of every individual to whom QueerDoc provided gender-affirming care can tell DOJ little about the alleged misbranding of drugs. But the same information "could be useful" in chilling and ultimately halting QueerDoc's provision of gender-affirming care. *Id.*; *see also UPMC*, 2025 WL 3724705, at *2 ("[T]he government's demand for deeply private and personal patient information carries more than a whiff of ill-intent.").

Against the weight of specific evidence adduced by QueerDoc, DOJ offers a moving target of investigatory theories in search of one that could support FDCA liability. When prompted to identify the basis for its investigation shortly after the subpoena was issued, DOJ demurred, stating simply that the "extent" of its investigation was its understanding that QueerDoc provided gender-affirming care. SER-9; *Seattle Children's*, 2025 WL 3562151, at *2 (noting that DOJ attorneys stated "that the subpoena was not prompted by any specific allegations about Seattle Children's, nor were they aware of any allegation that Seattle Children's had made a false or misleading statement"). This initial threadbare offering alone suffices to confirm the pretextual purpose the District Court found. *See Gertner*, 65 F.3d at 968, 970 (concluding that

36

the government's single "self-serving declaration," which was "utterly devoid of specifics" and amounted to a "web of unsubstantiated conclusions," supported the District Court's finding of improper purpose).

DOJ's post hoc attempts to rationalize the Subpoena it originally declined to justify further support the District Court's finding of improper purpose. In its opposition to QueerDoc's motion to quash, DOJ conceded that the Bondi Memo "authorizes only" investigations of potential FDCA violations by drug manufacturers and distributers. SER-15. DOJ also declined to offer any specific basis for its investigation of QueerDoc beyond a recitation of the Bondi and Shumate Memos' directive to investigate "whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated" the FDCA. SER-12. Two months later, DOJ filed the now-stricken Gordus Declaration and for the first time attempted to articulate a specific theory of liability under the FDCA, including by arguing that the mere prescribing of a drug "for unapproved uses may involve violations of the FDCA." ER-65.[4]

---

[4] The District Court properly struck the Gordus Declaration and did not consider it in rendering its judgment. ER-18 n.2. DOJ nonetheless includes the declaration in its excerpts of record. ER-58. Given that documents "expressly not made part of the record before [the District Court] do not form part of the record on appeal," *Ewalan*

In this Court, DOJ's theory of FDCA liability evolves yet again. Although it now expressly concedes that the off-label prescribing of a drug does not violate the FDCA, Br. 31, it maintains that a statement on QueerDoc's website is "labeling" and, because DOJ disagrees that the statement is truthful, the statement can "misbrand a drug" in violation of the FDCA, Br. 6–7, 11, 13. Or, DOJ concedes, it might not even be investigating QueerDoc at all. Br. 32–33. As other courts have observed, the fact that DOJ "has shifted its explanations for the investigation … as [courts] across the Nation have identified problems with the Department's numerous subpoenas" reinforces the finding that the subpoenas were not issued for a proper purpose. *Children's Hospital of Philadelphia*, 2025 WL 3252648, at *15.

---

*v. Holbrook*, 2022 WL 2209621, at *1 (W.D. Wash. June 21, 2022), this Court should decline to consider the Gordus Declaration in rendering its decision, *see Kirshner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1077–78 (9th Cir. 1988) (portions of ER "not filed with the district court or admitted into evidence by that court" not "properly part of the record on appeal"). To the extent DOJ argues the District Court abused its discretion in striking the Gordus Declaration, this Court should affirm. The District Court's decision not to allow the late submission of evidence and legal arguments pursuant to Local Rule 7(m) is sound. *See McNae v. ARAG Ins. Co.*, 2025 WL 2579734, at *3, *7 (W.D. Wash. Sept. 4, 2025) (concluding that "information, authority, or arguments that could have been presented in the original filing" are inappropriate fodder for a Rule 7(m) praecipe and should be "stricken").

38

DOJ also maintains that it "could simply issue a new subpoena to QueerDoc … using new evidence showing the *bona fides* of the investigation and validity of the subpoena's purpose." Br. 40. This concession further confirms that, whatever evidence DOJ believes it could muster in support of a hypothetical future subpoena, it has not mustered any of that hypothetical "new evidence" to show the "validity of" *this* "subpoena's purpose." And whatever that "evidence" may or may not be, it cannot save a subpoena that lacked predication when issued.

To be sure, appellate authority affirming the grant of a motion to quash an administrative subpoena is rare, but it is far from non-existent. *See Gertner*, 65 F.3d at 973; *Henry*, 491 F.2d at 705; *Dep't of Fin. v. AT&T Inc.*, 253 A.3d 537, 551–52 (Del. 2021). In *Gertner*, for example, the First Circuit affirmed the District Court's conclusion that Internal Revenue Service subpoenas seeking client records from a law firm were based on an improper and pretextual purpose and therefore could not be enforced. 65 F.3d at 971. The First Circuit approved of the District Court's reliance on evidence of bad faith similar to that the District Court considered here, namely, affidavits incorporating, among other things, "correspondence between the firm and the IRS" and "several public statements" belying

39

the IRS's claim that the subpoena was issued for its purported legitimate purpose. *Id.* at 969.

The cases DOJ relies on to argue that this Court routinely rejects claims of improper purpose bear little resemblance to the facts of this case. For example, in *Crystal*, the recipient argued that the subpoena was improper under a novel theory of "agency abuse" rather than the *Powell* standard relied on by the District Court here. *See* 172 F.3d at 1145 ("The Crystals acknowledge that the summonses here were not issued for one of the improper purposes identified in *Powell* or *LaSalle* … ."). In contrast to the substantial evidence of improper purpose in the record here, the taxpayers' evidence in *Crystal* amounted to a single "honest but mistaken" representation by a single Internal Revenue Service employee. *Id.* at 1147–48; *cf. United States v. Markwood*, 48 F.3d 969, 984–85 (6th Cir. 1995) (rejecting argument of improper purpose where the subpoena recipient alleged only that the individual agent had an improper motive that was not "institutionalized" by DOJ (citing *LaSalle Nat'l Bank*, 437 U.S. at 316–17)). Given this scant evidence, the District Court in *Crystal* found that the government's actions did not amount to bad faith. *See* 172 F.3d at 1145. By contrast,

40

recognizing as a whole the overwhelming evidence of DOJ's abuse of process, the District Court properly reached the opposite finding here.

Nor does *Chavez-Deremer v. Amazon.com Services, LLC*, 2025 WL 2417398 (9th Cir. Aug. 21, 2025), provide the shelter DOJ seeks. There, Amazon, the subpoena recipient, argued that the agency could only obtain the information it sought through an enforcement proceeding rather than its subpoena power. *Id.* at *2. QueerDoc makes no similar argument, but rather acknowledges that where DOJ satisfies the *Powell* elements and investigates in good faith for a proper purpose, it may exercise its subpoena power. And, as in *Crystal*, the single piece of evidence of bad faith Amazon mustered—the fact that the agency refused to accept its compromise offer to voluntarily supply some of the subpoenaed documents—pales in comparison to the significant evidence of improper purpose the District Court relied on here. *Id.*; *cf. United States v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 819 (8th Cir. 2012) (affirming district court's finding of proper purpose where there was "no credible evidence on the record" that the subpoenas were motivated by an improper purpose).

*     *     *

41

In light of the extensive evidence of the government's pretext for issuing the subpoena—and consistent with every other district court to review the July 2025 subpoenas—the District Court correctly found that DOJ issued the Subpoena for an improper purpose. The sole legitimate purpose of a HIPAA subpoena is to "investigat[e] … federal healthcare offense[s]." *In re Subpoena Duces Tecum*, 228 F.3d 341, 350 (4th Cir. 2000). A subpoena issued for a purpose other than that which Congress has authorized is improper. *See United States v. Samuels, Kramer and Co.*, 712 F.2d 1342, 1347–48 (9th Cir. 1983) (subpoena issued in part to "close [movant's business] down" should be quashed for improper purpose). Here, the District Court found on an ample record that DOJ issued this subpoena to end medical care that is lawful under the laws of numerous states. Decades of precedent holds that such a purpose is improper. And given the substantial record evidence offered by QueerDoc, the District Court's finding of improper purpose was not clearly erroneous.

## III. The Purpose Articulated by DOJ is Neither Within Its Authority Under HIPAA Nor Otherwise Legitimate

The authority to issue a subpoena "is created solely by [the] statute" authorizing that particular form of subpoena. *Peters*, 853 F.2d at 696.

As a result, the terms of the relevant statute impose specific limitations on the corresponding subpoena authority. *CFPB v. Accrediting Counc. for Indep. Colls. & Schs.*, 854 F.3d 683, 690 (D.C. Cir. 2017). By issuing a HIPAA subpoena on the basis of a statutorily invalid theory, DOJ has not demonstrated "the investigation will be conducted pursuant to a legitimate purpose." *Jose*, 131 F.3d at 1328 (quoting *Powell*, 379 U.S. 57). That shortcoming provides an alternative basis for affirmance.

## A. The Conduct Alleged by DOJ Does Not Violate the FDCA

As noted above, this Subpoena could only have been issued in furtherance of an investigation into "a Federal health care offense"— here, potential violations of the FDCA. *Supra* at 8–9. In an attempt to tie QueerDoc to such an investigation, DOJ maintains that a statement on QueerDoc's website regarding a certain class of drugs could violate the FDCA. It does not.

The FDCA enumerates certain "prohibited acts" including, as a general matter, the "misbranding" of a drug. 21 U.S.C. § 331(a), (b), (c), (k). Violating this prohibition "with the intent to defraud or mislead" is a felony; a violation absent such intent is a misdemeanor. *Id.* § 333(a)(1)-(2). Section 331(k) prohibits "the doing of any … act with respect to [a]

43

drug ... if such act is done while such article is held for sale ... after shipment in interstate commerce and results in such article being adulterated or misbranded." *Id.* § 331(k); *United States v. Sullivan*, 332 U.S. 689, 695 (1948). "The phrase 'held for sale' applies to physicians 'engaged in the business of providing medical services in exchange for payment.'" *United States v. Calif. Stem Cell Treatment Ctr., Inc.*, 117 F.4th 1213, 1218 n.1 (9th Cir. 2024) (quoting *United States v. Kaplan*, 836 F.3d 1199, 1210 (9th Cir. 2016)). A drug can be "misbranded" if it "bears false or misleading labeling." *Id.* at 1218 (citing 21 U.S.C. § 352).

For a litany of reasons, QueerDoc's characterization on its website of puberty-delaying medications as "reversible" is not actionable under the FDCA.

*First*, a statement on a provider's website is not "labeling" because it does not "accompany[]" the drug. *See* 21 U.S.C. § 321(m); *United States v. 24 Bottles "Sterling Vinegar & Honey Aged in Wood Cider Blended With Finest Honey Contents 1 Pint Prod. of Sterling Cider Co., Sterling, Mass."*, 338 F.2d 157, 158 (2d Cir. 1964) ("[L]abeling does not include every writing which bears some relation to the product."). To "accompany" a

44

drug, statements must be "distributed to consumers as part of an integrated distribution program." *Alberty Food Prods. Co. v. United States*, 185 F.2d 321, 325 (9th Cir. 1950) (finding newspaper advertisements did not "accompan[y]" a drug into interstate commerce and were not part of "an integrated distribution program").

By providing information regarding the off-label use of a commonly prescribed drug to patients and potential patients, QueerDoc has not "distributed" information "as part of an integrated distribution program." Unlike the literature in *Kordel v. United States*, the puberty-delaying medications QueerDoc prescribes and QueerDoc's statements do not share "a common origin," 335 U.S. 345, 348 (1948), and the statements were used to inform patients and prospective patients of potential treatment options rather than "for use in the distribution and sale of the drug," *id.* at 350. They are thus not so "integrated" as to be "interdependent." *Id.*

*Second*, the FDCA does not prohibit providers from accurately describing a clinically appropriate off-label use. Truthful, non-misleading communication about such use does not constitute "misbranding" under the statute. Although there is some precedent for

45

charging physicians with the *adulteration* of drugs in their possession in violation of 21 U.S.C. § 331(k), *see, e.g.*, *Kaplan*, 836 F.3d 1199, DOJ cites no case in which a physician was held liable for *misbranding* a drug by engaging in false or misleading labeling under the statute. This makes perfect sense, given that the "central premise" of the "FDCA and FDA regulations" is that the "manufacturer bears responsibility for the content of its label at all times." *Wyeth v. Levine*, 555 U.S. 555, 570–71 (2009).

Thus, although "the Act regulates a manufacturer's distribution of drugs, it does not go further by regulating a doctor's practice of medicine." *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 534 (6th Cir. 2021); *see also, e.g.*, *United States v. Evers*, 643 F.2d 1043, 1053 n.16 (5th Cir. 1981) ("[T]he [FDCA] was intended to regulate the distribution of drugs in interstate commerce, not to restrain physicians from public advocacy of medical opinions not shared by the FDA."). Indeed, in every case DOJ cites, defendants are manufacturers or distributors of drugs, not physicians explaining the use of the drugs to their patients. *E.g.*, *Kordel*, 335 U.S. at 346 (supplier of drugs and descriptive literature constituting misbranding properly charged under

46

FDCA). Indeed, DOJ has long taken the position that "the FDCA permits physicians … to speak about off-label use without consequence." *United States v. Caronia*, 703 F.3d 149, 165 (2d Cir. 2012).

DOJ's longstanding recognition that the FDCA does not regulate a *physician's* speech about off-label use is correct, because the FDCA does not regulate statements related to the practice of medicine in the first place. Since its inception nearly a century ago, it has been understood that the FDCA does not regulate "the practice of medicine" so as not "to interfere with physicians' treatment of their patients." *Chaney v. Heckler*, 718 F.2d 1174, 1180–81 & n.13 (D.C. Cir. 1983) (cleaned up) (discussing legislative history), *rev'd in irrelevant part*, 470 U.S. 821 (1985); *see also Evers*, 643 F.2d at 1044; *United States v. Algon Chem. Inc.*, 879 F.2d 1154, 1162 (3d Cir. 1989) (recognizing that FDCA does not regulate practice related to "extra-label use of a lawfully acquired drug").

This Court's decision in *California Stem Cell* is not to the contrary. There, this Court concluded that the FDCA reached a novel stem cell mixture that had received no FDA approval. 117 F.4th at 1219. In reaching that conclusion, the Court distinguished the "manufactur[ing]" of drugs from the general practice of medicine. *See id.* at 1217–18. As a

47

result, the doctors *could* be liable under the FDCA *only* because they manufactured and distributed to their patients their new, unapproved, homebrewed drug. *See id.* at 1218. Here, however, QueerDoc does not "manufacture" drugs, and the only speech upon which DOJ relies involves the clinical application of an approved drug for an off-label use.

Indeed, recent estimates suggest that between 20 and 50 percent of all prescriptions are for off-label indications, a number that is as high as 75 percent in oncology settings. James M. Beck, *Off-Label Use in the Twenty-First Century: Most Myths and Misconceptions Mitigated*, 54 UIC J. Marshall L. Rev. 1, 25–26 & n.112, n.113 (2021). Under DOJ's theory that providing information about the off-label use of a drug can constitute misbranding, a physician treating cancer patients would be barred from sharing information with their patients regarding the use of the vast majority of drugs they prescribe. This cannot be the result Congress intended.

*Third*, QueerDoc's statement regarding puberty-delaying medications is, at most, a statement of opinion with which the Administration now disagrees; it is not "false or misleading." The great weight of scientific and medical authority supports the proposition that

48

the effects of puberty-delaying medications are generally reversible, and when a patient discontinues their use, the patient typically resumes endogenous puberty. *See, e.g.*, Simona Martin et al., *Criminalization of Gender-Affirming Care—Interfering with Essential Treatment for Transgender Children and Adolescents*, 385 N. Eng. J. Med. 579, 580 (2021); *United States v. Skrmetti*, 605 U.S. 495, 582 (2025) (Sotomayor, J., dissenting) ("[T]he American Academy of Pediatrics, American Medical Association, American Psychiatric Association, American Psychological Association, and American Academy of Child Adolescent Psychiatry all agree that hormones and puberty blockers are 'appropriate and medically necessary' to treat gender dysphoria when clinically indicated." (citation omitted)). And puberty-delaying medications have been used by pediatric endocrinologists for more than forty years for the treatment of precocious puberty. F. Comite et al*., Short-Term Treatment of Idiopathic Precocious Puberty with a Long-Acting Analogue of Luteinizing Hormone-Releasing Hormone*, 305 N. Eng. J. Med. 1536, 1550 (1981).[5]

---

[5] DOJ also briefly argues that it suspects QueerDoc of miscoding diagnoses, "which can prove fraudulent intent." Br. 38. Although demonstration of intent is required to substantiate a felony violation of the FDCA, 21 U.S.C. § 333(a)(2), intent does not obviate the requirement that there be an underlying FDCA violation. Here, as

*Fourth*, to the extent DOJ argues that the FDCA could reach a doctor's speech regarding off-label use in the practice of medicine, that reading of the statute raises serious First Amendment concerns and should be avoided. *See Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018) (describing constitutional avoidance canon). The First Amendment protects truthful, non-misleading speech regarding off-label uses even by drug manufacturers. *See Caronia*, 703 F.3d at 168 ("We construe the misbranding provisions of the FDCA as not prohibiting and criminalizing the truthful off-label promotion of FDA-approved prescription drugs."). And QueerDoc is not a drug manufacturer proposing a commercial transaction; it is a healthcare provider offering medical advice, so any restrictions on its speech trigger the highest scrutiny. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767 (2018). By seeking to criminalize the provision of information to current and potential patients regarding a lawfully obtained drug used for an off-label purpose, DOJ runs headlong into core First Amendment protections.

---

demonstrated, there can be no underlying FDCA violation. Nor, as DOJ appears to concede, can miscoding alone constitute a violation of the FDCA. *See* 21 U.S.C. § 331.

Indeed, this Court has squarely held that a physician's "recommendation" of a drug, even when considered unsafe by the federal government, is protected by the First Amendment. *Conant v. Walters*, 309 F.3d 629, 632 (9th Cir. 2002), *cert. denied,* 540 U.S. 946 (2003). In so holding, the Court reiterated "the core First Amendment values of the doctor-patient relationship." *Id.* at 637. Those values extend to a medical provider's characterization of a lawful drug used for off-label purposes in that provider's medical practice.

*Finally*, DOJ's novel reading also risks interfering with the States' sovereign authority to "protect the health and safety of their citizens" as they see fit. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). Federalism principles dictate that "regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985); *see Skrmetti*, 605 U.S. at 524 (recognizing the core State authority to "pass legislation in areas where there is medical and scientific uncertainty"). And where Congress intends to interfere with this balance of federalism, it must do so clearly. *See Gonzales v. Oregon*, 546 U.S. 243, 273–75 (2006) (insufficient statutory indication that Attorney General

51

could revoke physicians' licenses under federal Controlled Substances Act for prescribing drugs in compliance with Oregon's Death With Dignity Act). The State of Washington expressly protects the provision of gender-affirming care. Wash. Rev. Code §§ 7.115.010(3), (4), 7.115.020(1). Regardless of the government's views on gender-affirming care, it may not, through a nationwide subpoena campaign premised on a misreading of the FDCA, intrude on Washington's protection of such care. At the very least, this Court should reject a view of the FDCA that criminalizes a doctor's well-founded characterization of a lawful drug in order to avoid such an intolerable encroachment on State sovereign authority.[6]

## B. The Investigation Is Otherwise So Vaguely Defined and Substantively Capacious As to Render the Subpoena Unenforceable

Finally, DOJ suggests that it could have issued the subpoena to QueerDoc in connection with the investigation of unnamed and unidentified "insurance" and "drug companies," because QueerDoc may have "information that is relevant to" the investigation of such

---

[6] DOJ notes that QueerDoc's CEO, Dr. Crystal Beal, with respect to death threats that providers of gender-affirming care have received, stated that they consider their "practice a form of civil disobedience." Br. 14. That statement, even if accurate, does nothing to suggest QueerDoc may be violating the FDCA.

companies. Br. 32–33. This Court has soundly rejected this precise use of sweeping third-party administrative subpoenas to investigate unidentified entities.

In *Peters v. United States*, the Immigration and Naturalization Service issued a subpoena to Dianna Peters, the manager of a farm labor camp, in connection with "a general criminal investigation of a group of unnamed tenants at the camp who may be undocumented aliens." 853 F.2d at 693. When Peters did not comply with the subpoena, INS initiated an enforcement proceeding in district court, and Peters responded with a motion to quash. *Id.* at 694. Although the District Court was "troubled that the INS could issue a subpoena seeking information about a group of unknown individuals without a showing that it was not conducting a mere fishing expedition," it "ordered enforcement of the subpoena." *Id.* at 694–95. "[R]el[ying] heavily on the Internal Revenue Service's" statutory authority to issue subpoenas to unnamed third parties, the District Court reasoned that the INS could wield the same authority. *Id.* at 694.

The Ninth Circuit reversed and "quash[ed] the subpoena," concluding that the District Court erred when it "transplanted IRS [John

53

Doe] summons law onto INS subpoena law." *Id.* at 699. Whereas Congress, in 26 U.S.C. § 7609(f), provided "specific legislative direction" to the IRS enabling it to issue third-party subpoenas in accordance with "unique procedural safeguards to protect the unknown parties," 8 U.S.C. § 1225(a), the statute authorizing the INS to issue subpoenas, did not include a similar grant of authority. *Id.* at 698–99. "Despite the INS's concededly broad subpoena and investigatory authority," the Court explained that it would not "assume the existence of the power to issue third-party subpoenas directed at unidentified targets where Congress has not provided for them specifically, nor provided procedural safeguards." *Id.* at 696.

As did the INS in *Peters*, DOJ claims the unbridled authority to issue a third-party subpoena to QueerDoc in connection with the ill-defined investigation of "unidentified targets." *Id.* Although 18 U.S.C. § 3486, like § 2225(a), grants DOJ "wide subpoena authority, it is not without limits." *Id.* at 695. And, as with § 1225(a), § 3486 contains no grant of authority to issue third-party subpoenas similar to the authority the IRS wields pursuant to § 7609(f). Accordingly, consistent with *Peters*, this Court should reject DOJ's attempt to "impute IRS John Doe

summons law onto [§ 3486] subpoena law without specific authorizing legislation," and conclude that a HIPAA subpoena issued for this purpose exceeds the statutory authority granted in § 3486. *Id.*

Furthermore, regardless whether § 3486 authorizes the issuance of sweeping third-party subpoenas, a subpoena issued pursuant to the investigation of unnamed and unidentified third parties is "too indefinite" to be enforced. *Id.* at 699. Given that the subpoena in *Peters* demanded information "in connection with a general investigation of unnamed individuals," the court concluded the INS "failed to demonstrate" the subpoena was "no broader than necessary to achieve its purpose." *Id.* at 699–700. The same principle applies here. DOJ's issuance of a sweeping subpoena in connection with a purported investigation of unidentified entities is overly broad and indefinite "so as to be in the nature of a 'fishing expedition,'" and must therefore be quashed on this ground as well. *Id.* at 700.

\* \* \*

Simply put, even DOJ's belatedly proffered justifications for the subpoena are improper. The conduct identified by DOJ does not violate the FDCA, nor could it. And a vague reference to unnamed third parties

55

is insufficiently definite to sustain a sweeping administrative subpoena. Because Congress has not granted authority for DOJ's purported investigation, this Court should also affirm for lack of a legitimate purpose.

## IV. Even if the Subpoena Was Issued for a Proper Purpose, It Seeks Irrelevant Information and Is Overly Broad and Unduly Burdensome

Although the District Court did not reach overbreadth and burden, the Subpoena is also invalid because it seeks irrelevant information and is overly broad. To establish the relevance of the material sought, DOJ must demonstrate "a realistic expectation rather than an idle hope that something may be discovered." *Goldman*, 637 F.2d at 667. At this prong, the government's burden, "while not great, is also not non-existent." *Id.* In addition, a subpoena is not enforceable if "the party being investigated proves the inquiry is unreasonable because it is overbroad or unduly burdensome." *EEOC v. Children's Hosp. Med. Cntr. of N. Cal.*, 719 F. 2d 1426, 1428 (9th Cir. 1983).

DOJ's subpoena seeks practically all of QueerDoc's records. Request No. 4, for instance, seeks "[a]ll documents reflecting communications" regarding "cod[ing] or bill[ing] for treatment of gender

dysphoria by using alternative diagnoses or alternative ICD codes." ER-28. Because "alternative" means *any* code, and the only service QueerDoc provides is "treatment for gender dysphoria" (*i.e.*, gender-affirming care), DOJ seeks *all* of QueerDoc's records regarding billing or coding. At its threshold, there is no practical difference between the contents of this Subpoena and DOJ demanding entry to all paper files in a medical provider's records room.

Nor are such documents relevant to an FDCA investigation. Again, the FDCA regulates "adulteration" or "misbranding," not billing or coding. 21 U.S.C. §§ 331(a)-(c); *see also, e.g.*, *United States v. Watkins*, 278 F.3d 961, 964 (9th Cir. 2002). As such, Requests 2, 3, 4, 5, and 6 are overbroad, as they do not bear on compliance with the statutory theory on which DOJ proceeds. *See, e.g.*, *Exxon Mobil Corp.*, 943 F.3d at 1287. Nor does DOJ attempt to link these requests to the FDCA. Rather, DOJ maintains that the Subpoena *generally* seeks documents uncovering "whether QueerDoc or other actors intentionally used incorrect diagnosis codes" or "deceived patients and their parents about the risks of gender-related treatments." Br. at 21–22. None of these allegations has anything to do with the FDCA.

57

Even those Requests that do bear on actual characterization of drugs used off-label—to the extent such conduct could even be actionable under the FDCA—are significantly overbroad and infringe mightily on patient privacy interests. For example, Requests 11 and 12 seek patient data for every patient prescribed puberty-delaying medications or hormone therapy, including "name, date of birth, social security number, address, and parent/guardian information." ER-28. That the Subpoena seeks information on adult patients, even though DOJ has steadfastly maintained it is investigating only the provision of gender-affirming care to minors, provides further evidence of the Subpoena's overbreadth and the "mismatch between DOJ's stated investigation and QueerDoc's actual operations," demonstrating "the subpoena's pretextual nature." ER-17. Request 13 similarly seeks a broad array of information relating to minor patients identified in Requests 11 and 12. As another court explained, "[t]hese materials reflect individualized clinical care and deeply personal medical disclosures." *Children's Hospital of Philadelphia*, 2025 WL 3252648, at *13. But they do not disclose how a drug was "labeled" or "branded" before being distributed or dispensed. Nor are such broad requests remotely similar to the more targeted

58

investigatory requests this Court has previously had occasion to examine. *See, e.g.*, *Reich*, 32 F.3d at 447 (declining to quash subpoena "[s]eek[ing] *only* documents relevant to [company's] welding practices and the danger of toxic gas leaks[,]" subject of OSHA investigation (emphasis added)).

DOJ's insistence that it is entitled to all of QueerDoc's patient files so that it may find "investigative leads," Br. at 38, is chilling. DOJ has taken the same position in each of the five cases, and each court found that position untenable. And for good reason: If a HIPAA subpoena may be used to investigate information provided about a drug during the provision of medical care, and that subpoena may be served because DOJ wants to assure itself that no criminality is afoot, then DOJ has articulated a virtually untrammeled right to collect *all* patient files of *all* Americans at will. The consequences are endless. Under DOJ's theory, an investigation targeting *in vitro* fertilization would entitle DOJ to all records of all patients who underwent IVF. And an investigation targeting COVID-19 vaccines would entitle DOJ to all records of all patients who were ever vaccinated against COVID-19. Congress did not license the use of administrative subpoenas for any such "fishing expedition." *Peters*, 853 F.2d at 700.

59

Lastly, the breadth of the requests also render the Subpoena unduly burdensome. DOJ does not contest that the Subpoena requests files for upwards of 2,500 patients, as QueerDoc maintained in its briefing before the District Court. This Court has recognized the significant privacy interests at stake in the production and disclosure of sensitive medical records. *See, e.g.*, *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004) (reproductive-health records). As every court to consider the question has acknowledged, requests for such records are "astonishingly broad." *Colorado Children's*, 2026 WL 3398, at *4 (quoting *Boston Children's*, 2025 WL 2607784, at *6). In light of the costs to both patients and QueerDoc itself, the Subpoena is decidedly overbroad as well.

## CONCLUSION

The Court should affirm the District Court's judgment quashing the Subpoena.

January 16, 2026

Respectfully submitted,

s/ *Paula Ramer*

Harry H. Schneider, Jr.
David B. Robbins
PERKINS COIE LLP
1301 Second Avenue, Suite 4200
Seattle, Washington, 98101
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
hschneider@perkinscoie.com
drobbins@perkinscoie.com

Adrien Leavitt, WSBA No. 44451
La Rond Baker, WSBA No. 43610
AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
PO Box 2728
Seattle, WA 98111
Phone: (206) 624-2184
aleavitt@aclu-wa.org
baker@aclu-wa.org

Paula Ramer
Marcus A. Asner
ARNOLD & PORTER KAYE
SCHOLER LLP
250 West 55th Street
New York, New York
Telephone: (212) 836-8000
Facsimile: (212) 836-8689
paula.ramer@arnoldporter.com
marcus.asner@arnoldporter.com

Benjamin C. Mizer
Samuel D. Kleinman
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
ben.mizer@arnoldporter.com
sam.kleinman@arnoldporter.com

Jaclyn Machometa
ARNOLD & PORTER KAYE
SCHOLER LLP
500 Boylston Street 20th Floor
Boston, MA 02116
Telephone: (617) 351-8050
Facsimile: (617) 226-9199
jaclyn.machometa@arnoldporter.com

Taylor B. Graham
ARNOLD & PORTER KAYE
SCHOLER LLP
1144 Fifteenth Street Suite 3100
Denver, CO 80202
Telephone: (303) 863-1000
Facsimile: (303) 863-2301
taylor.graham@arnoldporter.com

*Counsel for Movant-Appellee QueerDoc, PLLC*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, there are no known cases related to this appeal pending in the United States Court of Appeals for the Ninth Circuit.

s/ *Paula Ramer*
Paula Ramer

## CERTIFICATE OF SERVICE

The undersigned counsel for Appellee certifies that a true and correct copy of the foregoing brief was filed electronically on January 16, 2026, and will, therefore, be served electronically upon all counsel.

s/ *Paula Ramer*

Paula Ramer

## CERTIFICATE OF COMPLIANCE

The undersigned counsel for Appellee certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 11,823 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief further complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this brief has been prepared using Microsoft Office Word and is set in Century Schoolbook font, in a size equivalent to 14 points or larger.

s/ *Paula Ramer*

Paula Ramer