**Docket No. 25-7384**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

QUEERDOC, PLLC,

*Movant-Appellee,*

v.

UNITED STATES DEPARTMENT OF JUSTICE,

*Respondent-Appellant.*

_____

*Appeal from a Decision of the United States District Court for the Western District of Washington,*
*No. 2:25-mc-00042-JNW · Honorable Jamal N. Whitehead*

## *AMICUS CURIAE* BRIEF OF FORMER
## U.S. DEPARTMENT OF JUSTICE ATTORNEYS
## IN SUPPORT OF APPELLEE FOR AFFIRMANCE

MIRIAM ROSENBAUM, ESQ.
WENDY R. WEISER, ESQ.
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, New York 10271
Telephone (646) 292-8310
rosenbaumm@brennan.law.nyu.edu
weiserw@brennan.law.nyu.edu

JOSEPH GAETA, ESQ.
410 Cole Avenue
Providence, Rhode Island 02906
Telephone (646) 292-8310
gaetaj@brennan.law.nyu.edu

GREGORY L. DISKANT, ESQ.
JONAH M. KNOBLER, ESQ.
CAITLIN ROSS, ESQ.
BHARATH PALLE, ESQ.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone (212) 336-2000
gldiskant@pbwt.com
jknobler@pbwt.com
kross@pbwt.com
bpalle@pbwt.com

*Attorneys for Amicus Curiae Former U.S. Department of Justice Attorneys*

 

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* certify that none of *amici* has any parent corporations and that no publicly held company owns 10% or greater ownership in any of *amici*.

Date: January 23, 2026

*/s/Gregory L. Diskant*
GREGORY L. DISKANT

Attorney for *Amici Curiae*

**TABLE OF CONTENTS**

**Page**

INTEREST OF *AMICI CURIAE*..................................................................1

INTRODUCTION.......................................................................................2

BACKGROUND .........................................................................................5

ARGUMENT .............................................................................................9

I.   DOJ'S IMMENSE POWER MUST BE PROPERLY USED
     TO ENFORCE FEDERAL LAW.................................................................9

II.  DEVIATIONS FROM NORMS AND PROCEDURES IN
     THIS CASE CREATE AN INFERENCE THAT DOJ IS
     USING ITS AUTHORITY IMPROPERLY. ...................................................16

     A.   It is a well-established legal concept that deviations
          from normal procedures create an inference of
          improper purpose. ...............................................................16

     B.   From the outset, the President and his appointees have
          made clear that this investigation is about stopping
          lawful conduct, rather than enforcing federal law...............19

     C.   This investigation has not been conducted in a manner
          suggesting its true purpose is enforcing federal law............21

          1.   The Subpoenas' timing, thin legal justification,
               and overbreadth suggest a rush to persecute,
               rather than methodically prosecute. ...........................21

          2.   DOJ's approach to publicizing the investigation
               and Subpoenas violated longstanding norms and
               policies. .....................................................................25

i

III. THE INSTITUTIONAL SAFEGUARDS THAT ONCE WOULD HAVE POLICED THE IMPROPER USE OF DOJ AUTHORITY EVIDENT IN THIS CASE HAVE BEEN CHILLED OR ERODED. ............................................................... 30

CONCLUSION ................................................................................. 36

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
155 F.4th 1082 (9th Cir. 2025) ......................................................... 20

*Ass'n of Am. Physicians & Surgeons v. FDA,*
13 F.4th 531 (6th Cir. 2021) ............................................................ 23

*Blackledge v. Perry,*
417 U.S. 21 (1974) ............................................................................ 4

*Buckman Co. v. Plaintiffs' Legal Comm.,*
531 U.S. 341 (2001) .................................................................. 21, 23

*Cruz v. Bondi,*
146 F.4th 730 (9th Cir. 2025) .......................................................... 17

*Dep't of Com. v. New York,*
588 U.S. 752 (2019) ......................................................................... 18

*Doe v. Horne,*
115 F.4th 1083, 1103 (9th Cir. 2024) ............................................... 19

*Earl v. Nielsen Media Research, Inc.,*
658 F.3d 1108 (9th Cir. 2011) ......................................................... 19

*Gonzales v. Oregon,*
546 U.S. 243 (2006) ......................................................................... 20

*United States ex rel. Lujan v. Hughes Aircraft Co.,*
67 F.3d 242 (9th Cir. 1995), and FCA ............................................. 29

*Peters v. Shamrock Foods Co.,*
262 F. App'x 30 (9th Cir. 2007) ...................................................... 19

*Peters v. United States,*
853 F.2d 692 (9th Cir. 1988) ........................................................... 13

iii

*Porter v. California Dep't of Corr.*,
  419 F.3d 885 (9th Cir. 2005) ........................................................ 18, 19

*R.H. Stearns Co. of Bos., Mass., v. United States*,
  291 U.S. 54 (1934) .......................................................................... 18

*Richards v. City of Seattle*,
  32 F. App'x 452 (9th Cir. 2002) ...................................................... 19

*Schering Plough Corp. Intron/Temodar Consumer Class Action*,
  678 F.3d 235 (3d Cir. 2012) ............................................................ 20

*In re Admin. Subpoena No. 25-1431-019*,
  800 F. Supp. 3d 229 (D. Mass. 2025) ......................................... 25, 31

*In re DOJ Admin. Subpoena No. 25-1431-030*,
  2026 WL 33398 (D. Colo. Jan. 5, 2026) ........................................... 25

*In re Subpoena Duces Tecum No. 25-1431-016*,
  2025 WL 3562151 (W.D. Wash. Sept. 3, 2025) ................................. 31

*In re Subpoena No. 25-1431-014*,
  2025 WL 3252648 (E.D. Pa. Nov. 21, 2025) ...................... 9, 23, 25, 31

*In re 2025 UPMC Subpoena*,
  2025 WL 3724705 (W.D. Pa. Dec. 24, 2025) .................................... 31

*United States v. Anderson*,
  101 F.4th 586 (9th Cir. 2024) ......................................................... 19

*United States v. Colorado Supreme Court*,
  189 F.3d. 1281 (10th Cir. 1999) ...................................................... 13

*United States v. Skrmetti*,
  145 S. Ct. 1816 (2025) .................................................................. 6, 21

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) .................................................................. 18, 19

*Wayte v. United States*,
  470 U.S. 598 (1985) .......................................................................... 4

iv

**Statutes**

5 U.S.C. § 1211(b) ................................................................... 36

5 U.S.C. § 2301 ........................................................................ 35

21 U.S.C. § 331 ........................................................................ 23

31 U.S.C. § 3730(a) ................................................................. 30

31 U.S.C. § 3730(b) ................................................................. 29

False Claims Act ................................................................... 8, 29

Food, Drug, and Cosmetic Act ..................................... *passim*

Health Insurance Portability and Accountability Act ........................... 30

Wash. Rev. Code §§ 7.115.010(3), 7.1115.020(1) ..................... 6

**Other Authorities**

5 C.F.R. § 213.3102(d) ............................................................ 35

66 Fed. Reg. 37903 (July 20, 2001) ...................................... 33

74 Fed. Reg. 60123 (Nov. 17, 2019) ..................................... 14

86 Fed. Reg. 6803 (Jan. 18, 2021) ........................................ 14

90 Fed. Reg. 8615 (Jan. 20, 2025) .......................................... 7

90 Fed. Reg. 8771 (Jan. 28, 2025) .......................................... 7

AAP News, *AAP reaffirms gender-affirming care policy,*
*authorizes systematic review of evidence to guide update,*
(August 4, 2023) ....................................................................... 6

ABA Model Rule 3.1 ............................................................... 12

ABA Model Rule 3.8(a) ........................................................... 12

ABA Model Rule 8.4(d) ........................................................... 12

ABA Model Rule 4.4(a) ....................................................................... 12

ABC News, *DOJ inspector general will investigate 2018 seizure of House Democrats' data* (June 11, 2021) ............................. 33

Nick Bednar, *Merit System Protection Board's Independence Is Dead,* Lawfare (Jan. 20, 2026) ........................................................ 36

Bloomberg Law, *Justice Department Expands Gender Care Probe as Hospital Fights* (Aug. 20, 2025) .......................................... 23

Brennan Center, *The Department of Justice's Broken Accountability System* (Oct. 20, 2025) ................................................. 33

CNN, *'Fast and Furious' report slaps 14 at Justice, ATF* (September 19, 2012) ......................................................................... 33

CNN, *Federal workers turn to little–known 'merit board' as they try to avoid Trump's mass layoffs* (Feb. 28, 2025) ..................... 35

DOJ, Justice Manual § 1-4.010 ...................................................... 12, 13

DOJ, Justice Manual § 1-7.210 ........................................................... 12

DOJ, Justice Manual § 1-8.600 ........................................................... 16

DOJ, Justice Manual § 9-27.230 ......................................................... 15

DOJ Office of the Inspector General, *An Investigation of Alleged Misconduct by Senior DOJ Officials for Leaking Department Investigative Activities Concerning COVID-19 in Nursing Homes to Members of the News Media in October 2020* ............................................................................... 29

DOJ Office of Public Affairs, *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025) ..................................................................................... 9, 27

DOJ Office of Professional Responsibility, OPR's Role and Relationship to Other Offices and Congress (September 19, 2025) ................................................................................... 32

Federal News Network, *Trump's 'direct assault' on MSPB 'alarming' to former board member Limon* (Mar. 13, 2025) .............. 35

Federal News Network, *White House fires head of Merit Systems Protection Board*, (Feb. 12, 2015) ......................................... 35

Federal Rule of Criminal Procedure 6(e) ............................................... 29

Federal Trade Commission, *The Dangers of "Gender-Affirming Care" for Minors*, (Jul. 9, 2025) ........................................ 28

Food and Drug Administration, *Understanding Unapproved Use of Approved Drugs "Off Label"* (Feb. 5, 2018) ............................ 21

Robert Jackson, U.S. Attorney General, The Federal Prosecutor, Address at Second Annual Conference of United States Attorneys (Apr. 1, 1940) ........................................ 10, 11

Nancy Kassop, *Contacts Policy Between the White House and the Department of Justice: A Sleeper Issue - or Maybe Not?* (July 01, 2022) .............................................................................. 16

Memorandum from Pam Bondi, U.S. Attorney General, to All Department Employees Regarding General Policy Regarding Zealous Advocacy on Behalf of the United States (Feb. 5, 2025) ........................................................................ 17

Movement Advancement Project, *Bans on Best Practice Medical Care for Transgender Youth* (Jan. 22, 2026) ........................ 20

New York Times, *Depleted and Distracted, Justice Dept. Staff Fear Losing Focus on Potential Threats* (January 7, 2026) .............................................................................................. 37

New York Times, *Justice Dept.'s Inspector General to Move to the Federal Reserve* (Jun. 6, 2025) ...................................................... 34

Politico, *Trump's power to fire executive branch officials will be tested in another lawsuit,* (Feb. 10, 2025) ...................................... 36

Reuters, *US Justice Department senior career ethics official removed from post, source says* (Jan. 27, 2025) .................................. 34

U.S. Office of Special Counsel, *What Happens When an Employee Files a Disclosure Claim?* .................................................. 35

Washington Post, *Trump White House Says It Can Talk to Justice Dept. on Criminal Cases* (Feb. 9, 2025) .......................... 16, 17

Washington Post, *Several top career officials ousted at Justice Department*, (Mar. 7, 2025) .................................................... 34

The White House, *President Trump is Delivering on His Commitment to Protect our Kids* (Feb. 3, 2025) .................................. 9

The White House, *President Trump Promised to End Child Sexual Mutilation – and He Delivered* (July 25, 2025) ...................... 10

viii

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are former attorneys for the Department of Justice ("DOJ"). We have collectively served DOJ for over six decades, across administrations of both parties, in Main Justice and United States Attorneys' offices across the country. We have significant experience investigating and prosecuting civil and criminal federal offenses. Many of us have investigated and prosecuted cases under the laws at issue.

As such, *amici* have deep insight into the institutional norms and procedures that have historically governed DOJ's exercise of law-enforcement authority. We know first-hand how these norms and procedures have supported DOJ's institutional integrity, allowed its attorneys to investigate and prosecute civil and criminal cases ethically and evenhandedly, and helped prevent improper purposes from infecting prosecutorial and civil enforcement decisions.

*Amici* are not medical professionals, and we take no position here on gender-affirming care itself. Nor do we have personal knowledge of

---

[1] Consistent with Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no counsel for a party authored this brief in whole or in part, and no person or entity, other than *amici* and their counsel, has contributed money that was intended to fund preparing or submitting this brief. All parties provided consent for *amici* to file this brief.

1

how this investigation has been conducted, beyond what the record in this case discloses. However, what that record appears to show is deeply troubling: the use of DOJ's investigative authority not for a proper purpose, but to compel substantive policy change through intimidation, coercion, and retribution.

That is anathema to the norms, practices, and procedures that governed DOJ's operations for generations up until recently. We are also disturbed by the breakdown of the longstanding institutional safeguards at DOJ that have long existed to prevent such things from occurring in the first place. In our experience and judgment, these striking deviations from procedural norms support the District Court's finding that the challenged subpoena was pretextual and issued for an improper purpose.

*Amici* are identified by name, position(s), and dates of service at DOJ in the Appendix to this brief.

## INTRODUCTION

DOJ is entrusted with the immense responsibility of enforcing federal law across the country. Its investigative and prosecutorial powers can shape industries, vindicate fundamental rights, and impose severe penalties. In our decades of experience, we have investigated cases,

prosecuted crimes in court, and defended the federal government's arguments and conduct. We appreciate DOJ's power, and we know how it can be abused.

"[A]lthough prosecutorial discretion is broad, it is not 'unfettered.' Selectivity in the enforcement of criminal laws is subject to constitutional constraints." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (cleaned up). It has long been recognized that vindictive prosecutions can be abusive and violate a defendant's rights. *See id.*; *Blackledge v. Perry*, 417 U.S. 21, 25-26 (1974).

No less problematic is the precursor of the vindictive prosecution: the vindictive or coercive *investigation*. We understand this to mean the use of an investigatory tool—a grand jury subpoena, a civil investigative demand, or as here, an administrative subpoena—for a purpose not authorized by law and unrelated to the law authorizing the investigation. Such an investigation can be "vindictive" in the classic sense—used as a means of retribution against a perceived enemy—or as a tool for coercion, to achieve a change in conduct which the law would not otherwise empower the government to compel.

Vindictive or coercive investigations are especially dangerous because DOJ investigations typically take place under a veil of secrecy. Unlike prosecutions, which largely take place in the public eye and with the backstop of a judge and jury, the vindictive or coercive investigation can achieve its goal of harming a person or forcing the abandonment of lawful conduct without ever becoming public or being tested in court.

In *amici*'s view, the record appears to indicate that the subpoena at issue (the "QueerDoc Subpoena") was a vindictive or coercive one—*i.e.*, that it was not served with a legitimate intent to gather information about suspected violations of relevant law. The many deviations from longstanding DOJ norms and procedures that we observe and discuss below reinforce the District Court's finding that the "investigation" of QueerDoc is a pretext to harass, intimidate, and thereby coerce it into ceasing to provide the lawful gender-affirming care that this Administration has announced its desire to "end."

*Amici* believe that the use of a DOJ investigation for these purposes is dangerous and wrong and that failing to stop it could encourage more vindictive or coercive investigations to come. This Court has an important role to play in preventing such abuses—especially given the

4

recent dismantling of the institutional safeguards that have historically protected against such abuses of DOJ's investigative power.

## BACKGROUND

*Amici* are not medical professionals and take no position here on the medical propriety of gender-affirming care. We do know that many groups of mainstream physicians, including the American Academy of Pediatrics, recognize it as the standard in appropriate circumstances.[2] We also know that under binding Supreme Court precedent, the states have "wide discretion to pass legislation," pro or con, in this area. *United States v. Skrmetti*, 145 S. Ct. 1816, 1836 (2025). In Washington, where QueerDoc is based, "[g]ender-affirming treatment" for minors is protected by state law. *See* Wash. Rev. Code §§ 7.115.010(3), 7.1115.020(1).

Despite all of this, the current Administration has made it the declared policy of the federal government to stamp out such care nationwide. President Trump has issued two executive orders ("EOs") on

---

[2] Alyson Sulaski Wyckoff, *AAP reaffirms gender-affirming care policy, authorizes systematic review of evidence to guide update,* AAP News (August 4, 2023), https://publications.aap.org/aapnews/news/25340/AAP-reaffirms-gender-affirming-care-policy?autologincheck=redirected.

this subject. On January 20, 2025, the same day he was inaugurated, he issued EO 14168, stating: "It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality."[3]

Then, on January 28, 2025, he issued EO 14187, addressed specifically to gender-affirming care for minors. It provides in part: "[I]t is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures." Indeed, the EO proclaims that—lawful or not—such treatments "must end."[4]

On April 22, 2025, the Attorney General issued a memorandum cataloguing the supposed horrors of gender-affirming care and directing DOJ to implement EO 14187. ER-048. In relevant part, it ordered "all

---

[3] *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[4] *Protecting Children From Chemical and Surgical Mutilation*, Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025).

6

Department of Justice employees to . . . hold accountable those who prey on vulnerable children and their parents." ER-050.

Specifically, the Attorney General directed "the Civil Division's Consumer Protection Branch to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act (FDCA) by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of [medications] used to facilitate a child's so-called 'gender transition.'" ER-051. And it directed "the Civil Division's Fraud Section to pursue investigations under the False Claims Act (FCA) of false claims submitted to federal health care programs for any noncovered services related to radical gender experimentation." *Id.*

On June 11, 2025, Brett A. Shumate was sworn in as Assistant Attorney General for DOJ's Civil Division. That same day, Mr. Shumate issued a directive of his own, endorsing the Attorney General's directive to pursue investigations of "manufacturers and distributors" of drugs used in gender-affirming care for illegal promotion in violation of the FDCA, and investigations of "false claims submitted to federal health care programs" in violation of the FCA. ER-055.

Also on that same day—again, his first day in office—Mr. Shumate signed the QueerDoc Subpoena and at least nineteen other materially identical subpoenas (collectively, the "Subpoenas") to providers of gender-affirming care for minors who are not the "manufacturers and distributors" mentioned in the Attorney General's memorandum or Mr. Shumate's directive. *See In re Subpoena No. 25-1431-014,* No. 25-39, 2025 WL 3252648, at *6 (E.D. Pa. Nov. 21, 2025).[5]

As the District Court found, these explicit statements leave no doubt about the federal government's policy goal: to end gender-affirming care for minors, whether or not it complies with the law. ER-19. Indeed, one week after EO 14187 was issued, a White House press release acknowledged that the EO's "intended effect" was "to downsize or eliminate ... so-called gender affirming care programs."[6] In a subsequent

---

[5] *See also* Press Release, U.S. Dep't of Just., Off. of Public Affairs, *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children,* (July 9, 2025), https://www.justice.gov/opa/pr/department–justice–subpoenas–doctors–and–clinics–involved–performing–transgender–medical.

[6] The White House, *President Trump is Delivering on His Commitment to Protect our Kids* (Feb. 3, 2025), https://www.whitehouse.gov/articles/2025/02/president–trump–is–delivering–on–his–commitment–to–protect–our–kids/.

press release dated July 25, 2025, the Administration boasted that, as a result of its actions, a dozen or so hospitals had "stopped," "ended," "halted," or "suspended" gender-affirming care for minors.[7]

## ARGUMENT

### I.      DOJ'S IMMENSE POWER MUST BE PROPERLY USED TO ENFORCE FEDERAL LAW.

We start with a basic proposition: federal prosecutors enforce laws passed by Congress. Those laws define illegal conduct and provide prosecutors the tools they need to investigate that illegal conduct and prove their cases in court. Prosecutors do not have license to decide what conduct they believe is wrong; nor do they have unfettered authority to obtain evidence or testimony from targets or others.

The responsibility of a federal prosecutor was famously set forth by Justice Robert Jackson in a speech that still appears on DOJ's website:

> If the prosecutor is obliged to choose his cases, it follows that he can choose his defendants. Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than pick cases that need to be prosecuted.

---

[7] The White House, *President Trump Promised to End Child Sexual Mutilation – and He Delivered* (July 25, 2025), https://www.whitehouse.gov/articles/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered/ (emphasis in original).

9

With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some sort on the part of almost anyone. In such a case, it is not a question of discovering the commission of a crime and then looking for the man who has committed it, it is a question of picking the man and then searching the law books, or putting investigators to work, to pin some offense on him.

***It is in this realm – in which the prosecutor picks some person whom he dislikes or desires to embarrass or selects some group of unpopular persons and then looks for an offense, that the greatest danger of abuse of prosecuting power lies.***[8]

Crucially, it is improper to "pick[] the man and then ... put[] investigators to work ... to pin some offense on him," even if the government is motivated not by pure personal animus, but by the desire to achieve substantive policy goals. The key point of Justice Jackson's teaching is that investigation and prosecution should flow from a reasonable, concrete suspicion that someone has actually violated the law. The burden and *in terrorem* effect of federal investigation and enforcement action, criminal or civil, should not be harnessed for their own sake to advance other agendas.

---

[8] Robert Jackson, U.S. Attorney General, The Federal Prosecutor, Address at Second Annual Conference of United States Attorneys (Apr. 1, 1940), https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04–01–1940.pdf (emphasis and line breaks added).

10

Historically, DOJ procedures and ethical rules have worked together to constrain this power toward authorized ends. The Justice Manual includes hundreds of pages of guidance on everything from contacts with the media to the necessary consultations before proceeding with different types of charges. *See, e.g.*, DOJ, Justice Manual § 1-7.210. Criminal prosecutors also operate with the Principles of Federal Prosecution in the background of their decision-making, which "promote the reasoned exercise of prosecutorial authority and contribute to the fair, evenhanded administration of the federal criminal laws." *Id.* § 9-27.001. These Principles reflect the ethical duties prosecutors must obey, consistent with their professional licensure and role as officers of the court. *Id.* § 1-4.010.[9]

Of course, investigations are a search for evidence to establish whether federal criminal law has been violated. But even those initial

---

[9] *See, e.g.*, ABA Model Rule 3.1 (prohibiting a lawyer from bringing a proceeding "unless there is a basis in law and fact for doing so that is not frivolous"); ABA Model Rule 3.8(a) (requiring a lawyer to "refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause"); ABA Model Rule 4.4(a) ("a lawyer shall not [take actions] that have no substantial purpose other than to embarrass, delay, or burden a third person"); ABA Model Rule 8.4(d) ("professional misconduct for a lawyer to ... engage in conduct that is prejudicial to the administration of justice").

steps of a federal criminal prosecution entail the use of legal process covered by rules of professional ethics. DOJ, Justice Manual § 1-4.010; *see, e.g.*, *United States v. Colorado Supreme Court*, 189 F.3d. 1281, 1288-89 (10th Cir. 1999). As such, it is improper to use "[a]n administrative subpoena" to conduct a "fishing expedition"— just as it is improper to bring a court proceeding that is not well-founded in fact or law. *Peters v. United States,* 853 F.2d 692, 700 (9th Cir. 1988).

These rules and procedures provide well-settled standards to guide nearly every aspect of DOJ attorneys' conduct. Each of us has practiced under these principles and ethical rules. We may not have agreed with what each and every one of them required of us in every situation, but we recognize the invaluable role they play in constraining the awesome power of federal prosecutors and safeguarding against its abuse.

On appeal, the Government protests that the District Court effectively held that "any industry or practice that an administration opposes as a policy matter is somehow entitled to presumptive immunity from any criminal investigation." Gov't Br. at 18. That caricature of the District Court's reasoning misrepresents the historical relationship

12

between the President and DOJ, and the ways in which it is proper and improper for DOJ to advance the President's policy agenda.

Nothing in the District Court's decision prevents the President from setting DOJ's enforcement priorities. Career DOJ attorneys have faithfully advanced the policy directives of administrations of both parties throughout history. Many of us have been on the front lines of those initiatives. Presidential Executive Orders regularly direct the Attorney General (and his or her subordinates) to serve on task forces, collaborate with officials in other agencies and other levels of government, and otherwise participate in initiatives designed to step up enforcement of some aspect of federal law.[10] Indeed, the Principles of Federal Prosecution recognize "[t]he fact that a particular prosecution is

---

[10] *See, e.g.*, Protecting Law Enforcement Officers, Judges, Prosecutors, and Their Families, Exec. Order No. 13977, 86 Fed. Reg. 6803 (Jan. 18, 2021) ("The Attorney General shall prioritize the investigation and prosecution of Federal crimes involving actual or threatened violence against judges, prosecutors, or law enforcement officers or their family members…."); Establishment of the Financial Fraud Enforcement Task Force, Exec. Order No. 13519, 74 Fed. Reg. 60123 (Nov. 17, 2019) (directing the Attorney General to convene a task force to, among other things, "provide advice to the Attorney General for the investigation and prosecution of cases of bank, mortgage, loan, and lending fraud" and other specified financial crimes "when such cases are determined by the Attorney General ... to be significant").

13

part of a larger federal law enforcement initiative that serves a substantial federal interest is an appropriate and relevant consideration in determining whether that individual prosecution also serves such a federal interest."[11]  Contrary to what the Government argues here, the District Court did not conclude that there is an inherent conflict between White House policy initiatives and the work of a federal prosecutor.

Rather, the District Court properly examined the record, determining that the "timeline tells the story" about DOJ improperly implementing a White House policy objective *by deploying unrelated investigative tools.*  ER-016.  While there may be some reasonable debate about how much direction DOJ should receive from the White House, this case represents an extreme.  None of us has ever been directed by the White House or DOJ's political leadership to "hold accountable" an entire field or industry engaged in lawful conduct by seeking out criminal violations perpetrated by its members.  And none of us has been directed to seek out a violation of federal law to achieve a policy objective unrelated to the enforcement of that law.

---

[11] DOJ, Justice Manual § 9-27.230 comment 1.

Longstanding conventions would historically have prevented this sort of direction, and our ethical obligations would have obliged us to reject that direction if it occurred. In particular, since the 1990s, there has been a series of written policies limiting contacts between the White House and DOJ on specific matters.[12] Those policies have protected prosecutors' ability to independently assess the merits of any case and take steps consistent with their ethical responsibilities. Prosecutorial discretion on specific matters leaves plenty of room for DOJ to implement the President's policy priorities ethically.

However, along with many other norms, the firewall between the White House and DOJ prosecutors on most specific matters has been eliminated by this Administration.[13] The current Attorney General has

---

[12] *See* Memorandum from Merrick Garland, U.S. Attorney General, to All Department Personnel Regarding Department of Justice Communications with the White House (July 21, 2021), https://tinyurl.com/2s488wtn; Memorandum from Dana Remus, Counsel to the President, to All White House Staff Regarding Prohibited Contacts with Agencies and Departments (July 21, 2021), https://tinyurl.com/ymsvn3m6; *see also* Nancy Kassop, *Contacts Policy Between the White House and the Department of Justice: A Sleeper Issue - or Maybe Not?* (July 01, 2022), available at https://ssrn.com/abstract=4872676; DOJ, Justice Manual §1-8.600.

[13] Perry Stein and Jeff Stein, *Trump White House Says It Can Talk to Justice Dept. on Criminal Cases*, Wash. Post (Feb. 9, 2025),

15

described DOJ's employees as "the *President['s]*… lawyers."[14] DOJ lawyers today face the unprecedented threat of termination if they do not "zealously" and unquestioningly prosecute the President's ideological agenda.[15] Extreme cases like this show what can happen when prosecutorial independence is compromised and, as we discuss further below, when the safeguards that have historically addressed the improper influences on Department investigations are removed.

## II. DEVIATIONS FROM NORMS AND PROCEDURES IN THIS CASE CREATE AN INFERENCE THAT DOJ IS USING ITS AUTHORITY IMPROPERLY.

### A. It is a well-established legal concept that deviations from normal procedures create an inference of improper purpose.

*Amici* agree that, as a general matter, DOJ's investigatory and prosecutorial decisions should be presumed to have been made in good faith. *See Cruz v. Bondi*, 146 F.4th 730, 739 (9th Cir. 2025) (citing *United*

---

https://www.washingtonpost.com/national-security/2025/02/09/trump-justice-department-guidance-memo/.

[14] Memorandum from Pam Bondi, U.S. Attorney General, to All Department Employees Regarding General Policy Regarding Zealous Advocacy on Behalf of the United States (Feb. 5, 2025), https://www.justice.gov/ag/media/1388521/dl?inline (emphasis added).

[15] *Id.*

*States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926)). However, there is "[n]o doubt" that this "presumption of regularity is subject to be rebutted." *R.H. Stearns Co. of Bos., Mass., v. United States*, 291 U.S. 54, 63 (1934). Among other things, the presumption does not shield government action when the Court is "presented … with an explanation for [that] action that is incongruent with what the [public] record reveals about the agency's priorities and decisionmaking process." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

In this regard, significant deviations from longstanding procedures and norms can be compelling evidence of improper government motive. As the Supreme Court has recognized in the constitutional context, "[t]he specific sequence of events leading up to the challenged decision," and any "[d]epartures from the normal procedural sequence," can be strong "circumstantial ... evidence" of improper "intent." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-67 (1977).

This Court has used this analysis repeatedly to assess improper motive by both government and private actors. *See, e.g., Porter v. California Dep't of Corr.*, 419 F.3d 885, 896 (9th Cir. 2005) ("[D]eviations from the CDC's protocol support an inference of pretext"); *Peters v.*

17

*Shamrock Foods Co.*, 262 F. App'x 30, 33 (9th Cir. 2007) ("Deviations from protocol and procedural irregularities can create an inference of pretext."); *Richards v. City of Seattle*, 32 F. App'x 452, 456 (9th Cir. 2002) ("[D]eviation from normal procedure raises an inference of improper motive."); *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1117 (9th Cir. 2011) ("A plaintiff may ... raise a triable issue of pretext through evidence [of] deviation from established policy or practice"); *United States v. Anderson*, 101 F.4th 586, 594–95 (9th Cir. 2024) ("deputies' deviation from the governing inventory procedure" may "indicate[] that they acted in bad faith," rather than "for investigative purposes").  Indeed, this Court recently used this form of analysis in addressing whether legislation directed to transgender persons was adopted for an improper purpose.  *See Doe v. Horne*, 115 F.4th 1083, 1103 (9th Cir. 2024) (citing and applying *Arlington Heights*).

*Amici* think this analysis is appropriate here.  As we discuss below, the sequence of events leading up to the QueerDoc Subpoena and DOJ's many departures from its own norms and procedures support the District Court's findings that any presumption of regularity was rebutted, and that the QueerDoc Subpoena was issued for an improper and pretextual

18

purpose. *Cf. Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 155 F.4th 1082, 1093 (9th Cir. 2025) (federal government's "departures" from "ordinary processes" precluded it from "invoking presumptions ordinarily attendant upon the very processes it has ignored").

**B. From the outset, the President and his appointees have made clear that this investigation is about stopping lawful conduct, rather than enforcing federal law.**

The type of gender-affirming care provided by QueerDoc is lawful in 23 states and the District of Columbia.[16] Washington, where QueerDoc is based, is among those states. The "medical profession" has long been "regulated" primarily "under the States' police powers," not federal law. *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006). Congress has not legislated to "displace[] the States' general regulation of medical practice." *Id.* Relevant here, courts have observed that "the FDCA does not regulate the practice of medicine." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 240 (3d Cir. 2012). Thus, "once the FDA approves a drug, healthcare providers generally may prescribe the

---

[16] Movement Advancement Project, *Bans on Best Practice Medical Care for Transgender Youth* (Jan. 22, 2026), available at https://tinyurl.com/y42n7mh2.

drug for an unapproved use when they judge that it is medically appropriate for their patient."[17]

Despite these well-settled legal principles, this Administration has expressly declared that it is now the official policy of the United States to "end" a form of medical care that is lawful in almost half the states; that Congress has not legislated against; that the Executive Branch has no authority unilaterally to prohibit; and that the Supreme Court has recently held is within the "discretion" of the States to allow. *Skrmetti*, 145 S. Ct. at 1836.

As the District Court concluded, this public record obviates any need for "speculation about hidden motives." ER-017. "[I]t is the Administration's explicit agenda" to end gender-affirming care nationwide, whether or not it comports with law. *Id.* "No clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating." *Id.*

---

[17] FDA, *Understanding Unapproved Use of Approved Drugs "Off Label"* (Feb. 5, 2018), https://tinyurl.com/2m56uxm2; *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 & n. 5 (2001).

**C. This investigation has not been conducted in a manner suggesting its true purpose is enforcing federal law.**

    **1.    The Subpoenas' timing, thin legal justification, and overbreadth suggest a rush to persecute, rather than methodically prosecute.**

*Amici* bring a wide range of experience at DOJ. We have prosecuted criminal cases in district courts across the country, conducted civil and criminal investigations, defended the United States in civil actions, and represented it in appeals. Some of us have been political appointees; others have been career attorneys and managers. Many of us have investigated and prosecuted cases under the laws invoked by DOJ in this very case.

Our shared experience tells us that, in the traditions of the Department, prosecutors generally proceed with careful deliberation to develop their investigations; assess the strength of their cases; and ensure that their investigations and prosecutions have a valid basis in law, protect individuals' rights, and comport with their ethical responsibilities.

The record of this case indicates that something very different happened here. The process DOJ followed in issuing the QueerDoc Subpoena appears not to have begun with the kind of deliberate plan that

DOJ norms and ethical rules demand. The QueerDoc Subpoena (and the other 19 Subpoenas) were issued on Mr. Shumate's first day in office. *See In re Subpoena No. 25-1431-014*, 2025 WL 3252648, *supra*, at \*6.[18]

Although the Attorney General's memorandum directed "appropriate investigations of [FDCA violations] by *manufacturers and distributors* engaged in misbranding," ER-051 (emphasis added), QueerDoc neither manufactures nor distributes medications. *See* 21 U.S.C. § 331; *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 534 (6th Cir. 2021) (explaining that the "[FDCA] regulates a manufacturer's distribution of drugs") (citing *Buckman*, 531 U.S. at 351).

Likewise, the Attorney General's memorandum directed "investigations under the [FCA] of *false claims submitted to federal health care programs* for any noncovered services." ER-051 (emphasis added). However, QueerDoc represented to the District Court that "it

---

[18] It has been reported that Mr. Shumate's predecessor, Amanda Liskamm, "declined to sign" the Subpoenas, "rais[ing] serious concerns about collecting children's health data and whether it was necessary to advance the investigation," and opining "that investigating providers and doctors for prescribing [gender-affirming therapy] would be unlikely to lead to a successful criminal prosecution." Liskamm and her deputy subsequently resigned. Ben Penn et al., *Justice Department Expands Gender Care Probe as Hospital Fights*, Bloomberg Law (Aug. 20, 2025), https://tinyurl.com/yn8p8rxf.

22

does not participate in federal insurance programs or submit insurance claims," ER-007 (citing Dkt. No. 13 at 4–5 & n.3), and the Government does not appear to dispute that representation or now pursue that theory on appeal.

According to the record, DOJ counsel *admitted* to QueerDoc's counsel that the QueerDoc Subpoena was issued merely because of the aforementioned directives from the President and Attorney General, and that DOJ had no basis for targeting QueerDoc in particular, except for who it was: a "prominent" provider of gender-affirming care. "That's the extent of it," the DOJ attorney said. SER-009 ("Ramer Decl.") ¶¶ 6-7.[19] In other words, the Government has apparently *conceded* that the investigation lacked a proper factual predicate, and was instead motivated by the Administration's desire to "end" gender-affirming care as such. Such an admission from a DOJ attorney is near-unprecedented in *amici*'s experience.

---

[19] DOJ made similar statements to counsel for Seattle Children's Hospital, who was told that its analogous subpoena was "not prompted by any specific information or allegations," and was issued merely because "DOJ knows that [it] provides gender-affirming care to minors." *In re: Subpoena Duces Tecum No. 25-1431-016*, 2:25-mc-00041-JHC, Declaration of Chrisopher N. Manning, Esq. at 2, Dkt. No. 2 (W.D. Wash. Jul. 8, 2025).

23

Finally, Mr. Shumate's first-day Subpoenas were wildly overbroad, seeking a wide variety of information, including private medical files of vulnerable minor patients. As several courts have recognized, this demand for the deeply personal information of minors experiencing a sensitive medical condition is particularly suspect, given the Administration's record of hostility to transgender persons.[20] In our experience, the shocking overbreadth and burden of the Subpoenas are still further evidence that they were propounded to coerce and intimidate, and not for a legitimate investigatory motive.

*Amici* do not claim to know what other evidence the Government may have that is not reflected in this record, nor whether there is some other legal theory it has not articulated that may justify its actions. However, we *can* say that as of now—seven months after the Subpoenas were issued, and after many opportunities to defend its conduct and explain its theory—the Government has failed to provide any credible

---

[20] *See, e.g., In re: DOJ Admin. Subpoena No. 25-1431-030*, No. 25-MC-00063-SKC-CYC, 2026 WL 33398, at *6 (D. Colo. Jan. 5, 2026); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 238 (D. Mass. 2025); *In re Subpoena No. 25-1431-014,* No. MC 25-39, 2025 WL 3252648, at *13 (E.D. Pa. Nov. 21, 2025).

explanation for its conduct that is consistent with a legitimate investigatory motive.

As the District Court found in this case, "DOJ issued the [S]ubpoena[s] first and searched for a justification second." ER-017. This kind of conduct is far outside the traditions and norms of the Department and is deeply troubling to *amici*.

### 2. DOJ's approach to publicizing the investigation and Subpoenas violated longstanding norms and policies.

In addition, DOJ's efforts to publicize this investigation are contrary to prosecutorial best practices, Department rules, and the ethical responsibilities of prosecutors and other civil trial attorneys. In *amici*'s experience, this departure may be additional evidence of improper motivation supporting the District Court's holding.

On July 9, 2025—one day after QueerDoc filed its motion to quash the QueerDoc Subpoena and moved to seal that motion—DOJ effectively mooted the sealing motion by issuing what the District Court rightly called an "inflammatory" press release "attempting to sway public

25

sentiment against healthcare providers like QueerDoc." ER-012.[21]  In relevant part, the Attorney General said that "[m]edical professionals and organizations that mutilated [sic] children in the service of a warped ideology will be held accountable by this Department of Justice." *Id.*

As the District Court concluded, this rhetoric "appears calculated to intimidate rather than investigate." ER-012.  But even more remarkably, the press release said *explicitly* that DOJ was seeking to "h[o]ld [QueerDoc] accountable" for purportedly "mutilat[ing] children in the service of a warped ideology"—*i.e.*, for providing gender-affirming care *per se*.  There was not a word in the press release about unlawful promotion of pharmaceuticals in violation of the FDCA—the ostensible focus of the investigation.

Moreover, on the same day as the DOJ press release, Department officials, including then-DOJ Chief of Staff Chad Mizelle and Deputy Assistant Attorney General for the Consumer Protection Branch of the Civil Division Jordan Campbell, publicly discussed the Department's

---

[21] Press Release, U.S. Dep't of Just., Off. of Pub. Affairs, *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical.

investigation and "issu[ance of] nearly 20 subpoenas against clinics" at a Federal Trade Commission conference entitled "The Dangers of 'Gender-Affirming Care' for Minors." There, moments after mentioning the Subpoenas, Mr. Mizelle openly stated that DOJ's goal was to "*take down this ... industry*" (*i.e.*, gender-affirming care), and that "[w]e are using all of the tools at the Department of Justice to address this issue."[22] Once again, the Government's own statements make it difficult to credit that the investigation or the Subpoenas had a valid law-enforcement purpose.

In *amici*'s experience, it was not just the content of these remarks that is extraordinary; it is extraordinary that the Government said anything at all. The Justice Manual states that the Department "generally will not confirm the existence of or otherwise comment about ongoing investigations." Justice Manual § 1-7.400(B). That is because "[d]isseminating non-public, sensitive information about DOJ matters could," *inter alia*, "put a witness or law enforcement officer in danger; jeopardize an investigation or case; prejudice the rights of a defendant;

---

[22] Federal Trade Commission, *The Dangers of "Gender-Affirming Care" for Minors*, Tr. at 49 (Jul. 9, 2025), https://tinyurl.com/4a9rc7bx (emphasis added).

or unfairly damage the reputation of a person." *Id.* § 1-7.100. To that end, DOJ attorneys are counseled that "disclosure of such information to anyone, including to family members, friends, or even colleagues, is prohibited and could lead to disciplinary action," including "criminal prosecution or administrative action." *Id.*[23]

The Department's internal rule tracks the ethical responsibilities of prosecutors, specifically as they relate to investigatory tools. Most importantly, Federal Rule of Criminal Procedure 6(e) prohibits government attorneys from disclosing a matter before a grand jury except in limited circumstances. *Qui tam* civil actions under the False Claims Act are filed and proceed under seal as the government investigates the facts, *see* 31 U.S.C. §3730(b); *United States ex rel. Lujan v. Hughes Aircraft Co.*, 67 F.3d 242 (9th Cir. 1995), and FCA investigations initiated

---

[23] In a recent analogous situation, DOJ's Office of Inspector General concluded that the Department violated its own rules by issuing a press release announcing information requests related to nursing-home care during the COVID pandemic. DOJ Office of the Inspector General, *An Investigation of Alleged Misconduct by Senior DOJ Officials for Leaking Department Investigative Activities Concerning COVID-19 in Nursing Homes to Members of the News Media in October 2020* at 42-44, https://tinyurl.com/nhzr94kj.

by the government under 31 U.S.C. §3730(a) are not made public until the investigation is complete and the government brings suit.

It is true that HIPAA—the statutory basis for these Subpoenas—does not expressly *require* confidentiality, as other investigative tools do. But as a matter of common sense and longstanding DOJ practice, those of us with experience in criminal investigations fail to see what law-enforcement purpose is served by announcing a wide-ranging criminal investigation well before an indictment has been filed or any obviously criminal conduct has been identified. Investigations becoming public in their early stages makes a prosecutor's job harder, not easier, by putting potential targets and witnesses on notice and risking the destruction or alteration of necessary evidence. In that way, too, the announcement suggests that the investigation and Subpoenas were pretextual.

Just as extraordinarily, despite these internal rules, ethical responsibilities, and best prosecutorial practices, DOJ opposed QueerDoc's motion to seal these proceedings below. It was QueerDoc—not the Department—that sought to shield from public view the fact that the Department was conducting an investigation and seeking, *inter alia*, highly sensitive medical records of minors. *See* ER-012 (the "troubling

29

behavior by DOJ actually strengthens the case for transparency, not secrecy").[24] Once again, it is nigh unprecedented in our experience for DOJ to seek publicity of a sensitive criminal investigation in its early fact-gathering stage—and to be so insistent on doing so that it would oppose a sealing motion, at the risk of having its own nascent investigation dissected in open court.

## III. THE INSTITUTIONAL SAFEGUARDS THAT ONCE WOULD HAVE POLICED THE IMPROPER USE OF DOJ AUTHORITY EVIDENT IN THIS CASE HAVE BEEN CHILLED OR ERODED.

DOJ is no stranger to political pressure in its investigations. That is why, over many decades, numerous institutional safeguards have existed to protect the Department's decisions from improper influence. Those protections could be presumed to operate in the background to prevent or deter the type of impropriety the District Court found here. Unfortunately, these safeguards—which have historically supported a presumption of regularity in DOJ's operations—have been systematically

---

[24] Other district courts have concluded similarly. *See In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229 (D. Mass. 2025); *In re Subpoena No. 25-1431-014*, 2025 WL 3252648 (E.D. Pa. Nov. 21, 2025); *In re 2025 UPMC Subpoena*, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025); *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151 (W.D. Wash. Sept. 3, 2025).

dismantled by this Administration. The QueerDoc Subpoena has been issued at a time when DOJ offices and other oversight agencies responsible for policing the Department are unlikely or unwilling to do so. For that reason, judicial review has never been more necessary.

Until recently, DOJ has had multiple guardrails that prevent the institution of a proceeding without an adequate basis or for an improper purpose. For example, the Department's Office of Professional Responsibility is the DOJ office exclusively responsible for investigating allegations of professional misconduct by DOJ attorneys. That office investigates allegations of DOJ attorneys making misrepresentations to the court or opposing counsel; failing to comply with court orders or departmental rules and regulations; and abusing DOJ's authority or prosecutorial discretion.[25] The Office of Inspector General is an independent, nonpartisan office housed within the Department charged with detecting and preventing waste, fraud, and abuse.[26] This office has

---

[25] OPR's Role and Relationship to Other Offices and Congress, Office of Professional Responsibility, U.S. Department of Justice, (September 19, 2025), https://www.justice.gov/opr/frequently-asked-questions#role.

[26] Office of the Inspector General, 66 Fed. Reg. 37903 (July 20, 2001), https://www.ecfr.gov/current/title-28/chapter-I/part-0/subpart-E-4.

looked into allegations of politically motivated investigations, misconduct involving electioneering, the improper issuance of subpoenas based on political affiliation, and mishandled probes.[27]

These offices once provided an independent assessment of cases and conduct outside the chain of command, conducting fact-finding and setting precedents that deterred improper actions and guided the conduct of all DOJ attorneys.

This Administration has undermined the work of these offices through terminations, demotions, and reassignments.[28] In the first weeks of this Administration, DOJ's political appointees ousted several key senior career officials, including the head of the Office of Professional Responsibility, who had served at the DOJ for nearly 38 years,[29] and the

---

[27] *See, e.g.,* Luke Barr et. al., *DOJ inspector general will investigate 2018 seizure of House Democrats' data*, ABC News (June 11, 2021), https://abcnews.go.com/Politics/doj-inspector-general-investigate-2018-seizure-house-democrats/story?id=78222845; Terry Friedan, *'Fast and Furious' report slaps 14 at Justice, ATF*, CNN (September 19, 2012), https://www.cnn.com/2012/09/19/us/us-fast-furious-report.

[28] Brennan Center, *The Department of Justice's Broken Accountability System* (Oct. 20, 2025), https://tinyurl.com/3p6twp9t.

[29] Perry Stein et. al., *Several top career officials ousted at Justice Department*, Washington Post (Mar. 7, 2025), https://www.washingtonpost.com/national-security/2025/03/07/justice-department-trump-firings/.

Associate Deputy Attorney General—the highest-ranking career attorney in the Department—who was responsible for making ethics determinations involving high-level DOJ officials, including those relating to partiality and improper political influence.[30]  DOJ's Inspector General left his role in June 2025, after 13 years of service, following the firing or demotion of 20 inspectors general across the government.[31]

Meanwhile, this Administration has eroded civil-service and whistleblower protections enforced by agencies outside the Department. Most career DOJ attorneys, like other civil servants, are covered by the Merit Systems Protection Board ("MSPB"), which adjudicates and remedies prohibited personnel practices against federal workers, such as whistleblower retaliation, discrimination based on political affiliation, and politicized employment decisions.  5 U.S.C. § 2301, subch. II; 5 C.F.R. § 213.3102(d).  The Office of Special Counsel has the authority to securely

---

[30] Sarah Lynch, *US Justice Department senior career ethics official removed from post, source says*, Reuters (Jan. 27, 2025), https://www.reuters.com/world/us/us-justice-department-senior-career-ethics-official-removed-post-source-says-2025-01-27/.

[31] Charlie Savage, *Justice Dept.'s Inspector General to Move to the Federal Reserve*, N.Y. Times (Jun. 6, 2025), https://www.nytimes.com/2025/06/06/us/justice-inspector-general-fed.html.

33

receive whistleblower disclosures and direct the head of an agency, like the Attorney General, to investigate meritorious disclosures.[32]

These changes have eroded the protections that were provided in the past. The Administration fired MSPB Chair Cathy Harris and demoted Vice Chair Ray Limon, who subsequently retired.[33] This left the MSPB without a quorum.[34] The Administration also fired Special Counsel Hampton Dellinger seemingly without cause and in violation of the statute preventing his termination absent "inefficiency, neglect of

---

[32] U.S. Office of Special Counsel, *What Happens When an Employee Files a Disclosure Claim?*, https://osc.gov/Services/Pages/DU-Process.aspx.

[33] *See* Marshall Cohen & Tami Lubby, *Federal workers turn to little–known 'merit board' as they try to avoid Trump's mass layoffs*, CNN (Feb. 28, 2025), https://www.cnn.com/2025/02/28/politics/federal–workers–merit–board–doge; Michele Sandiford, *White House fires head of Merit Systems Protection Board*, Fed. News Network (Feb. 12, 2015), https://federalnewsnetwork.com/federal–newscast/2025/02/white–house–fires–head–of–merit–systems–protection–board/; Drew Friedman, *Trump's 'direct assault' on MSPB 'alarming' to former board member Limon*, Fed. News Network (Mar. 13, 2025), https://federalnewsnetwork.com/workforce/2025/03/trumps–direct–assault–on–mspb–alarming–to–former–board–member–limon/.

[34] See Marshall Cohen & Tami Lubby, *Federal workers turn to little–known 'merit board' as they try to avoid Trump's mass layoffs*, CNN (Feb. 28, 2025), https://www.cnn.com/2025/02/28/politics/federal-workers-merit-board-doge

duty, or malfeasance in office." 5 U.S.C. § 1211(b).[35] Even though MSPB has now re-attained a quorum and a new Special Counsel has been confirmed, these actions cast serious doubt on whether DOJ attorneys can rely upon these offices to protect them if they resist improper influences or become whistleblowers, as they have done in the past.[36]

Lastly, in addition to these formal guardrails, career DOJ prosecutors bring decades of experience and judgment to any new investigation. Over the years, these attorneys accrue invaluable wisdom grappling with the hard questions of what facts are properly considered when investigating conduct and developing a case for prosecution. But the exodus of career attorneys from DOJ in the past year has been enormous and crippling.[37] In our view, these departures have devastated

---

[35] *See* Josh Gerstein, *Trump's power to fire executive branch officials will be tested in another lawsuit*, Politico (Feb. 10, 2025), https://www.politico.com/news/2025/02/10/trump–executive–branch–lawsuit–00203354.

[36] *See generally* Nick Bednar, *The Merit System Protection Board's Independence Is Dead,* Lawfare, (Jan. 20, 2026), https://www.lawfaremedia.org/article/the-merit-system-protection-board-s-independence-is-dead

[37] Michael S. Schmidt, et.al., *Depleted and Distracted, Justice Dept. Staff Fear Losing Focus on Potential Threats*, N.Y. Times, (January 7, 2026), https://www.nytimes.com/2026/01/07/us/justice-department-threats-cyberattacks-terrorism.html.

the Department's institutional judgment and removed perhaps the most important checks against abuse in cases like this one.

## CONCLUSION

In *amici*'s view, the record in this case is sufficient to overcome any presumption of regularity that might otherwise attach to DOJ's actions, and to support the conclusion that the QueerDoc Subpoena was issued for improper purposes. *Amici* urge the Court to affirm.

Date: January 23, 2026

Respectfully submitted,

*/s/ Gregory L. Diskant*

JOSEPH GAETA
BRENNAN CENTER FOR JUSTICE
 AT NYU SCHOOL OF LAW
410 Cole Ave.
Providence, RI 02906
gaetaj@brennan.law.nyu.edu

MIRIAM ROSENBAUM
WENDY R. WEISER
BRENNAN CENTER FOR JUSTICE
 AT NYU SCHOOL OF LAW
120 Broadway #1750
New York, NY 10271
Phone: (646) 292-8310
rosenbaumm@brennan.law.nyu.edu
weiserw@brennan.law.nyu.edu

GREGORY L. DISKANT
JONAH M. KNOBLER
CAITLIN ROSS
BHARATH PALLE
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
Phone: 212-336-2000
gldiskant@pbwt.com
jknobler@pbwt.com
kross@pbwt.com
bpalle@pbwt.com

*Attorneys for Amici Curiae*

37

# APPENDIX:
## Identity of *Amici*[1]

1.  **Dan Anderson**, Deputy Director, Assistant Director, Senior Counsel for Healthcare Fraud, Frauds Section, Trial Attorney, U.S. Department of Justice, Civil Division (1996–2019)

2.  **Sam Bagenstos**, General Counsel, Department of Health and Human Services (2022–24), General Counsel, Office of Management and Budget (2021–22), Principal Deputy Assistant Attorney General (2010–11), Deputy Assistant Attorney General (2009), Trial Attorney (1994–97), U.S. Department of Justice, Civil Rights Division

3.  **Brendan Ballou**, Special Counsel (2023–25), Trial Attorney (2020–23), U.S. Department of Justice, Antitrust Division

4.  **Harry Benner**, Assistant U.S. Attorney, U.S. Attorney's Office for the District of Columbia (1972–2000)

5.  **Paul Blaine**, Chief (2013–15), Assistant Chief (2009–13), Assistant U.S. Attorney (1983–2009), U.S. Attorney's Office for the District of New Jersey; Assistant Director, Frauds Section, Commercial Litigation Branch (1981–83), Trial Attorney (1974–81), U.S. Department of Justice, Civil Division

6.  **Joyce Branda**, Deputy Assistant Attorney General, Commercial Litigation Branch, U.S. Department of Justice, Civil Division, Natural Resources Division (1980–2017)

7.  **Subodh Chandra**, Assistant U.S. Attorney, U.S. Attorney's Office for the District of Northern District of Ohio (1999–2002)

8.  **Ben Clements**, Assistant U.S. Attorney, U.S. Attorney's Office for the District of Massachusetts (1994–2001)

9.  **Ty Cobb**, Assistant to the President and Special White House Counsel (2017–18); Chief of the Criminal Division, Mid-Atlantic

---

[1] Affiliations are listed for institutional identification only.

Regional Coordinator, Organized Crime and Drug Enforcement Task Force (1983–86), Assistant U.S. Attorney (1980–86), U.S. Attorney's Office for the District of Maryland

10. **Mary McGowan Davis**, Deputy Chief, Chief of the Appeals Division (1981–86), Appellate Attorney (1977–80), U.S. Attorney's Office for the District of Eastern District of New York

11. **Peter R. Ginsberg**, Assistant U.S. Attorney, U.S. Attorney's Office for the Eastern District of New York (1985–92)

12. **Bill Killian**, U.S. Attorney for the Eastern District of Tennessee (2010–15)

13. **Elizabeth Langer**, Trial Attorney, U.S. Department of Justice (1976–82)

14. **Brian Legghio**, Assistant U.S. Attorney, U.S. Attorney's Office for the Eastern District of Michigan (1982–88)

15. **Jim Lewis**, U.S. Attorney for the Central District of Illinois (2010–16)

16. **Ellyn Linsday**, Assistant U.S. Attorney (1987–2015), DOJ Honors Program Graduate (1985–87), U.S. Attorney's Office for the Central District of California

17. **Mildred E. Methvin**, U.S. Magistrate Judge, Western District of Louisiana (1983–2009); Assistant U.S. Attorney, U.S. Attorney's Office for the Western District of Louisiana (1979–81)

18. **Wendy Olson**, U.S. Attorney (2010–17), Assistant U.S. Attorney (1997–2010), U.S. Attorney's Office for the District of Idaho; Trial Attorney, U.S. Department of Justice, Civil Rights Division (1992–97)

19. **Ann Powers**, Senior Trial Attorney, U.S. Department of Justice, Lands and Natural Resources Division (1979–84); Assistant U.S. Attorney, U.S. Attorney's Office for the District of Columbia (1975–79)

A-2

20. **Susan Raab**, Assistant U.S. Attorney, U.S. Attorney's Office for the Middle District of Florida (1990–2007)

21. **Ismail Ramsey**, U.S. Attorney (2023–25), Assistant U.S. Attorney (1999–2003), U.S. Attorney's Office for the Northern District of California

22. **Roland Riopelle**, Assistant U.S. Attorney, U.S. Attorney's Office for the Southern District of New York (1991–98)

23. **Elizabeth Trosman**, Chief of the Appellate Division (2012–21), Assistant U.S. Attorney (1982–2021), U.S. Attorney's Office for the District of Columbia

24. **John Warshawsky**, Senior Trial Counsel (2010–14), Trial Attorney (1990–2008), U.S. Department of Justice, Civil Division

25. **Sarah Winslow**, Chief of the Civil Division (2016–21), Civil Health Care Fraud Coordinator (2002–16), Assistant U.S. Attorney (2002–16), Affirmative Civil Enforcement Coordinator, U.S. Attorney's Office for the Northern District of California; Trial Attorney, U.S. Department of Justice, Civil Fraud Section (1996–2001)

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7384

I am the attorney or self-represented party.

**This brief contains** 6,934 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [        ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Gregory L. Diskant   **Date** 1/23/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2026, I caused the foregoing *Amicus Curiae* Brief of Former U.S. Department of Justice Attorneys to be electronically filed using the CM/ECF system, which will send notification of such filing to all parties of record.

/s/    *Gregory L. Diskant*
Attorney for *Amici Curiae*