**No. 25-7384**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

QUEERDOC, PLLC,
*Movant-Appellee,*

v.

UNITED STATES DEPARTMENT OF JUSTICE,
*Respondent-Appellant.*

On Appeal from the United States District Court
for the Western District of Washington
No. 2:25-mc-00042-JNW

_____

**BRIEF OF NATIONAL CENTER FOR LGBTQ RIGHTS, NATIONAL
CENTER FOR YOUTH LAW, AND GLBTQ LEGAL ADVOCATES &
DEFENDERS AS AMICI CURIAE IN SUPPORT OF MOVANT-APPELLEE
AND AFFIRMANCE**

_____

Amy Whelan (CA Bar: 215675)
NATIONAL CENTER FOR LGBTQ
RIGHTS
1401 21st Street #11548
Sacramento, CA 95811
T: (415) 392-6257
E: awhelan@nclrights.org

Jennifer L. Levi
Donovan C. Bendana
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@gladlaw.org
dbendana@gladlaw.org

*Attorneys for Amici Curiae*

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES..................................................................... ii

RULE 29(A)(4)(E) STATEMENT .......................................................... vi

INTEREST OF AMICI CURIAE ..............................................................1

ARGUMENT ............................................................................................3

I.   THE DISCONNECT BETWEEN THE INFORMATION
SOUGHT AND DOJ'S PURPORTED INTERESTS
SUPPORTS THE DISTRICT COURT'S ORDER QUASHING
THE SUBPOENA. ...............................................................................3

II.  QUEERDOC PATIENTS HAVE CONSTITUTIONALLY
PROTECTED PRIVACY INTERESTS UNDER
CONTROLLING SUPREME COURT AND CIRCUIT LAW. ........................6

    A.  Compelled Disclosure of QueerDoc Patients' Medical
Records Implicate Their Constitutional Privacy Interests. .........................7

    B.  The Court Should Protect the Informational Privacy
Interests at Issue in this Case. ..................................................12

        1.  Disclosure Would Subject QueerDoc Patients and Their
Families to Enormous Risk of Harm...................................................15

        2.  Disclosure Would Subject QueerDoc Patients and Their
Families to Enormous Risk of Harm...................................................19

CONCLUSION.....................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2025 Children's Hospital of Los Angeles Subpoena*,
No. 2:25-cv-11183 (C.D. Cal. Jan. 22, 2026) ....................................................14

*In re 2025 Subpoena to Children's Nat'l Hosp.*,
No. 1:25-cv-03780-JRR, 2026 WL 160792 (D. Md. Jan. 21, 2026)..5, 12, 14, 21

*In re 2025 UPMC Subpoena*,
No. 2:25-mc-01069-CB, 2025 WL 3724705 (W.D. Pa. Dec. 24,
2025) .................................................................................................................5, 21

*In re Admin. Subpoena No. 25-1431-019*,
No. 1:25-MC-91324-MJJ, 2025 WL 2607784 (D. Mass. Sept. 9,
2025) ...................................................................................................................4, 5

*Caesar v. Mountanos*,
542 F.2d 1064 (9th Cir. 1976), *cert. denied*, 430 U.S. 954 (1977) ....................11

*Carlson v. United States*,
837 F.3d 753 (7th Cir. 2016) .................................................................................6

*Carpenter v. United States*,
585 U.S. 296 (2018) ..........................................................................................9, 10

*Consumer Credit Ins. Agency, Inc. v. United States*,
599 F.2d 770 (6th Cir. 1979) .................................................................................7

*In re Crawford*,
194 F.3d 954 (9th Cir. 1999) ....................................................................10, 13, 17

*D.T. v. Christ*,
552 F. Supp. 3d 888 (D. Ariz. 2021) ...................................................................18

*In re: Dep't of Just. Admin. Subpoena No. 25-1431-030*,
No. 25-MC-00063-SKC-CYC, 2026 WL 33398 (D. Colo. Jan. 5,
2026) .......................................................................................................................6

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) ................................................................................9, 11

*Doe v. Claiborne*,
103 F.3d 495 (6th Cir. 1996) ...................................................................15

*Doe v. Garland*,
17 F.4th 941 (9th Cir. 2021) ....................................................................11

*Ferguson v. City of Charleston*,
532 U.S. 67 (2001).................................................................................9, 20

*Flotill Products, Inc. v. Federal Trade Com.*,
278 F.2d 850 (9th Cir. 1960) .....................................................................7

*In re Grand Jury Proceedings Harrisburg Grand Jury 79-1*,
658 F.2d 211 (3rd Cir. 1981) .....................................................................6

*In re Grand Jury Subpoena*,
829 F.2d 1291 (4th Cir. 1987) ...................................................................6

*Kallstrom v. City of Columbus*,
136 F.3d 1055 (6th Cir. 1998) .............................................................15, 18

*Lane v. Pena*,
518 U.S. 187 (1996).................................................................................11

*Love v. Johnson*,
146 F. Supp. 3d 848 (E.D. Mich. 2015) .................................................18

*Nat'l Aero. & Space Admin. v. Nelson*, 562 U.S. 134 (2011) .............................8, 9

*Nixon v. Adm'r of Gen. Servs.*,
433 U.S. 425, (1977) ..........................................................................8, 9, 10

*Norman-Bloodsaw v. Lawrence Berkeley Lab'y*,
135 F.3d 1260 (9th Cir. 1998) .................................................................11

*Nw. Mem. Hosp. v. Ashcroft*,
362 F.3d 923 (7th Cir. 2004) ...........................................................19, 21, 22

*Payne v. Taslimi*,
998 F.3d 648 (4th Cir. 2021) ...................................................................14

iii

*Planned Parenthood Fed'n of Am., Inc. v. Ashcroft*,
No. C03-4872 PJH, 2004 WL 432222 (N.D. Cal. Mar. 5, 2004)...........19, 21, 22

*Planned Parenthood of S. Arizona v. Lawall*,
307 F.3d 783 (9th Cir. 2002) .................................................................10, 13, 21

*Powell v. Schriver*,
175 F.3d 107 (2d Cir. 1999) .............................................................................17

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
No. 2:25-MC-00042-JNW, 2025 WL 3013568 (W.D. Wash. Oct.
27, 2025) .....................................................................................................3, 4, 16

*Ray v. Himes*,
No. 2:18-cv-272, 2019 WL 11791719 (S.D. Ohio, Sept. 12, 2019) .................17

*Roe v. Critchfield*,
137 F.4th 912 (9th Cir. 2025) ...........................................................................10

*In re Subpoena Duces Tecum No. 25-1431-016*,
No. 2:25-mc-00041-JHC, 2025 WL 3562151 (W.D. Wash. Sept. 3,
2025) ...................................................................................................................5

*In re Subpoena No. 25-1431-014*,
No. MC 25-39, 2025 WL 3252648 (E.D. Pa. Nov. 21, 2025)....................*passim*

*Tanis v. Cnty. of San Diego*,
576 F. Supp. 3d 721 (S.D. Cal. 2021).................................................................16

*Tucson Woman's Clinic v. Eden*,
379 F.3d 531 (9th Cir. 2004) ....................................................11, 13, 15, 19, 20

*United States v. Doe*,
457 F.2d 895 (2d Cir. 1972) ................................................................................6

*United States v. Exxon Corp.*,
628 F.2d 70 (D.C. Cir. 1980)...............................................................................7

*United States v. Miller*,
425 U.S. 435 (1976).............................................................................................9

*Whalen v. Roe*,
429 U.S. 589 (1977)..............................................................................8, 9, 10, 11

iv

**Other Authorities**

Fourth Amendment ...................................................................8, 9, 20

Carmel Shachar & Carleen Zubrzycki, *Informational Privacy After Dobbs*, ALA. L. REV. 1 (2023*)*.......................................................10

*Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, DEP'T JUSTICE OFF. PUB. AFFS. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical.......................20

Fed. R. App. P. 29(a)(2).............................................................1

MEMORANDUM FOR SELECT COMPONENT HEADS RE PREVENTING THE MUTILATION OF AMERICAN CHILDREN, OFF. ATT'Y GEN. (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl .......................................20

*National Child Abuse Prevention Month, 2025*, WHITE HOUSE (Apr. 3, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/national-child-abuse-prevention-month-2025; .......................16

## RULE 29(A)(4)(E) STATEMENT

No party's counsel authored any portion of this brief, in whole or in part. No person or entity other than amici and amici's counsel has or is expected to contribute money intended to fund the preparation or submission of this brief.

### INTERESTS OF *AMICI CURIAE*[1]

*Amici curiae* are the National Center for LGBTQ Rights, National Center for Youth Law, and GLBTQ Legal Advocates & Defenders. As national legal organizations that have represented transgender children and adolescents and their families in litigation around the country related to medical and healthcare issues, *amici* have developed substantial expertise in the legal and factual issues presented here. *Amici* therefore submit this brief in support of Movant-Appellee.

**The National Center for LGBTQ Rights (NCLR)** is a national non-profit legal organization dedicated to protecting and advancing the civil rights of lesbian, gay, bisexual, and transgender people and their families through litigation, public policy advocacy, and public education. Since its founding in 1977, NCLR has played a leading role in securing fair and equal treatment for LGBTQ people and their families in cases across the country involving constitutional and civil rights. NCLR has a particular interest in promoting equal opportunity for LGBTQ people in healthcare through legislation, policy, and litigation.

**National Center for Youth Law (NCYL)** is a private, non-profit law firm that uses the law to help children achieve their potential by transforming the public agencies that serve them. For over 50 years, NCYL has worked to protect the rights

---

[1] Pursuant to Fed. R. App. P. 29(a)(2), this brief is filed with the consent of all parties.

1

of children and ensure that they have the resources, support, and opportunities they need to live safely with their families in their communities and that public agencies promote their safety and well-being. NCYL has extensive experience litigating to enforce the rights of young people—including those who identify as lesbian, gay, bisexual, transgender, queer, and other identities across the gender and sexuality identity spectrum (hereinafter LGBTQ+)—to health care, to connections to their families and communities, and to reduce reliance on traumatic family separation.

**GLBTQ Legal Advocates & Defenders (GLAD Law)** is a legal rights organization that seeks equality for all persons under the law regardless of their sexual orientation, transgender status, or HIV status. Since 1978, GLAD Law has worked nationally through strategic litigation, public policy advocacy, and education. GLAD Law has an enduring interest in LGBTQ families and children, including their right to access healthcare free from overreaching government intrusion.

**ARGUMENT**

The district court properly quashed the Department of Justice's ("DOJ") administrative subpoena to QueerDoc after concluding it sought to coerce providers into abandoning lawful medical care by demanding a sweeping amount of information untethered to any legitimate investigative purpose. *Amici* submit this brief to further highlight the constitutional privacy interests implicated for transgender minors and their families who sought care at QueerDoc. Those interests reinforce the district court's conclusion and independently warrant affirmance. *See* Mot. to Quash at 17 (arguing the DOJ subpoena "substantially burdens patient privacy"); *QueerDoc, PLLC v. U.S. Dep't of Just.*, No. 2:25-MC-00042-JNW, 2025 WL 3013568, at *6 (W.D. Wash. Oct. 27, 2025) ("No legitimate investigation would demand thousands of patient records from an entity that cannot, by definition, commit the violations being investigated.").

## I. THE DISCONNECT BETWEEN THE INFORMATION SOUGHT AND DOJ'S PURPORTED INTERESTS SUPPORTS THE DISTRICT COURT'S ORDER QUASHING THE SUBPOENA.

DOJ's stated purpose of investigating healthcare fraud bears no relationship to its broad requests for information. These requests, for example, demand expansive and intimate patient information entirely untethered to DOJ's stated investigation, confirming the district court's finding of improper purpose.

3

DOJ contends that its subpoena relates to its investigation of "whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated federal law, including the Food, Drug, and Cosmetic Act[]." *QueerDoc*, 2025 WL 3013568, at *2 (quoting subpoena); *see also* Opening Br. at 15. Yet several of the requests "demand a staggering amount of personal health data related to QueerDoc's patients" and their families, which "have little to do with investigating violations of FDCA." *QueerDoc*, 2025 WL 3013568, at *6. This disconnect reveals DOJ's true intent: not to investigate healthcare fraud, but to intimidate QueerDoc into ending its provision of established health care for transgender adolescents. The subpoena's near-unbridled scope—demanding vast amounts of highly sensitive medical information with no connection to FDCA enforcement[2]—confirms the district court's finding of improper purpose. Indeed, five other district courts evaluating substantially identical subpoenas have likewise found that their overbreadth evinces improper purpose:

> • The District of Massachusetts court found DOJ's subpoena to Boston Children's Hospital to be "astonishingly broad" and "virtually unlimited in scope" largely because it "seek[s] all medical records and personal information of patients who have been provided with GAC [gender-affirming care], . . . despite the tenuous link these medical records (or their personal information) would have to potential fraudulent billing codes and unlawful off-label promotion." *In re Admin. Subpoena No. 25-*

---

[2] The subpoenas, for instance, seek names, dates of birth, social security numbers, addresses, and parent/guardian information for QueerDoc's patients, all documents concerning their diagnoses, all documents relating to informed consent, and documentation of adverse side effects. *See* Mot. to Quash, Ex. 3 at 6-7.

*1431-019*, No. 1:25-MC-91324-MJJ, 2025 WL 2607784, at *6 (D. Mass. Sept. 9, 2025); *see also id.* at *7 ("[T]he subpoena was issued for an improper purpose, motivated only by bad faith.").

- The Eastern District of Pennsylvania found it impossible to "discern" how "child-patients' identities and highly sensitive medical information" were "*relevant* to an inquiry into a federal health care offense'" with respect to DOJ's subpoena to Children's Hospital of Philadelphia. *In re Subpoena No. 25-1431-014*, No. MC 25-39, 2025 WL 3252648, at *13 (E.D. Pa. Nov. 21, 2025) (emphasis in original); *see also id.* at *14 ("[T]he connection between child-patient-identifying information and potential fraudulent billing codes or unlawful off-label promotion is tenuous at best and cannot shoulder the weight of compelled disclosure of a child's medical files.").

- The Western District of Pennsylvania quashed DOJ's subpoena to UPMC, explaining that it "joins the others in finding that the government's demand for deeply private and personal patient information carries more than a whiff of ill-intent." *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069-CB, 2025 WL 3724705, at *2 (W.D. Pa. Dec. 24, 2025).

- The Western District of Washington found that DOJ's subpoena to Seattle Children's Hospital was issued for an improper purpose in large part because of "significant evidence at the DOJ issued the subpoena to pressure hospitals into ending gender-related care for minors." *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041-JHC, 2025 WL 3562151, at *11 (W.D. Wash. Sept. 3, 2025). The court also observed that "DOJ's threadbare justification for its subpoena" combined with this "strong evidence" of improper purpose" meant that "private interests must prevail in this case." *Id.* at *13.

- The District of Maryland concluded that DOJ's subpoena to Children's National Hospital was "not issued for a legitimate governmental purpose, is not limited in scope to any legitimate purpose, and is oppressive in its breadth." *In re 2025 Subpoena to Children's Nat'l Hosp.*, No. 1:25-cv-03780-JRR, 2026 WL 160792, at *8 (D. Md. Jan. 21, 2026). "Considering the patent disassociation of the scope of the Subpoena from purported investigation of Hospital FDCA violations," the court found, instead, that the subpoena "is a pretext to fulfill the Executive's well-publicized policy objective to terminate and block gender affirming healthcare." *Id.*

Similarly, a Colorado federal magistrate judge issued a report and recommendation that a "facially overbroad" DOJ subpoena be quashed because it "create[d] a dragnet designed to sweep in all patient data related to any prescription of puberty blockers or hormone therapy," instead of "limiting its request for patient data to some criteria relevant to an ostensible investigation into misbranded labeling . . . ." *In re: Dep't of Just. Admin. Subpoena No. 25-1431-030*, No. 25-MC-00063-SKC-CYC, 2026 WL 33398, at *4 (D. Colo. Jan. 5, 2026); *see also id.* (holding "the Subpoena never attempts to satisfy its burden as to limited scope" and that the subpoena's requests "which seek personal health data . . . are not, therefore, relevant in purpose to an FDCA investigation").

So too here. DOJ makes no attempt to cabin the information it seeks in this subpoena to its purported intended investigations. Instead, the subpoena demands profoundly sensitive patient information with no nexus to alleged FDCA violations. This disconnect confirms improper purpose and warrants the district court's order.

## II. QUEERDOC PATIENTS HAVE CONSTITUTIONALLY PROTECTED PRIVACY INTERESTS UNDER CONTROLLING SUPREME COURT AND CIRCUIT LAW.

A subpoena "remains at all times under the control and supervision of a court." *In re Grand Jury Subpoena*, 829 F.2d 1291, 1297 (4th Cir. 1987) (quoting *United States v. Doe*, 457 F.2d 895, 898 (2d Cir. 1972)); *see also Carlson v. United States*, 837 F.3d 753, 760 (7th Cir. 2016); *In re Grand Jury Proceedings Harrisburg Grand*

6

*Jury 79-1*, 658 F.2d 211, 214 (3rd Cir. 1981); *Consumer Credit Ins. Agency, Inc. v. United States*, 599 F.2d 770, 776 n.1 (6th Cir. 1979). "Since the enforcement of a subpoena is an independent judicial action . . . a court is free to change the terms of an agency subpoena as it sees fit." *United States v. Exxon Corp.*, 628 F.2d 70, 77 (D.C. Cir. 1980) (citing *Flotill Products, Inc. v. Federal Trade Com.*, 278 F.2d 850, 852 (9th Cir. 1960)). That supervisory authority is critical where, as here, compelled disclosure threatens core constitutional privacy interests of non-party patients who cannot practicably protect their own information.

### A. Compelled Disclosure of QueerDoc Patients' Medical Records Implicate Their Constitutional Privacy Interests.

DOJ's subpoena directly implicates QueerDoc's patients' constitutional privacy interests by seeking exceptionally sensitive medical information. DOJ's stated purpose of investigating healthcare fraud bears no relationship to the subpoena as a whole, but is especially disconnected to Requests 11, 12, 13, and 15 (Patient Data Requests). These requests demand expansive and intimate patient information entirely untethered to DOJ's stated investigation, confirming the district court's finding of improper purpose. They seek names, dates of birth, social security numbers, addresses, and parent/guardian information for QueerDoc's patients and their families, all documents concerning their diagnoses, all documents relating to informed consent, and documentation of adverse side effects. *See* Mot. to Quash, Ex. 3 at 6-7.

7

As the U.S. Supreme Court and this Court have recognized for decades, patients have strong, constitutional privacy interests in the types of highly sensitive personal and medical information sought by the subpoena. These interests are rooted in both substantive due process and the Fourth Amendment. In *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977), for instance, the U.S. Supreme Court found patients' informational privacy interests were implicated by a state law requiring doctors to report to the state health department the names, addresses, physicians, pharmacies, and dosages of patients receiving certain prescription drugs. 429 U.S. at 591, 600. The Court distinguished between "two different kinds of interests" in privacy cases: "the individual interest in avoiding disclosure of personal matters," and "the interest in independence in making certain kinds of important decisions." *Id.* at 599-600. Informational privacy is the former. *See also id.* at 599 n.25 (collecting cases demonstrating longstanding recognition of this interest).

The Court has affirmed the constitutional interest in informational privacy several times since *Whalen*. In *Nixon v. Adm'r of Gen. Servs.*, the Court explained that the right to privacy includes an "'individual interest in avoiding disclosure of personal matters.'" 433 U.S. 425, 457 (1977) (quoting *Whalen*, 429 U.S. at 599). Similarly, in *Nat'l Aero. & Space Admin. v. Nelson*, the Court explained that it has "referred broadly to a constitutional privacy 'interest in avoiding disclosure of

8

personal matters.'" 562 U.S. 134, 157 (2011) (citing *Whalen*, 429 U.S. at 599, and *Nixon,* 433 U.S. at 457).[3]

The Supreme Court has also grounded the right to informational privacy in the Fourth Amendment, which is particularly relevant in the context of the administrative subpoena here. For instance, in *Ferguson v. City of Charleston*, the Court held that state agents obtaining medical information with neither a warrant nor patient consent violated the Fourth Amendment. 532 U.S. 67, 76-77 (2001). The Court recognized a patient's reasonable expectation of privacy in their medical tests and warned that "intru[ding] on that expectation . . . may deter patients from receiving needed medical care." *Id.* at 78 & n.14 (citing *Whalen*, 429 U.S. at 599-600); *see also Nixon*, 433 U.S. at 457-59 (relying on *Whalen* but also citing Fourth Amendment cases to explain the Constitution protects informational privacy).[4]

---

[3] The Court reaffirmed the distinction between informational and decisional privacy interests in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), and described "two very different meanings of the term ['right of personal privacy']: the right to shield information from disclosure and the right to make and implement important personal decisions without governmental interference." *Id.* at 273 (favorably citing *Whalen*, 429 U.S. at 599-600).

[4] More recently, in *Carpenter v. United States*, the Court held that individuals retain a reasonable expectation of privacy in particularly sensitive information, such as medical records, under the Fourth Amendment, even when that information has been shared with third parties. 585 U.S. 296, 314, 317-18 (2018). Although the Court recognized that a person typically forfeits their reasonable expectation of privacy for run-of-the-mill business records held by a "third party," *see, e.g.*, *United States v. Miller*, 425 U.S. 435 (1976), the *Carpenter* Court clarified that citizens retain that privacy when particularly sensitive information is at issue. *Carpenter*, 585 U.S. at

9

The Ninth Circuit has similarly recognized the constitutional right to informational privacy for decades. *See, e.g.*, *In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999) (recognizing "the individual interest in avoiding disclosure of personal matters.") (citing *Doe v. Att'y Gen. of U.S.*, 941 F.2d 780, 795 (9th Cir.1991)); *Planned Parenthood of S. Arizona v. Lawall*, 307 F.3d 783, 789-90 (9th Cir. 2002) ("[T]he right to 'informational privacy,' applies both when an individual chooses not to disclose highly sensitive information to the government and when an individual seeks assurance that such information will not be made public.") (citing *Crawford,* 194 F.3d at 958); *Roe v. Critchfield*, 137 F.4th 912, 931 (9th Cir. 2025) (same); *see also generally* Carmel Shachar & Carleen Zubrzycki, *Informational Privacy After Dobbs*, 75 ALA. L. REV. 1, 19 (2023) (observing that *Whalen*, *Nixon*, and *Nelson* "form the seeds from which many lower court cases confirm a right to informational privacy, often in the context of medical records" and collecting cases). The Ninth Circuit has also long recognized that this interest extends to adolescence. *See, e.g.*, *Lawall,* 307 F.3d at 789 (recognizing adolescence's "privacy interest in avoiding disclosure of sensitive personal information" in medical context).

Like the Supreme Court, the Ninth Circuit has stressed that the constitutional informational privacy interest is particularly implicated by the disclosure of medical

---

309-10; *see also id.* at 312 (cell-site information reveals uniquely private information in part because cell phones follow their owners "into . . . doctor's offices").

records and information. *See, e.g.*, *Norman-Bloodsaw v. Lawrence Berkeley Lab'y*, 135 F.3d 1260, 1269 (9th Cir. 1998); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004) (protecting constitutional privacy interest "in avoiding 'disclosure of personal matters,' including medical information") (quoting *Whalen*, 429 U.S. at 599), *abrogated on other grounds*, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *Att'y Gen.*, 941 F.2d at 795 (same) (citing *Whalen*, 429 U.S. at 599)), *overruled on other grounds*, *Lane v. Pena*, 518 U.S. 187 (1996); *Caesar v. Mountanos*, 542 F.2d 1064, 1067 n.9 (9th Cir. 1976) (privacy right includes provider-patient communications), *cert. denied*, 430 U.S. 954 (1977). The Ninth Circuit recently affirmed that disclosing "highly sensitive medical information," such as "*full medical histories*," implicates "patients' informational right to privacy." *Doe v. Garland,* 17 F.4th 941, 947 (9th Cir. 2021) (citing *Tucson Woman's Clinic*, 379 F.3d at 552-53) (emphasis in original). These are precisely the kind of protected records sought by DOJ's subpoena here.

Indeed, the medical records at issue—which include mental health and medical needs assessments for vulnerable adolescent patients—are deserving of the highest legal protection. *See* Shachar & Zubrzycki, *supra*, at 28 (noting informational privacy right is particularly protective "in contexts that implicate information including medical or sexual information or that have implications for personal safety" and collecting cases). DOJ's subpoena targets patient information

about sex, gender transition, and the most intimate aspects of these young patients' lives. These records are precisely the type of information that is shielded by constitutional informational privacy. *See In re 2025 Subpoena to Children's Nat'l Hosp.*, 2026 WL 160792, at \*8 ("There can be no question that [patients] have a constitutionally reasonable expectation of privacy in the highly sensitive medical records subject to the Subpoena.").

### B. The Court Should Protect the Informational Privacy Interests at Issue in this Case

Multiple district courts around the country have assessed patient privacy rights in the context of identical or nearly identical subpoenas. *See supra* Section I. Similarly, this Court should affirm the district court's decision in full, especially considering the expansiveness and sensitivity of the Patient Data Requests. Should the Court disagree, amici respectfully urge the Court remand these issues to the district court to determine in the first instance, or in the alternative, narrow the subpoena by quashing the Patient Data Requests.

When constitutional informational privacy interests are implicated, Courts weigh multiple factors to determine whether disclosure is justified. These include:

> (1) the type of information requested, (2) the potential for harm in any subsequent non-consensual disclosure, (3) the adequacy of safeguards to prevent unauthorized disclosure, (4) the degree of need for access, and (5) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

12

*Tucson Woman's Clinic v. Eden*, 379 F.3d at 551 (citing *Lawall*, 307 F.3d at 790). The government bears the burden of showing that "its use of the information would advance a legitimate state interest and that its actions are narrowly tailored to meet the legitimate interest." *Crawford*, 194 F.3d at 959 (quoting *Att'y Gen.*, 941 F.2d at 796).

Each factor of the *Tucson Woman's Clinic* test counsels in favor of quashing the subpoena in its entirety or, at a minimum, the Patient Data Requests. *See Subpoena No. 25-1431-014*, 2025 WL 3252648, at *24-*33 (applying *Westinghouse* factors, which substantially parallel the *Tucson Woman's Clinic* factors, and concluding that "[t]he exceptional privacy interests at stake compel limiting the Subpoena to exclude" requests seeking patient data).

Regarding the first factor, the type of information sought is inherently sensitive and merits protection against disclosure. *See supra* Section II(A); *see also In re: Subpoena 25-1431-014*, 2025 WL 3252648, at *26 (applying analogous factor to equivalent requests and concluding the "level of detail [sought] places the information among the most personal and sensitive a medical provider can hold and squarely within the class of intimate material . . . warranting the strongest constitutional protection").

Similarly, the fourth and fifth factors—the degree of need for and a recognizable public interest in access to this information—also militate against

13

disclosure here. DOJ's alleged need for this information, to investigate potential violations of the FDCA in ostensible service of public health and safety, has no relationship to the identifying information sought by the subpoena and especially the Patient Data Requests. *See supra* Section I; *see also In re: Subpoena No. 25-1431-014*, 2025 WL 3252648, at *31 (applying analogous factor to equivalent requests and concluding that none of DOJ's "areas of inquiry inherently requires access to children's and their families' identities, psychosocial histories, sexual-development disclosures, family dynamics, trauma histories, or other intimate clinical details sought in" these requests); *In re 2025 Subpoena to Children's Nat'l Hosp.*, 2026 WL 160792, at *8 ("[Patients]' interest in maintaining the privacy of their sensitive medical records outweighs any interest of the Government in calling for their production. No proper (never mind compelling) governmental purpose has been demonstrated.") (citing *Payne v. Taslimi*, 998 F.3d 648 (4th Cir. 2021). Indeed, DOJ recently withdrew these same Patient Data Requests in order to resolve litigation involving the Children's Hospital of Los Angeles. *In re 2025 Children's Hospital of Los Angeles Subpoena*, No. 2:25-cv-11183, Dkt. No. 25 at 2 (C.D. Cal. Jan. 22, 2026) ("On December 8, 2025, the Government . . . withdrew Subpoena Requests 11, 12, and 13 in their entirety.").

The remaining factors are discussed in turn.

14

### 1. Disclosure Would Subject QueerDoc Patients and Their Families to Enormous Risk of Harm.

The second factor of the *Tucson Woman's Clinic* test relates to the potential for harm in any subsequent, non-consensual disclosure of the information sought. Forced disclosure of transgender healthcare medical records would place QueerDoc patients and their families at enormous risk of harm, as other courts have already held. *See, e.g., In re: Subpoena No. 25-1431-014*, 2025 WL 3252648, at *27 (applying analogous factor to equivalent requests and concluding that "[s]uch disclosures would strip patients of control over their most personal information, expose intimate details about their bodies and lives, and risk public outing and lasting stigma," which "would inflict deep emotional harm, destroy trust in medical care, and spread the damage to families, peers, and many others").

This Circuit has recognized that the "potential for harm" is "obviously tremendous" when the disclosure involves sensitive medical records. *Tucson Woman's Clinic*, 379 F.3d at 552-53. Other courts agree that "where the release of private information places an individual at substantial risk of serious bodily harm, . . . the 'magnitude of the liberty deprivation . . . strips the very essence of personhood.'" *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1064 (6th Cir. 1998) (quoting *Doe v. Claiborne*, 103 F.3d 495, 506-07 (6th Cir. 1996)). This risk attaches to the sensitive identifying information sought by the Patient Data Requests, even if revealed only to government officials, and to any subsequent non-consensual

15

disclosures. As discussed briefly below, this risk is further evidenced by: (1) the stigma associated with transgender healthcare, (2) the discrimination faced by transgender people from both this administration and the public, (3) the importance of goodwill between patients and their doctors, and (4) the damage that would result if DOJ successfully intimidates QueerDoc into ceasing this care.

First, this risk attaches generally to the identifying information demanded by the Patient Data Requests, which would subject the revealed patients and their families to high risk of harassment and humiliation if made public. This risk is especially high with respect to adolescents. *See, e.g.*, *Doe by & through Tanis v. Cnty. of San Diego*, 576 F. Supp. 3d 721, 736 (S.D. Cal. 2021) ("Under [*Tucson Woman's Clinic*'s] balancing test, the court finds the potential for harm in the non-consensual disclosure of the minor victim's personal information—including legal name, home address, school address, and cell phone number—is obviously very high.").

Importantly, this risk remains significant even if the identities of QueerDoc patients and families are revealed only to federal government officials. The current administration has made clear it considers parents' informed consent to transgender healthcare for their children to be child abuse. *See National Child Abuse Prevention Month, 2025*, WHITE HOUSE (Apr. 3, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/national-child-abuse-prevention-month-2025; *see generally QueerDoc*, 2025 WL 3013568, at *5

(canvassing current administration's record of attacking transgender healthcare for transgender youth).

Second, the stigma attached to gender dysphoria and this healthcare in general make the risk of harassment upon disclosure extraordinarily high. The potential for harm upon non-consensual disclosure is high for medical records generally, *see supra* Section I, but, as courts have emphasized, is even higher for medical records regarding controversial or stigmatized conditions. *See, e.g.*, *Crawford*, 194 F.3d at 960 (distinguishing SSN disclosure from forced "disclos[ure of] HIV status [or] sexual orientation" because "[u]nlike these personal facts, a SSN is not inherently sensitive or intimate information, and its disclosure does not lead directly to injury, embarrassment or stigma").

Third, the fact that QueerDoc patients' transgender identity would be revealed upon non-consensual public disclosure of the sought information triggers a high risk of harm. The Second Circuit in *Powell* emphasized that one's transgender identity "is likely to provoke . . . hostility and intolerance from others." *Powell v. Schriver*, 175 F.3d at 111; *see also id.* at 113 (observing that public disclosure thereof in a prison environment "might lead to inmate-on-inmate violence"). If QueerDoc patients' transgender status is disclosed, they too are likely to face discrimination, harassment, and violence as a result. *See, e.g., Ray v. Himes*, No. 2:18-cv-272, 2019 WL 11791719, at *7 (S.D. Ohio, Sept. 12, 2019) ("forced disclosure of Plaintiffs'

transgender status" to the relevant government agency "place[s] their 'personal safety and bodily integrity in jeopardy'") (quoting *Kallstrom*, 136 F.3d at 1064); *Love v. Johnson*, 146 F. Supp. 3d 848, 855 (E.D. Mich. 2015) (finding that because plaintiffs' transgender identities would be revealed by inaccurate identity documents, the policy at issue "poses a real threat to their 'personal security and bodily integrity'"). This harm is especially concerning when adolescents are involved. *See D.T. v. Christ*, 552 F. Supp. 3d 888, 897 n.8 (D. Ariz. 2021) (observing that "involuntary exposure of a child's transgender status . . . unnecessarily exposes this child to stigma, bullying, fear, and violence" and "other courts have recognized the harsh realities often facing transgender children" (collecting cases)). Disclosure of QueerDoc patients' receipt of this controversial medical care related to a marginalized minority population would subject them to serious risk of harassment and discrimination.

Finally, producing this information would harm the doctor-patient relationship. If patients cannot trust their providers to maintain confidentiality, they will be deterred from seeking necessary care or from being candid during treatment, which further counsels against disclosure. *See In re: Subpoena No. 25-1431-014*, 2025 WL 3252648, at *29 ("Patients and families who believe their medical records can be turned over to federal investigators will understandably hesitate to seek care, withhold critical information from their doctors, or avoid treatment for gender-

affirming concerns (given the present attacks on this care by the highest levels of law enforcement).”). This risk only increases with respect to stigmatized conditions or treatments, where trust between patients and providers is of paramount importance. *See, e.g.*, *Nw. Mem. Hosp. v. Ashcroft*, 362 F.3d 923, 929 (7th Cir. 2004) (cautioning that hospital “will lose the confidence of its patients, and persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment” if it fails to “shield the medical records of its abortion patients from disclosure”); *Planned Parenthood Fed'n of Am., Inc. v. Ashcroft*, No. C03-4872 PJH, 2004 WL 432222, at *2 (N.D. Cal. Mar. 5, 2004) (“[T]he potential for injury to the relationship between patient and provider is significant given the providers' pledge of confidentiality.”).

For these reasons, the potential for harm to QueerDoc's patients from subsequent, non-consensual disclosures is exceedingly high.

### 2. DOJ Provides No Safeguards to Protect Against Unwarranted Disclosure.

Under the third factor of the *Tucson Woman's Clinic* test, DOJ has failed to identify any—let alone sufficient—safeguards to prevent unwarranted dissemination of the sought information. *See In re: Subpoena No. 25-1431-014*, 2025 WL 3252648, at *30 (applying analogous factor to equivalent requests and concluding that DOJ “offers nothing to mitigate a concern for these children and their families given these pronouncements”).

In fact, DOJ could share this information widely with federal and state authorities to facilitate criminal law enforcement against providers like QueerDoc. *See, e.g.*, MEMORANDUM FOR SELECT COMPONENT HEADS RE PREVENTING THE MUTILATION OF AMERICAN CHILDREN, OFF. ATT'Y GEN. at 3-4 (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl (directing all U.S. Attorneys to investigate and prosecute all suspected providers of "gender-affirming care," directing other components of DOJ to investigate FCA and FDCA claims based on same, and announcing partnership with state attorneys general to support state-level prosecution of these providers); *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, DEP'T JUSTICE OFF. PUB. AFFS. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical (stating that medical professionals and organizations who provide this care "in the service of a warped ideology will be held accountable by this Department of Justice"). This risk of subsequent non-consensual disclosure of medical information for law enforcement purposes would violate QueerDoc patients' informational privacy rights. *See Ferguson*, 532 U.S. at 76 (state's obtainment of patients' medical information and transfer to law enforcement without warrant or consent violated Fourth Amendment privacy right); *see also Tucson Woman's Clinic*, 379 F.3d at 551-52 ("Even if a law adequately protects against *public* disclosure of a patient's private

information, it may still violate informational privacy rights if an unbounded, large number of government employees have access to the information." (citing *Lawall*, 307 F.3d at 789-90)).

DOJ has proposed in related litigation that providers can simply redact confidential patient information, *see In re 2025 UPMC Subpoena*, 2025 WL 3724705, at *1 (granting relief to plaintiffs despite "the government's concession that it will accept 'anonymized' medical records"), but redaction would not cure the constitutional defects of the subpoenas. *See In re 2025 Subpoena to Children's Nat'l Hosp.*, 2026 WL 160792, at *9 ("The court rejects the Government's suggestions that anonymizing Movants' patient records cures the Subpoena's defects. The Subpoena lacks a legitimate purpose. That cannot be ameliorated by providing patient records in redacted form."). Moreover, "[e]ven if there were no possibility that a patient's identity might be learned from a redacted medical record, there would be an invasion of privacy" given "[t]he revelation of the intimate details contained" in these medical records—here, for instance, the extent of one's gender dysphoria, dosage levels and adjustments, side effects and mental health details. *Ashcroft*, 362 F.3d at 929. Courts regularly shield even redacted medical records from disclosure precisely because these details are still deeply personal even when not tied to particular names. *See, e.g.*, *Planned Parenthood*, 2004 WL 432222, at *2 (rejecting disclosure of medical records to government even with "redaction of . . . objectively

identifying information" because they "nevertheless contain other . . . information of an extremely personal and intimate nature[.]"). In *Ashcroft*, the Seventh Circuit affirmed quashing a subpoena for redacted medical records because redaction could not eliminate realistic risks of reidentification and would not prevent harm, including the chilling effect on patient care. 362 F.3d at 929–31. Those concerns apply with full force here. The Government's overt hostility toward transgender health care magnifies the risks of reidentification and erodes patient trust in the healthcare system—risks that redaction fails to cure. *Id.* at 928-29 ("The natural sensitivity that people feel about the disclosure of their medical records – the sensitivity that lies behind HIPAA – is amplified when the records are of a procedure that [the Government] has now declared to be a crime.").

## CONCLUSION

*Amici* respectfully urge this Court to affirm the district court's order quashing DOJ's administrative subpoena in its entirety based on improper purpose. At a minimum, the Court should remand this issue to the district court to determine in the first instance or should uphold the district court's order quashing the Patient Data Requests.

Dated: January 23, 2026

Respectfully submitted,

/s/ Amy Whelan

22

NATIONAL CENTER FOR
LGBTQ RIGHTS
Shannon Minter (CA Bar: 168907)
Amy Whelan (CA Bar: 215675)
1401 21st Street #11548
Sacramento, CA 95811
Telephone: (415) 392-6257
Facsimile: (415) 392-8442
awhelan@nclrights.org
sminter@nclrights.org

Jennifer L. Levi
Donovan C. Bendana
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@gladlaw.org
dbendana@gladlaw.org

*Attorneys for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on January 23, 2026, I caused a true and accurate copy of the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the CM/ECF system.

I further certify that the participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Amy Whelan
*Attorney for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated        .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                               **Date**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                        *Rev. 12/01/22*