No. 25-7384

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

U.S. DEPARTMENT OF JUSTICE,

*Respondent-Appellant*,

v.

QUEERDOC, PLLC,

*Movant-Appellee*.

---

On Appeal from the United States District Court
for the Western District of Washington
No. 2:25-mc-00042-JNW

---

## BRIEF OF AMICUS CURIAE LAMBDA LEGAL DEFENSE AND
## EDUCATION FUND, INC. IN SUPPORT OF MOVANT-APPELLEE

---

A.D. Lewis
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
4221 Wilshire Blvd., Ste. 280
Los Angeles, CA 90010
(213) 382-7600

Morgan Walker
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
214-219-8585

Karen L. Loewy
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006
202-804-6245

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
212-809-8585

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* Lambda Legal Defense and Education Fund, Inc. certifies that it is a nonprofit organization, that it has no parent corporation, and that no corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................i

TABLE OF CONTENTS.......................................................... ii

TABLE OF AUTHORITIES ................................................... iii

INTEREST OF *AMICUS CURIAE*...........................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................2

ARGUMENT ........................................................................5

   I.    THE SUBPOENA TO QUEERDOC IS PART OF THE TRUMP ADMINISTRATION'S TARGETED ATTACKS ON TRANSGENDER PEOPLE.................................................................7

       A. The Administration Has Targeted Transgender People for Discrimination and Barred Government Acknowledgement of Transgender People's Existence. ......................................7

       B. The Administration's Endgame is to Eliminate GAMC, Particularly for Adolescents. ..................................................11

       C. The Subpoenas to Healthcare Providers Like QueerDoc are a Component of DOJ's Implementation of the Administration's Mission to Discriminate Against Transgender People and End Access to GAMC. ..................................................16

   II.   DOJ'S UNFOUNDED ALLEGATIONS OF HEALTHCARE OFFENSES AGAINST PROVIDERS LIKE QUEERDOC WHO PROVIDE GAMC ILLUSTRATE THE SUBPOENA'S IMPROPER PURPOSE.................................................................18

       A. Off-label Prescription of Medications as Part of GAMC Does Not Violate the FDCA or Otherwise Constitute a Healthcare Offense. ...19

       B. Informing Patients About the Off-Label Use of Puberty Blockers and Hormone Therapy to Treat Gender Dysphoria Does Not Violate the FDCA or Otherwise Constitute a Healthcare Offense.......................23

CONCLUSION...................................................................27

CERTIFICATE OF COMPLIANCE.......................................29

CERTIFICATE OF SERVICE ..............................................30

# TABLE OF AUTHORITIES

## Cases

*Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Insts. of Health*,
795 F. Supp. 3d 678 (D. Md. 2025) ........................................................ 11

*Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*,
13 F.4th 531 (6th Cir. 2021) ................................................................... 20

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) .......................................................................... 20, 21

*Chaney v. Heckler*,
718 F.2d 1174 (D.C. Cir. 1983) .............................................................. 21

*Dekker v. Weida*,
679 F.Supp.3d 1271 (N.D. Fla. 2023) ..................................................... 26

*Doe v. McHenry*,
763 F. Supp. 3d 81 (D.D.C. 2025) .......................................................... 10

*In Re 2025 Subpoena to Children's Nat'l Hosp.*,
No. 1:25-cv-03780-JRR, 2026 WL 160792 (D. Md. Jan. 21, 2026) ....................... 3

*In re 2025 UPMC Subpoena*,
No. 2:25-MC-01069-CB, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025) ................ 3

*In re Admin. Subpoena No. 25-1431-019*,
800 F.Supp.3d 229 (D. Mass. 2025) ........................................................... 3

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
678 F.3d 235 (3d Cir. 2012) .................................................................... 24

*In re Subpoena No. 25-1431-014*, No.,
MC 25-39, 2025 WL 3252648 (E.D. Pa. Nov. 21, 2025) ........................... 3, 24, 27

*Kadel v. Folwell*,
100 F.4th 122 (4th Cir. 2024) ................................................................... 1

*Kingdom v. Trump,*
No. 1:25-CV-691-RCL, 2025 WL 1568238 (D.D.C. June 3, 2025) ..................... 10

*PFLAG, Inc. v. Trump,*
769 F.Supp.3d 405 (D. Md. 2025) ................................................................ 1, 9

*Pritchard v. Blue Cross Blue Shield of Ill.,*
159 F.4th 646 (9th Cir. 2025) ........................................................................ 1

*Rosati v. Igbinoso,*
791 F.3d 1037 (9th Cir. 2015) ....................................................................... 1

*San Francisco AIDS Found. v. Trump,*
786 F.Supp.3d 1184 (N.D. Cal. 2025) ......................................................... 1, 9

*Schlacter v. United States,*
No. CV GLR-25-1344, 2025 WL 2606101 (D. Md. Sept. 9, 2025) ..................... 10

*UFCW Local 1776 v. Eli Lilly & Co.,*
620 F.3d 121 (2d Cir. 2010) ......................................................................... 24

*United States v. Caronia,*
703 F.3d 149 (2d. Cir 2012) ......................................................................... 21

*United States v. Evers,*
643 F.2d 1043 (5th Cir. 1981) ...................................................................... 25

*United States v. Morton Salt Co.,*
338 U.S. 632 (1950) ...................................................................................... 5

*United States v. Powell,*
379 U.S. 48 (1964) ........................................................................................ 5

*United States v. Skrmetti,*
605 U.S. 495 (2025) ...................................................................................... 1

**Executive Orders**

*Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) .......................................................................... 2, 7, 8, 9, 10, 11, 12, 13

*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025)................................................ 8

*Ending Radical Indoctrination in K-12 Schooling*, Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan 29, 2025)
........................................................................................................... 9

*Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025)................................................ 8

*Keeping Men Out of Women's Sports*, Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 11, 2025)............................................................................................... 9

*Prioritizing Military Excellence and Readiness*, Exec. Order No. 14183, 90 Fed. Reg. 8757 (Jan. 27, 2025) ....................................................................... 8, 9

*Protecting Children From Chemical and Surgical Mutilation*, Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025)......................... 2, 3, 8, 12, 13, 16, 17, 26

**Statutes**

18 U.S.C. § 24 ......................................................................................... 20

21 U.S.C. § 301 *et seq*. ............................................................................ 4

21 U.S.C. § 396........................................................................................ 20

**Rules**

Fed. R. App. P. 26.1.................................................................................. i

Fed. R. App. P. 29(a)(2)............................................................................ 2

**Regulations**

*Medicaid Program; Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children*, 90 Fed. Reg. 59441 (proposed Dec. 19, 2025) ....................................................... 15

*Medicare and Medicaid Programs; Hospital Condition of Participation: Prohibiting Sex-Rejecting Procedures for Children*, 90 Fed. Reg. 59463 (proposed Dec. 19, 2025) ....................................................... 15

*Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance*, 90 Fed. Reg. 59478 (proposed Dec. 19, 2025) ....................................................... 16

*Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability*, 90 Fed. Reg. 27074 (June 25, 2025) ....................................................... 12

**Other Authorities**

Am. Acad. of Pediatrics, *Policy Statement – Off-Label Use of Drugs in Children*, 133 Pediatrics 563, 564 (2014). ............................................................. 23

Christopher M. Wittich et al., *Ten common questions (and their answers) about off-label drug use*, 87 Mayo Clinic Proc. 982, 983 (2012), https://doi.org/10.1016/j.mayocp.2012.04.017 .................................................... 22

*Declaration of HHS Secretary Re: Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents* (Dec. 18, 2025), https://tinyurl.com/4uyrafyf ....................................................... 15

FDA, *Understanding Unapproved Use of Approved Drugs "Off Label"* (Feb. 5, 2018), https://tinyurl.com/pd6ff88v ....................................................... 22

Fed. Bureau of Investigation, X.com (June 2, 2025), https://x.com/FBI/status/1929587710894739567?s=20 ......................................... 17

Fed. Trade Comm'n, *The Dangers of "Gender-Affirming Care" for Minors*, https://www.ftc.gov/news-events/events/2025/07/dangers-gender-affirming-care-minors .......................................................................................................... 16

Fed. Trade Comm'n, *Request for Public Comment Regarding "Gender-Affirming Care" for Minors,* Document No. FTC-2025-0264-001 (Jul. 27, 2025), https://tinyurl.com/5x69775u ................................................................... 16

G. Nic Rider, et al., *Scientific integrity and pediatric gender healthcare: Disputing the HHS Review*, Sexuality Research and Social Policy 1-6 (2025), https://doi.org/10.1007/s13178-025-01221-55 ...................................... 14

H. Christine Allen, et al., *Off-Label Medication use in Children, More Common than We Think: A Systematic Review of the Literature*, 111 J Okla State Med Assoc. 776-783 (2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6677268/ ...... 22

Ilan H. Meyer & Lauren J. Bouton, The Williams Inst., *Impact of Executive Orders on Access to Federal Data* (Feb. 2025), https://tinyurl.com/2c9a4d4y .................. 11

James M. Beck & Elizabeth D. Azari, *FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions*, 53 Food & Drug L.J. 71 (1998) ............... 21

Joanne LaFleur, et al., Univ. of Utah Coll. of Pharmacy, *Gender-Affirming Medical Treatments for Pediatric Patients with Gender Dysphoria* (Nov. 2024), https://le.utah.gov/AgencyRP/downloadFile.jsp?submissionId=287 ............... 14,15

Juliana Kim, *Park Service erases 'transgender' on Stonewall website, uses the term 'LGB' movement*, NPR (Feb. 14, 2025), https://tinyurl.com/3pj27pap ......... 11

Matthew J. Vaeth, Off. of Mgmt. & Budget, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025), https://tinyurl.com/3zpchy7r .............................................................................. 10

Nadia Dowshen, et al., *A Critical Scientific Appraisal of the Health and Human Services Report on Pediatric Gender Dysphoria*, 77 The Journal of Adolescent Health 342-345 (2025), https://doi.org/10.1016/j.jadohealth.2025.06.002 ............ 14

Orion Rummler, *Three hospitals are under investigation for providing gender-affirming care to trans youth*, The 19th (Jan. 7, 2026), https://tinyurl.com/3muuawv7 .............................................................................. 16

*Paediatric off-label prescribing in the USA*, Reactions Weekly 1773, 10 (2019), https://doi.org/10.1007/s40278-019-68767-y. ....................................................... 22

Phie Jacobs, *Researchers slam HHS report on gender-affirming care for youth*, Science (May 2, 2025), https://tinyurl.com/326md8yf ...................................................................................................... 14

Selena Simmons-Duffin, *Health care for transgender children questioned in 400-page Trump administration report*, NPR (May 2, 2025), https://tinyurl.com/4c2d699h .................................................................. 13

Susan J. Kressly, *AAP Statement on HHS Report Treatment for Pediatric Gender Dysphoria*, Am. Academy Pediatrics (May 1, 2025), https://tinyurl.com/478yckca ............................................................................................................. 14

The White House, *National Child Abuse Prevention Month, 2025* (Apr. 3, 2025), https://tinyurl.com/42swzwe5 .................................................................... 13

The White House, *President Trump is Delivering on His Commitment to Protect our Kids* (Feb. 3, 2025), https://tinyurl.com/bdf5757j ................................................ 12

U.S. Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* (May 2025, rev. Nov. 2025, https://tinyurl.com/yxjdbud7 ..................................................... 13

U.S. Dept. of Health & Hum. Servs., *Urgent Review of Quality Standards and Gender Transition Procedures* (May 28, 2025), https://tinyurl.com/4j2bt2zd ..... 15

U.S. Off. of Pers. Mgmt., *Chemical and Surgical Sex-Trait Modification Services for Plan Year 2026 Proposals* (Aug. 15, 2025), https://tinyurl.com/bdf5757j ...... 12

U.S. Off. of Pers. Mgmt., *Initial Guidance Regarding President Trump's Executive Order Defending Women* (Jan. 29, 2025), https://tinyurl.com/243c49d6 .............. 10

William M. Janssen, *A Historical Perspective on Off-Label Medicine: From Regulation, Promotion, and the First Amendment to the Next Frontiers*, SSRN Elec. J. (2014), https://doi.org/10.2139/ssrn.2519223 ...............................................22

# INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* **Lambda Legal Defense and Education Fund, Inc.** ("Lambda Legal") is the nation's oldest and largest legal organization dedicated to achieving full recognition of the civil rights of lesbian, gay, bisexual, transgender, and queer (LGBTQ+) people and everyone living with HIV through impact litigation, education, and policy advocacy. Since its founding in 1973, Lambda Legal has sought to eliminate discriminatory barriers to health care for LGBTQ+ people, particularly transgender people, serving as counsel or *amicus* in cases across the country. *See, e.g.*, *United States v. Skrmetti*, 605 U.S. 495 (2025); *Pritchard v. Blue Cross Blue Shield of Ill.*, 159 F.4th 646 (9th Cir. 2025); *Kadel v. Folwell*, 100 F.4th 122, 133 (4th Cir. 2024), *cert. granted, judgment vacated*, 145 S.Ct. 2838 (2025); *Rosati v. Igbinoso*, 791 F.3d 1037 (9th Cir. 2015). This includes cases pushing back against the Trump Administration's defunding of researchers and healthcare entities serving transgender people. *See*, *e.g.*, *San Francisco AIDS Found. v. Trump*, 786 F.Supp.3d 1184 (N.D. Cal. 2025) ("*SFAF*"); *PFLAG, Inc. v. Trump*, 769 F.Supp.3d 405 (D. Md. 2025).

Having long litigated cases involving barriers to gender-affirming medical

---

[1]  No party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money to fund preparing or submitting this brief. No person other than *amicus*, its members, or its counsel made a monetary contribution to its preparation or submission.

care, *Amicus* offers perspectives on the far-ranging targeting of transgender people and their healthcare by the Trump Administration and on the provider conduct alleged to be unlawful as the Court considers the improper purpose underlying the subpoenas sent to providers like QueerDoc.

*Amicus* files this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2). All parties to this appeal consent to its filing.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

In June 2025, the U.S. Department of Justice ("DOJ") issued substantively identical subpoenas to more than twenty health care institutions across the country whose care for their patients includes gender-affirming medical care ("GAMC") to transgender adolescents who need such health care. The latest salvo in the Trump Administration's broad-based discriminatory, demeaning campaign against transgender people, the subpoenas were issued to intimidate providers of evidence-based GAMC for transgender adolescents and to end this care entirely.

The attacks on transgender people began on day one of this term with a mandate to eradicate "gender ideology."[2] The following week, Executive Order 14187[3] established as "the policy of the United States that it will not fund, sponsor,

---

[2]     Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("Gender EO").

[3]     Exec. Order No. 14187, *Protecting Children From Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025) ("Denial-of-Care EO").

promote, assist, or support" GAMC for minors, and "will rigorously enforce all laws that prohibit or limit" such care, declaring it to be a "stain on our Nation's history," and that "it must end." Denial-of-Care EO § 1. A series of implementation efforts followed, including by DOJ, culminating in the issuance of the subpoenas to providers, including the one to QueerDoc at issue here.

But the Administration's animus towards transgender people and its rancor towards GAMC that enables transgender adolescents to live authentically are not lawful bases for any subpoenas. As every court that has considered the issue has concluded, the subpoenas lack a legitimate investigatory basis and were, instead, issued for the improper purpose of "fulfill[ing] the Executive's well-publicized policy objective to terminate and block gender affirming healthcare." *See In Re 2025 Subpoena to Children's Nat'l Hosp.*, No. 1:25-cv-03780-JRR, 2026 WL 160792 at *8 (D. Md. Jan. 21, 2026).[4]

---

[4]     *See also*, *e.g.*, *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, No. 25-MC-00063-SKC-CYC, 2026 WL 33398, at *7 (D. Colo. Jan. 5, 2026) ("government's aim is not actually to investigate FDCA violations, but to use the FDCA as a smokescreen for its true objective of pressuring pediatric hospitals into ending gender-affirming care through commencing vague, suspicionless 'investigations.'"); *In re 2025 UPMC Subpoena*, No. 2:25-MC-01069-CB, 2025 WL 3724705, at *2 (W.D. Pa. Dec. 24, 2025) (subpoena "carries more than a whiff of ill-intent."); *In re Admin. Subpoena No. 25-1431-019*, 800 F.Supp.3d 229, 237, 239 (D. Mass. 2025) (subpoena's "true purpose" is to interfere with "Massachusetts' right to protect GAC within its borders, to harass and intimidate BCH to stop providing such care, and to dissuade patients from seeking such care."); *In re Subpoena No. 25-1431-014*, No. MC 25-39, 2025 WL 3252648, at *10 (E.D. Pa. Nov. 21, 2025) (DOJ's asserted concerns "describe policy disagreements about the

The district court properly reached this same conclusion regarding the subpoena to QueerDoc, finding that "DOJ has abandoned good faith investigation in favor of policy enforcement through prosecutorial coercion." ER-016. The *post hoc* justifications DOJ offered do nothing to rehabilitate the subpoena and only serve to underscore its improper purpose. The Declaration of DOJ attorney Allan Gordus ("Gordus Decl."), offered inappropriately two months after briefing closed below and properly stricken by the district court, attempted to tie the subpoena to purported investigations of healthcare offenses under the Food, Drug, & Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"), but its allegations regarding off-label use of medications to treat gender dysphoria bear no resemblance to any offense prohibited by that statute. The same is true of DOJ's argument that statements on QueerDoc's website regarding the medications they prescribe could amount to unlawful "misbranding or mislabeling." Appellant Br. 26. Both theories are rooted in the Administration's disdainful, inflammatory narrative regarding GAMC, relying on commissioned sources designed to fit that narrative. These manufactured violations and DOJ's evolving framing serve to illustrate that DOJ devised them after the fact to conceal their improper motive for the subpoena rather than serving as a lawful

---

propriety of medical care," not a legitimate basis for a subpoena); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-MC-00041-JHC, 2025 WL 3562151, at *10-11 (W.D. Wash. Sept. 3, 2025) (finding "threadbare" allegations pretextual; true purpose was "to pressure hospitals into ending gender-related care for minors.").

predicate. As the district court concluded, "[n]o clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating." ER-017.

Because the district court's findings of improper purpose are well founded, this Court should affirm the order quashing to the subpoena to QueerDoc.

## ARGUMENT

While an administrative subpoena is generally permissible so long as it "is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant," *United States v. Morton Salt Co.*, 338 U.S. 632, 652-53 (1950), a court may not enforce an administrative subpoena issued for an improper purpose or in bad faith such that enforcing it "would be an abusive use of the court's process." *United States v. Powell*, 379 U.S. 48, 51 (1964). Such an abuse of process includes when a subpoena is issued "to harass the [recipient] or to put pressure on [it] to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id.* at 58.

The district court properly quashed DOJ subpoena to QueerDoc under these established principles. DOJ did not establish reasonable relevance of the subpoena to QueerDoc to any legitimate investigation at the outset and DOJ's subsequent efforts to reframe its purpose as something other than carrying out the Trump Administration's effort to end the provision of GAMC to adolescents similarly fail.

5

It is impossible to view the subpoenas in isolation as their issuance is the direct result of the Executive's targeted campaign to make it impossible for transgender people to live as themselves and for providers to prescribe the medically necessary GAMC to transgender adolescents that allows them to do so.

Through the Gordus Declaration, DOJ proffered arguments about the legitimacy of DOJ's nationwide investigation into federal healthcare offenses under the FDCA. Though the district court properly struck the declaration in recognition of DOJ's deliberate misuse of court procedure in its submission, ER-018 n.2, DOJ continues to rely on it before this Court. Appellant Br. 15-16, 39-40. This belatedly offered declaration in no way establishes a proper purpose for the subpoena because the conduct DOJ claims to be investigating is not illegal. This belies DOJ's claims to merely be "enforce[ing] existing federal health care laws against entities in this industry." Appellant Br. 27. Far from ensuring that providers are carrying out the provision of GAMC "in a lawful manner," *id.* at 29, the Gordus Declaration and DOJ's brief frame the ordinary practice of medicine in this context as inherently unlawful, whether in terms of prescribing off-label use or providing patients with information about the medications themselves. DOJ's *post hoc* justifications bolster that the subpoena was issued in bad faith and for an improper purpose—to harass QueerDoc and pressure them into ending the provision of GAMC to transgender adolescents. This is precisely the type of improper purpose courts have condemned.

## I. THE SUBPOENA TO QUEERDOC IS PART OF THE TRUMP ADMINISTRATION'S TARGETED ATTACKS ON TRANSGENDER PEOPLE.

DOJ's subpoenas to providers like QueerDoc are a direct result of the Trump Administration's relentless targeting of transgender people for unequal treatment, including its multifaceted campaign to eliminate the provision of GAMC to adolescents. The district court properly recognized this context, noting both that "[t]he timeline tells the story here," ER-016, and the Executive's own "repeated declarations" that the "intended effect" of these subpoenas and the Executive Orders that induced them is to "'downsize or eliminate'" all GAMC. ER-017. Given the impossibility of extricating the subpoena from these broader efforts to exclude transgender people from public life and deny them access to the health care that enables them to live authentically, the district court properly exercised its discretion in finding that the subpoena was imbued with an improper purpose and granting QueerDoc's motion to quash.

### A. The Administration Has Targeted Transgender People for Discrimination and Barred Government Acknowledgement of Transgender People's Existence.

The Trump Administration set the tone on its first day in office by launching its attack on transgender people via the issuance of the Gender EO, a cross-cutting effort to reverse existing protections and deny recognition of transgender people's existence. *See*, *e.g.*, Gender EO § 2 (declaring "the policy of the United States to

7

recognize two sexes, male and female;" rejecting that a person might have a gender identity different from their birth-assigned sex as a "false claim"). The Gender EO mandated all agencies to interpret sex-based terms as birth-assigned sex, including with regard to government-issued identification documents and personnel records, § 3(c), (d); rescinded provisions of prior executive orders combating discrimination against LGBTQ people and enabling transgender persons to serve in the military, § 7(b); barred federal funding from being "used to promote gender ideology," § 3(g); mandated housing in accordance with a person's birth-assigned sex in federal prisons and HUD-funded shelters, § 4; and directed federal agencies to rescind guidance, forms, and policies acknowledging the existence of transgender people, §§ 3(e), 7(c).

Additional Executive Orders followed, with the Administration using the power of the purse to enforce its erasure of transgender people and its refusal to recognize any form of systemic discrimination;[5] targeting GAMC for transgender adolescents through the Denial-of-Care EO; excluding transgender people from military service;[6] threatening federal funding for schools that recognize and affirm

---

[5]     *See*, *e.g.*, Exec. Order No. 14151, *Ending Radical and Wasteful DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025); Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025).

[6]     Exec. Order No. 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025) ("Military Ban EO").

transgender students' identities;[7] and barring transgender athletes from competing with their teammates.[8]

These Executive Orders employ dehumanizing, inaccurate rhetoric to cast transgender people and transgender-inclusive policies as an existential threat to "the validity of the entire American system," Gender EO § 1, as antonymic with "an honorable, truthful, and disciplined lifestyle," lacking "humility and selflessness," Military Ban EO § 1, and as a source of "endangerment, humiliation, and silencing of women and girls," Sports Ban EO § 1. Far from mere policy preferences, courts have recognized that these EOs specifically seek to erase transgender people and to punish those who provide necessary services to them. *See*, *e.g.*, *PFLAG*, 769 F.Supp.3d at 443-44 (the Gender EO "den[ies] the existence of transgender persons altogether;" "[t]he Court cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist."); *SFAF*, 786 F.Supp.3d at 1215-16 ("the Gender Order necessarily singles out transgender people and excludes them from being able to benefit from federal funds.").

Federal agencies took immediate action to carry out the EOs' campaign

---

[7]   Exec. Order No. 14190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan 29, 2025).

[8]   Exec. Order No. 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 11, 2025) ("Sports Ban EO").

against transgender people. For example, within days of the Gender EO, Secretary of State Rubio ordered State Department staff "to suspend any application where the applicant is seeking to change their sex marker from the definition provided in [the Gender EO]" or "requesting an 'X' sex marker." *Schlacter v. United States*, No. CV GLR-25-1344, 2025 WL 2606101, at *3 (D. Md. Sept. 9, 2025) (internal quotations omitted). Contemporaneously, the Bureau of Prisons ("BOP") initiated transfers of transgender women to men's prisons, paused access to GAMC, and discontinued access to gender-affirming clothing and toiletries. *See Doe v. McHenry*, 763 F. Supp. 3d 81, 84 (D.D.C. 2025) (granting TRO to prohibit imminent transfers); *Kingdom v. Trump*, No. 1:25-CV-691-RCL, 2025 WL 1568238, at *1 (D.D.C. June 3, 2025) (granting PI to protect access to GAMC and social accommodations).

The Office of Personnel Management instructed federal agencies to "take down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology." U.S. Off. of Pers. Mgmt., *Initial Guidance Regarding President Trump's Executive Order Defending Women* (Jan. 29, 2025).[9] The Office of Management and Budget promised to stop the use of federal funds to promote "transgenderism." Matthew J. Vaeth, Off. of Mgmt. & Budget, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025).[10]

---

[9]     https://tinyurl.com/243c49d6.

[10]     https://tinyurl.com/3zpchy7r.

Within days, agencies from the National Park Service to the Centers for Disease Control removed references to transgender people from government websites. *See, e.g.*, Juliana Kim, *Park Service erases 'transgender' on Stonewall website, uses the term 'LGB' movement*, NPR (Feb. 14, 2025);[11] Ilan H. Meyer & Lauren J. Bouton, The Williams Inst., *Impact of Executive Orders on Access to Federal Data* (Feb. 2025).[12]

Similarly, the National Institutes of Health terminated hundreds of research grants relating to LGBTQ+ people because the research related to "transgender issues" and, according to the Administration, "research based on gender identity … do[es] nothing to enhance the health of many Americans" and "ignore[s] biological realities." *Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Insts. of Health*, 795 F. Supp. 3d 678, 688, 696-97 (D. Md. 2025).

The breadth of these executive actions is breathtaking and has a dramatic impact on transgender people's ability to navigate our government and society at large.

## B. The Administration's Endgame is to Eliminate GAMC, Particularly for Adolescents.

The Administration's efforts have included working to eliminate all access to and withdrawing federal government support for GAMC. Starting with the Gender

---

[11] https://tinyurl.com/3pj27pap.
[12] https://tinyurl.com/2c9a4d4y.

EO's mandate to BOP to ensure that no federal funding be used to provide GAMC, Gender EO § 4(c), countless agencies have issued policies or promulgated regulations to cut off or limit access to this care. *See*, *e.g.*, U.S. Off. of Pers. Mgmt., *Chemical and Surgical Sex-Trait Modification Services for Plan Year 2026 Proposals* (Aug. 15, 2025) (excluding GAMC from insurance coverage for federal employees and dependents);[13] *Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability*, 90 Fed. Reg. 27074 (June 25, 2025) (prohibiting defining GAMC as an "essential health benefit").

The sharpest tip of the Administration's attacks against transgender people is aimed at transgender adolescents, their families and supporters, and the medical professionals who provide care to them. The Denial-of-Care EO inaccurately and harmfully reframed GAMC as "chemical and surgical mutilation" to sow doubt and justify its endgame: ending GAMC. *Id*. Immediately after it issued, multiple large hospitals paused providing GAMC to youth. Within days, the White House celebrated that the Denial-of-Care EO was already having its "intended effect[:] [h]ospitals around the country … downsize[d] or eliminate[d] their so-called 'gender-affirming care' programs." The White House, *President Trump is Delivering on His Commitment to Protect our Kids* (Feb. 3, 2025).[14] The President's

---

[13]     https://tinyurl.com/2etdbadc.
[14]     https://tinyurl.com/bdf5757j.

incendiary rhetoric regarding this care extends to characterizing it as child abuse, referring to the "the sinister threat of gender ideology" as "one of the most prevalent forms of child abuse facing our country today" in a proclamation for Child Abuse Prevention Month.[15]

Agencies have similarly carried out the Gender EO's and Denial-of-Care EO's mandates. As required by § 3(ii) of the Denial-of-Care EO, the Department of Health and Human Services (HHS) published a report allegedly reviewing "the existing literature on best practices for promoting the health of children" with gender dysphoria. U.S. Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* (May 2025, rev. Nov. 2025) ("HHS Report").[16] This deeply flawed report was commissioned with a preordained conclusion, referring to the recognized clinical treatment guidelines and support the safety and efficacy of GAMC as "junk science." Denial-of-Care EO § 3. The inflammatory rhetoric around its release included the White House Deputy Chief of Staff describing GAMC as "barbaric" and "child torture." Selena Simmons-Duffin, *Health care for transgender children questioned in 400-page Trump administration report*, NPR (May 2, 2025).[17] But in truth, the rhetoric is irrelevant because the bias

---

[15]     The White House, *National Child Abuse Prevention Month, 2025* (Apr. 3, 2025), https://tinyurl.com/42swzwe5.

[16]     https://tinyurl.com/yxjdbud7.

[17]     https://tinyurl.com/4c2d699h.

is readily apparent. HHS published its report without author names, failed to engage in pre-publication peer review, and ultimately *only* recommended talk therapy.

The HHS Report was lambasted by the medical establishment as "misrepresent[ing] the current medical consensus and fail[ing] to reflect the realities of pediatric care. Susan J. Kressly, *AAP Statement on HHS Report Treatment for Pediatric Gender Dysphoria*, Am. Academy Pediatrics (May 1, 2025).[18, 19] Indeed, multiple studies and systematic reviews have found GAMC for adolescents to be evidence-based care for which there is low regret, low dissatisfaction, low side effects, and documented improvements in gender dysphoria and body satisfaction, as well as other mental health improvements.[20] Despite the widespread critiques of

---

[18] https://tinyurl.com/478yckca.

[19] *See also*, *e.g.*, G. Nic Rider, et al., *Scientific integrity and pediatric gender healthcare: Disputing the HHS Review*, Sexuality Research and Social Policy 1-6 (2025), https://doi.org/10.1007/s13178-025-01221-55 (condemning "the political motivations leading to the publication of the HHS review without consulting pediatric gender care experts and organizations" and "the review's misrepresentation of the evidence surrounding the benefits of supporting and affirming TGNB youth."); Nadia Dowshen, et al., *A Critical Scientific Appraisal of the Health and Human Services Report on Pediatric Gender Dysphoria*, 77 The Journal of Adolescent Health 342-345 (2025), https://doi.org/10.1016/j.jadohealth.2025.06.002 ("The HHS report, with its extensive violations of scientific norms, misrepresentations of science, and wanton disregard of the expert standard of care for TGD youth, is a dangerous incursion of politics into science and medicine."); Phie Jacobs, *Researchers slam HHS report on gender-affirming care for youth*, Science (May 2, 2025), https://tinyurl.com/326md8yf.

[20] *See*, *e.g.*, Joanne LaFleur, et al., Univ. of Utah Coll. of Pharmacy, *Gender-Affirming Medical Treatments for Pediatric Patients with Gender Dysphoria* (Nov.

the HHS Report, HHS notified healthcare providers of the Report's findings and requested detailed information about GAMC for minors from providers. *See* U.S. Dept. of Health & Hum. Servs., *Urgent Review of Quality Standards and Gender Transition Procedures* (May 28, 2025).[21]

In December 2025, HHS Secretary Kennedy went further and sought by fiat to unilaterally establish that *any* provision of GAMC for minors is *per se* below the standard of care. *See Declaration of HHS Secretary Re: Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents* (Dec. 18, 2025) ("RFK Declaration").[22] The same day, HHS published proposed rules (1) barring Medicaid and Children's Health Insurance Program funds from paying for GAMC,[23] (2) prohibiting hospitals from providing GAMC as a condition of participation in Medicare and Medicaid,[24] and (3) excluding gender

---

2024), https://le.utah.gov/AgencyRP/downloadFile.jsp?submissionId=287; Dopp, Alex R. Dopp, et al., RAND Corp., *Interventions for Gender Dysphoria and Related Health Problems in Transgender and Gender-Expansive Youth: A Systematic Review of Benefits and Risks to Inform Practice, Policy, and Research* (2024), https://tinyurl.com/4fmhjs5u.

[21]     https://tinyurl.com/4j2bt2zd.

[22]     https://tinyurl.com/4uyrafyf.

[23]     *Medicaid Program; Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children*, 90 Fed. Reg. 59441 (proposed Dec. 19, 2025) (to be codified at 42 C.F.R. pt. 441, 457).

[24]     *Medicare and Medicaid Programs; Hospital Condition of Participation: Prohibiting Sex-Rejecting Procedures for Children*, 90 Fed. Reg. 59463 (proposed Dec. 19, 2025) (to be codified at 42 C.F.R. pt. 482).

dysphoria from disability-based antidiscrimination protections.[25] HHS's General Counsel also publicized his referrals of children's hospitals providing GAMC to HHS's Office of Inspector General "for failing to meet 'recognized standards of health care,' citing Kennedy's declaration."[26] HHS's sweeping contemporaneous actions confirm HHS's intent to operationalize a categorical, nationwide prohibition of GAMC by sub-regulatory pronouncement.[27]

### C. The Subpoenas to Healthcare Providers Like QueerDoc are a Component of DOJ's Implementation of the Administration's Mission to Discriminate Against Transgender People and End Access to GAMC.

The Denial-of-Care EO imposed specific obligations on DOJ to explore legal avenues for limiting or ending the provision of GAMC. Attorney General Pam Bondi diligently took on these mandates, with federal law enforcement entities publicly

---

[25] *Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance*, 90 Fed. Reg. 59478 (proposed Dec. 19, 2025) (to be codified at 45 C.F.R. pt. 84).

[26] Orion Rummler, *Three hospitals are under investigation for providing gender-affirming care to trans youth*, The 19th (Jan. 7, 2026), https://tinyurl.com/3muuawv7.

[27] Other agencies have also taken steps to carry out these mandates. For example, the Federal Trade Commission held a workshop on the purported on "dangers" of GAMC to minors and has sought public comment relating to GAMC with the goal of exploring unprecedented enforcement against GAMC providers under the guise that the provision of such care constitutes an unfair or deceptive trade practice. *See* Fed. Trade Comm'n, *The Dangers of "Gender-Affirming Care" for Minors*, https://www.ftc.gov/news-events/events/2025/07/dangers-gender-affirming-care-minors; Fed. Trade Comm'n, *Request for Public Comment Regarding "Gender-Affirming Care" for Minors,* Document No. FTC-2025-0264-001 (Jul. 27, 2025), https://tinyurl.com/5x69775u.

pronouncing their intent to target transgender people and medical care providers. *See*, *e.g.*, Fed. Bureau of Investigation, X.com (June 2, 2025) ("Help the FBI protect children. As the Attorney General has made clear, we will protect our children and hold accountable those who mutilate them under the guise of gender-affirming care. Report tips of any hospitals, clinics, or practitioners performing these surgical procedures on children at 1-800-CALL-FBI or http://tips.fbi.gov.").[28]

In April 2025, A.G. Bondi directed "the Civil Division … to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'" ER-048. The Civil Division announced it would do so, issuing a June 2025 memorandum committing to prioritizing these investigations. ER-054. The subpoenas followed immediately.

The Gordus Declaration illustrates the subpoenas' purpose of carrying out the Denial-of-Care EO and the Administration's broader aims. It mirrors the Bondi memo. *Compare* ER-048 ("the promotion of off-label uses of hormones . . . run afoul of the FDA's prohibitions on misbranding and mislabeling") *with* Gordus Decl. ¶ 18 ("To the extent these drugs are marketed or promoted for treating gender dysphoria, they could constitute unapproved new drugs under federal law, and their distribution

---

[28] https://x.com/FBI/status/1929587710894739567?s=20

for that unapproved use could violate the FDCA and be a federal crime."). It also relies on the HHS Report's erroneous determination that GAMC lacks robust evidence to support its efficacy. Gordus Decl. ¶ 19. Lastly, it attests that the government has committed significant resources to this investigation, including "several veteran, career prosecutors" and "multiple FBI agents and analysts are assigned with various field activities and are employing advanced data analytics to identify prescribing and reimbursement patterns and potential FDCA violations related to unapproved use of the drugs." Gordus Decl. ¶ 31. There can be no plainer evidence that the subpoena to QueerDoc was issued for the improper purpose of fulfilling the Administration's mission of ending access to GAMC as part of its broad attacks on transgender people.

## II. DOJ'S UNFOUNDED ALLEGATIONS OF HEALTHCARE OFFENSES AGAINST PROVIDERS LIKE QUEERDOC WHO PROVIDE GAMC ILLUSTRATE THE SUBPOENA'S IMPROPER PURPOSE.

Not only is the issuance of the subpoena to QueerDoc inextricable from the Administration's targeting of transgender people and the GAMC they need, as well as the providers who prescribe it, but DOJ's attempts to justify it betray the pretextual nature of its actions. Specifically, the Gordus Declaration's unfounded allegation that a physician's prescription of an approved medication for off-label use constitutes an FDCA violation or other federal healthcare offense shows that the subpoenas are part of a legally meritless fishing expedition designed to end the

provision of evidence-based, widely established care, rather than a routine mechanism to collect information reasonably relevant to a genuine investigation. This is further bolstered by DOJ's subsequent shift to an exclusive focus on statements regarding that off-label use on QueerDoc's website as the basis of a similarly groundless misbranding claim. Appellant Br. 11. Both the lack of foundation for these supposed legal violations and DOJ's change in tactics undermine their claim that this has always been about a legitimate investigation.

### A.  Off-label Prescription of Medications as Part of GAMC Does Not Violate the FDCA or Otherwise Constitute a Healthcare Offense.

From the outset of this matter, DOJ has portrayed the alleged violation the subpoena purported to investigate in terms drawn directly from the DOJ Memos implementing the applicable Executive Orders: "whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated" the FDCA. SER-012. In so doing, the Government wrongfully implied that a doctor who issues an off-label prescription of an otherwise lawful medication violates the FDCA. Through the Gordus Declaration, DOJ doubled down and expanded upon this theory, misleadingly suggesting that prescribing "off-brand" (*i.e.*, for an "unapproved" use) is either unlawful in itself, or at least is evidence of some other illegal activity: "FDA's approval of a drug does not mean that the drug is safe and effective for unapproved uses or that the drug has adequate directions for unapproved uses. While it is possible for doctors to prescribe an approved drug for

an unapproved use, prescriptions for unapproved uses may involve violations of the FDCA." Gordus Decl. ¶¶ 7-8.

Contrary to the Government's suggestion, however, the FDCA does not prohibit doctors from off-label prescribing.

> Although the [FDCA] regulates a manufacturer's distribution of drugs, it does not go further by regulating a doctor's practice of medicine. The Act thus does not prohibit doctors from prescribing an FDA-approved drug (say, a chemotherapy drug approved to treat leukemia) for an 'off-label' use (say, treatment of other cancers). It instead leaves the regulation of doctors to the states.

*Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 534 (6th Cir. 2021) (internal citations omitted). Moreover, 18 U.S.C. § 24 defines "Federal health care offenses," but "off-label" prescribing is not enumerated among them.

DOJ's argument ignores controlling precedent that the FDCA does not, and Congress did not intend it to, regulate the practice of medicine. "Off-label" usage (meaning usage "for some other purpose than that for which it has been approved by the FDA) is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) (citing, *inter alia*, James M. Beck & Elizabeth D. Azari, *FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions*, 53 Food & Drug L.J. 71 (1998)). In *Buckman*, the Supreme Court interpreted 21 U.S.C. § 396 as "expressly disclaim[ing] any intent to

20

directly regulate the practice of medicine," and acknowledged that "off-label use is generally accepted." *Buckman* at 351. As Beck and Azari noted,

> It is an accepted principle that once FDA determines that a drug or device can be marketed, a physician's discretionary use of that product (the practice of medicine) is not restricted to the uses indicated on FDA-regulated labels. Off-label use is widespread in the medical community and often is essential to giving patients optimal medical care, both of which medical ethics, FDA, and most courts recognize. Even so, the public (and an occasional court) mistakenly presumes that all off-label treatment is investigational or experimental and that physicians therefore should inform their patients of this whenever an off-label use is proposed.

53 Food & Drug L.J. at 72.[29]

Further, the FDA's own website expressly identifies the medically legitimate and perfectly lawful reasons a doctor might prescribe off-label and makes clear that that providers may exercise their clinical judgment to prescribe a medication for a reason other than that for which the FDA has granted approval:

> From the FDA perspective, once the FDA approves a drug, healthcare providers generally may prescribe the drug for an unapproved use when they judge that it is medically appropriate for their patient. You may be asking yourself why your healthcare provider would want to prescribe a drug to treat a disease or medical condition that the drug is not approved for. One reason is that there might not be an approved drug to treat your disease or medical condition. Another is that you may have tried all approved treatments without seeing any benefits. In situations like these, you and your healthcare provider may talk about using an

---

[29]    *See also United States v. Caronia*, 703 F.3d 149, 153 (2d. Cir 2012); *Chaney v. Heckler*, 718 F.2d 1174, 1180 (D.C. Cir. 1983), *rev'd on other grounds*, 470 U.S. 821 (1985).

approved drug for an unapproved use to treat your disease or medical condition.[30]

DOJ is simply wrong to suggest that off-label prescribing is illegal or evidence of some other unlawful act.

Longstanding medical practice bears this out. Contrary to DOJ's position, off-label use of medications in pediatric patients is a common practice,"[31] particularly in light of "paediatric drug testing barriers,"[32] including ethical concerns.[33] Off-label use is often necessary to deliver the best evidence-based care.[34] These principles apply equally in the context of GAMC. The prescription of puberty blockers and hormone therapy to treat an adolescent's gender dysphoria despite the FDA approval of those medications having been for other conditions does not "render them 'unapproved new drugs.'" Appellant Br. 11. To the contrary, "in no way does a lack

---

[30] FDA, *Understanding Unapproved Use of Approved Drugs "Off Label"* (Feb. 5, 2018), https://tinyurl.com/pd6ff88v.

[31] H. Christine Allen, et al., *Off-Label Medication use in Children, More Common than We Think: A Systematic Review of the Literature*, 111 J Okla State Med Assoc. 776-783 (2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6677268/.

[32] *Paediatric off-label prescribing in the USA*, Reactions Weekly 1773, 10 (2019), https://doi.org/10.1007/s40278-019-68767-y.

[33] *See also* Christopher M. Wittich et al., *Ten common questions (and their answers) about off-label drug use*, 87 Mayo Clinic Proc. 982, 983 (2012), https://doi.org/10.1016/j.mayocp.2012.04.017.

[34] *See* William M. Janssen, *A Historical Perspective on Off-Label Medicine: From Regulation, Promotion, and the First Amendment to the Next Frontiers*, SSRN Elec. J. (2014), https://doi.org/10.2139/ssrn.2519223 (in some circumstances, "a physician's failure to prescribe the medical product for such an unapproved use can constitute medical malpractice").

of labeling signify that therapy is unsupported by clinical experience or data in children." Am. Acad. of Pediatrics, *Policy Statement – Off-Label Use of Drugs in Children*, 133 Pediatrics 563, 564 (2014). And a lack of labeling should not be confused with a finding of contraindication or unsafety. *Id.* To suggest otherwise is erroneous and contravenes common medical practice.

DOJ's attempt to shoehorn a healthcare provider's entirely lawful practice of exercising their clinical judgment to prescribe FDA-approved medications to treat a patient's gender dysphoria into a violation of the FDCA or other healthcare offense illustrates the subpoena's lack of legitimate purpose. Because QueerDoc's off-label prescribing is plainly authorized, the justification set forth in the Gordus Declaration is pretextual and does nothing to suggest that the district court abused its discretion in quashing the subpoena.

**B. Informing Patients About the Off-Label Use of Puberty Blockers and Hormone Therapy to Treat Gender Dysphoria Does Not Violate the FDCA or Otherwise Constitute a Healthcare Offense.**

Seemingly recognizing that their focus on off-label use in and of itself cannot establish a health care offense, DOJ's opening brief focuses exclusively on their allegation that the information QueerDoc provides to its patients regarding GAMC, including on its website, constitutes "misbranding" under the FDCA. Appellant Br. 11. This theory was set forth in the Gordus Declaration as well, alleging that the information being provided "is potentially false and misleading labeling that renders

23

the drugs misbranded," relying on "HHS and other clinical sources [that] have stated that some effects are uncertain or possibly permanent." Gordus Decl. ¶ 23.

Both this shift in tactics[35] and the baselessness of the argument itself underscore the improper purpose of the subpoena rather than its legitimacy. First, this "misbranding" theory ignores the FDCA's distinction between manufacturers and pharmacies on the one hand, and doctors on the other. *See*, *e.g.*, *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 240 (3d Cir. 2012) (noting "asymmetry" between doctors and manufacturers in regulation of off-label uses; physicians may lawfully prescribe off-label uses, but FDCA bans manufacturers from marketing such uses to doctors); *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 127 (2d Cir. 2010) ("off-label prescriptions are permitted within a physician's discretion," while manufacturers are barred from promoting a drug's off-label uses). As noted *supra*, the FDCA was never intended to interfere with the practice of medicine, which includes a provider's explanation of the risks and benefits of a particular medicine to patients.

---

[35] One court considering another subpoena noted that DOJ "has shifted its explanations for the investigation before us as our colleagues across the Nation have identified problems with the Department's numerous subpoenas," concluding that DOJ's "evolving rationales expose a uniquely misplaced view of its ability to expand the limits Congress imposed" on the investigations DOJ is authorized to pursue. *In re Subpoena No. 25-1431-014*, 2025 WL 3252648, at *15, 17.

The Fifth Circuit rejected the notion that a doctor's providing (or failing to provide) adequate directions for an off-label use of an FDA-approved drug could constitute "misbranding" in *United States v. Evers*, 643 F.2d 1043, 1053 (5th Cir. 1981). Calling the Government's interpretation of the statute "nonsensical," *id.* at 1053, the Court rejected "that this interpretation was intended by the drafters of the statute." *Id.* DOJ's overboard interpretation of "misbranding" is similarly nonsensical. Even A.G. Bondi's memo from which these subpoenas directly flow only authorizes investigations of potential FDCA violations by drug manufacturers and distributors and not by providers, as DOJ has conceded. SER-015. In creating out of whole cloth this alleged violation by a physician providing information to patients about an off-label use of FDA-approved medication to treat their gender dysphoria, DOJ cannot claim that the subpoena is legally authorized. *See* Appellee Br. 42-52.

Second, DOJ's claims that QueerDoc's representations regarding the risks and benefits of GAMC are "potentially false and misleading" flow directly from the Administration's campaign against this care rather than from science or research. Despite that these treatments have long been recognized by the medical establishment as the standard of care in accordance with evidence-based clinical guidelines, *see Dekker v. Weida*, 679 F.Supp.3d 1271, 1285-86 (N.D. Fla. 2023), the Gordus Declaration and DOJ's opening brief reflect the Administration's "belie[f]s"

about and "strong moral, ethical, and policy opposition to" GAMC in their portrayal of QueerDoc's assessments in this light. Appellant Br. 27; *id.* at 12, Gordus Decl. ¶ 23.

Specifically, DOJ points to two government sources for their position that "these interventions are untested, unsafe, unnecessary, and unethical," Appellant Br. 27, both of which were created as a result or in implementation of the Denial-of-Care EO's mandates to undermine longstanding recognition of the medical necessity of these treatments and to use every tool available to end the provision of GAMC. Denial-of-Care EO, §§ 1, 3, 5. First, they point to the HHS Report as having "determined that that the evidence for the safety and efficacy of these drugs for the treatment of gender dysphoria is weak;" that they "carry risk of significant harms" and "regret;" and that the quality of evidence supporting their use is "very low." Gordus Decl. ¶ 19; *see also* Appellant Br. 27. But, as discussed *supra*, this Report, with a predetermined outcome, is highly flawed.

Second, DOJ's brief relies on the RFK Declaration for the proposition that "sex-rejecting procedures for children and adolescents are neither safe nor effective as a treatment modality for gender dysphoria, gender incongruence, or other related disorders in minors, and therefore, fail to meet proves signal recognized standards of healthcare." Appellant Br. 12. This baldly unauthorized political pronouncement intended to carry out the intended purposes of the Denial-of-Care EO cannot alter

the lack of statutory authority for the subpoena to QueerDoc, particularly given that the subpoena was issued long before it. No authority exists for the proposition that the FDCA empowers the HHS Secretary to dictate how doctors practice medicine.[36] To the contrary, as one court considering a subpoena noted, the Administration's "mantra of concern for child welfare, however genuine, is not a substitute for the limited authority granted to them by the elected representatives. … Congress … does not authorize a federal investigation into lawful medical practice simply because the President or current Attorney General disapproves of the care provided." *In re Subpoena No. 25-1431-014*, 2025 WL 3252648, at *17.

## CONCLUSION

Because DOJ's baseless and evolving claims of QueerDoc's purported wrongdoing, including through the Gordus Declaration, do not actually allege violations of the FDCA or otherwise constitute health care offenses, and in light of the inextricable throughline from the Administration's discriminatory targeting of transgender people to the subpoena, the district court correctly recognized the subpoena for what it is: a "fishing expedition" that "seeks to rifle through thousands of patient records hoping to find something—anything—to justify its predetermined goal of ending gender-affirming care." ER-019.

---

[36]     It is precisely this infringement of the States' authority to regulate the practice of medicine that prompted several states to challenge the RFK Declaration. *See Oregon v. Kennedy*, No. 6:25-cv-02409 (D. Or. Filed Dec. 23, 2025).

The Administration's disdain for transgender people and the GAMC that enables them to live authentically cannot legitimize the use of DOJ's subpoena authority to bully law-abiding doctors into conforming to its policy preferences. This Court should affirm the district court's decision.

Dated:  January 23, 2026                    Respectfully submitted,

                                            /s/ *Karen L. Loewy*
                                            Karen L. Loewy

A.D. Lewis
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
4221 Wilshire Blvd., Ste. 280
Los Angeles, CA 90010
(213) 382-7600

Morgan Walker
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX  75219
214-219-8585

Karen L. Loewy
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006
202-804-6245

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
212-809-8585

*Counsel for Amicus Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 25-7384 _____

I am the attorney or self-represented party.

**This brief contains 6532 words,** excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____ s/ *Karen L. Loewy* _____ **Date** _____ Jan. 23, 2026 _____

29

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 23, 2026. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ *Karen L. Loewy*
Karen L. Loewy