No. 25-7384

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

U.S. DEPARTMENT OF JUSTICE,

Respondent-Appellant,

v.

QUEERDOC, PLLC,

Movant-Appellee.

———————————

On Appeal from the United States District Court
for the Western District of Washington

———————————

**REPLY BRIEF FOR APPELLANT**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

BRAD HINSHELWOOD
SARAH WELCH
  *Attorneys, Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3180*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................ii

INTRODUCTION........................................................................................ 1

ARGUMENT .............................................................................................. 2

I.    The QueerDoc subpoena is valid and was properly issued. ................................. 2

II.   The district court erred in quashing the subpoena based on an ostensible improper subjective purpose. .................................. 11

     A.   The government did not issue the subpoena for an improper purpose. .................................................. 11

     B.   The district court's improper purpose finding would not justify quashing the subpoena in any event. ......................................... 17

     C.   At minimum, the district court should have given the government the opportunity to satisfy its new standard. ................................ 20

III.  The subpoena is appropriately tailored and not unduly burdensome. ............... 21

CONCLUSION ......................................................................................... 27

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                              **Page(s)**

*Bryant v. Dupree,*
　252 F.3d 1161 (11th Cir. 2001) .................................................................. 20

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
　401 U.S. 402 (1971) .................................................................................. 18

*Department of Com. v. New York,*
　588 U.S. 752 (2019) .................................................................................. 18

*Doe v. United States,*
　253 F.3d 256 (6th Cir. 2001) .................................................................... 15

*Donaldson v. United States,*
　400 U.S. 517 (1971) ........................................................................ 11-12, 17

*Donovan v. Shaw,*
　668 F.2d 985 (8th Cir. 1982) ...................................................................... 4

*EEOC v. Children's Hosp. Med. Ctr.,*
　719 F.2d 1426 (9th Cir. 1983) .................................................................... 4

*EEOC v. Federal Express Corp.,*
　558 F.3d 842 (9th Cir. 2009) ............................................................. 4, 5, 25

*EEOC v. Karuk Tribe Hous. Auth.,*
　260 F.3d 1071 (9th Cir. 2001) .................................................................. 4, 5

*Endicott Johnson Corp. v. Perkins,*
　317 U.S. 501 (1943) .................................................................................... 5

*Facebook, Inc. v. Power Ventures, Inc.,*
　844 F.3d 1058 (9th Cir. 2016) .................................................................... 3

*General Ins. Co. of Am. v. EEOC,*
　491 F.2d 133 (9th Cir. 1974) .................................................................... 21

*Krupski v. Costa Crociere S.p.A.,*
　560 U.S. 538 (2010) .................................................................................. 20

*Lynn v. Biderman*,
  536 F.2d 820 (9th Cir. 1976) .................................................................. 17, 19

*NLRB v. North Bay Plumbing, Inc.*,
  102 F.3d 1005 (9th Cir. 1996) ...................................................................... 23

*Oklahoma Press Pub. Co. v. Walling*,
  327 U.S. 186 (1946) ...................................................................................... 5

*Peters v. United States*,
  853 F.2d 692 (9th Cir. 1988) ....................................................................... 10

*Reich v. Montana Sulphur & Chem. Co.*,
  32 F.3d 440 (9th Cir. 1994) ......................................................................... 25

*Sealed Case, In re*,
  42 F.3d 1412 (D.C. Cir. 1994) ..................................................................... 25

*Subpoena Duces Tecum, In re*,
  228 F.3d 341 (4th Cir. 2000) ............................................................. 15, 16, 26

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ...................................................................................... 18

*United States v. Armstrong*,
  517 U.S. 456 (1996) ...................................................................................... 18

*United States v. Burke*,
  781 F.2d 1234 (7th Cir. 1985) ...................................................................... 21

*United States v. Gmoser*,
  30 F.4th 646 (7th Cir. 2022) ........................................................................... 9

*United States v. Golden Valley Elec. Ass'n*,
  689 F.3d 1108 (9th Cir. 2012) .......................................................... 3, 4, 10, 25

*United States v. LaSalle Nat'l Bank*,
  437 U.S. 298 (1978) ...................................................................................... 17

*United States v. Marschall*,
  82 F.4th 774 (9th Cir. 2023) ........................................................................... 6

*United States v. Morris,*
   827 F.2d 1348 (9th Cir. 1987) ...................................................................... 21

*United States v. Morton Salt Co.,*
   338 U.S. 632 (1950) ..........................................................................10, 14, 21

*United States v. Powell,*
   379 U.S. 48 (1964) .................................................................................18, 19

*United States v. Rodriguez,*
   44 F.4th 1229 (9th Cir. 2022) ...................................................................... 20

*United States v. Skrmetti,*
   605 U.S. 495 (2025) ........................................................................................ 1

*United States v. Sturm, Ruger & Co.,*
   84 F.3d 1 (1st Cir. 1996) ............................................................................ 4, 5

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,*
   429 U.S. 252 (1977) ...................................................................................... 18

*Walsh v. Alight Sols. LLC,*
   44 F.4th 716 (7th Cir. 2022) ........................................................................ 10

**Statutes:**

Federal Food, Drug, and Cosmetic Act
   21 U.S.C. § 351.............................................................................................. 2

Health Insurance Portability and Accountability Act
   18 U.S.C. § 3486(a)(1)(A)............................................................................. 9
   18 U.S.C. § 3486(a)(8) ................................................................................ 26
   18 U.S.C. § 3486(d) ..................................................................................... 26
   18 U.S.C. § 3486(e) ...............................................................................15, 26
   18 U.S.C. § 3486(e)(1) ................................................................................ 26
   18 U.S.C. § 3486(e)(2) ................................................................................ 26

**Regulation:**

21 C.F.R. § 201.128 ........................................................................................ 6

**Rule:**

Fed. R. App. P. 10(a)................................................................ 20-21, 21

**Other Authorities:**

Press Release, U.S. Dep't of Just., *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025), https://perma.cc/XL8X-X7J2 ................................................................ 13

Press Release, U.S. Dep't of Just., *Eli Lilly and Company to Pay U.S. $36 Million Relating to Off-Label Promotion* (Dec. 21, 2005), https://perma.cc/2Y64-FUK5.................................................................. 7

Press Release, U.S. Dep't of Just., *Genzyme Corporation to Pay $32.5 Million to Resolve Criminal Liability Relating to Seprafilm* (Sep. 3, 2015), https://perma.cc/P7AT-MUVT ............................................................. 7

Press Release, U.S. Dep't of Just., *Wyeth Pharmaceutical Agrees to Pay $490.9 Million for Marketing the Prescription Drug Rapamune for Unapproved Uses* (July 30, 2013), https://archives.fbi.gov/archives/oklahomacity/press-releases/2013/wyeth-pharmaceutical-agrees-to-pay-490.9-million-for-marketing-the-prescription-drug-rapamune-for-unapproved-uses.................................................................7-8

QueerDoc, *Legal Transition Consult*, https://perma.cc/CDU7-ZHYC ......................... 24

QueerDoc, *Sexual Health Consult*, https://perma.cc/GW6F-GKAJ ............................. 24

Restatement (Second) of Torts § 682 cmt. b (A.L.I. 1977), Westlaw (database updated Sep. 2025) ........................................................ 19

*United States v. Cephalon, Inc.*, No. 2:08-cr-598 (E.D. Pa. Oct. 10, 2008), Dkt. 11 .......... 7

# INTRODUCTION

The Department of Justice served a valid subpoena on QueerDoc as part of an investigation into possible violations of the Federal Food, Drug, and Cosmetic Act (FDCA). As we explained, the Department issued the subpoena to investigate credible information from whistleblowers and experts that actors in the industry are engaged in misbranding in violation of the FDCA. QueerDoc does not dispute that it may have information relevant to that investigation, in particular about the actions of manufacturers and distributors of cross-sex hormones and puberty blockers.

Instead, QueerDoc argues that the Department cannot investigate actors in the so-called "gender affirming care" industry because the Department harbors a policy goal of ending the provision of so-called "gender affirming care." That approach would have startling consequences for the Executive Branch's ability to investigate potential violations of federal law. Every administration has policy priorities and is entitled to pursue those priorities—including, in this arena, by opposing medical and surgical interventions on minors with gender dysphoria, which many States have banned. *See United States v. Skrmetti*, 605 U.S. 495, 504-05 (2025). But the Executive Branch is also tasked with enforcing federal law, and it is entitled to determine what sorts of investigations to prioritize and pursue to ensure compliance with federal law. There is nothing improper about an administration initiating investigations of an industry or practice of particular policy concern, and permitting law enforcement only if it is irrelevant to an administration's policy priorities would paralyze federal law

enforcement and immunize whole industries. An administration that seeks to outlaw sports gambling is not powerless to enforce the tax laws or other federal statutes against sports gambling businesses. Indeed, insofar as QueerDoc urges that the administration's policy positions alone are a basis to infer an improper purpose, those same arguments would leave the government unable to investigate drug adulteration—also criminalized by the FDCA—even if the government received whistleblower reports that manufacturers sold contaminated or defective puberty blockers or cross-sex hormones. *See* 21 U.S.C. § 351.

QueerDoc's objections to the government's motivations are unfounded in any event. The government cannot "end" "gender-affirming care" by serving a subpoena on QueerDoc or by investigating misbranding of cross-sex hormones and puberty blockers; such subpoenas only ensure compliance with existing law. The evidence the government sought is relevant to its investigation; indeed, the government has repeatedly relied on the sort of information requested by the subpoena in misbranding prosecutions. And QueerDoc's concerns about the breadth and burdens of the subpoena are unfounded, particularly when neither QueerDoc nor the district court has ever questioned the relevance of multiple requests. The Court should reverse.

## ARGUMENT

### I.  The QueerDoc subpoena is valid and was properly issued.

All agree that, in general, an administrative subpoena is valid so long as (1) Congress has granted the authority to investigate, (2) the relevant procedural

requirements have been followed, and (3) the evidence sought is relevant and material to the investigation. *United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108, 1113 (9th Cir. 2012). The subpoena meets each requirement: the Health Insurance Portability and Accountability Act (HIPAA) authorizes the Attorney General to issue subpoenas to investigate FDCA offenses, the subpoena followed the proper procedures, and it seeks relevant evidence. Opening Br. 19-22; *see* pp. 6-8, *infra* (discussing the relevance of the evidence sought).

QueerDoc argues for the first time on appeal that the subpoena fails to meet these threshold requirements. Resp. Br. 42-55. Those arguments fail in multiple respects. At the outset, QueerDoc cannot now press a new, unpreserved ground for quashing the subpoena. *See, e.g.*, *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1064 (9th Cir. 2016) (limiting alternative-ground affirmance to grounds "presented to the district court"). QueerDoc has never before challenged the subpoena as exceeding the government's HIPAA authority. In the district court, it challenged the subpoena on just two grounds: that it was motivated by an improper purpose and that it was overly broad and unduly burdensome. ER-079-91 (motion to quash); *see, e.g.*, ER-080 (challenging the "Subpoena's discriminatory purpose and expansive breadth"); Dkt. 13, at 1-6 (reply advancing same arguments). It briefly questioned the government's FDCA theories only in service of its argument that the subpoena was overbroad. ER-088-89; *see* Resp. Br. 19 n.2. That is also how the district court understood matters, observing that QueerDoc did not "meaningfully dispute" that the subpoena was

3

"procedurally sound." ER-014 n.1. Indeed, although statutory authority for the subpoena is a component of the threshold inquiry antecedent to consideration of improper purpose, *see Golden Valley Elec. Ass'n*, 689 F.3d at 1113, QueerDoc itself acknowledges that the district court "[p]roceed[ed] directly to the second step of the analysis" in addressing QueerDoc's claims of improper purpose, Resp. Br. 20.

Even aside from forfeiture, QueerDoc's arguments about the validity of the subpoena are unavailing. At the outset, QueerDoc's lengthy arguments about the scope of FDCA liability are procedurally misplaced in this subpoena enforcement posture. Opening Br. 19, 32. As this Court has explained, a subpoena recipient "may not avoid an administrative subpoena on the ground that it has a valid defense to a potential subsequent lawsuit" and cannot raise "factual challenges based on a lack of statutory 'coverage'" of a recipient's activities. *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1076-77 (9th Cir. 2001); *see EEOC v. Federal Express Corp.*, 558 F.3d 842, 846 (9th Cir. 2009); *EEOC v. Children's Hosp. Med. Ctr.*, 719 F.2d 1426, 1429 (9th Cir. 1983) (en banc); *Donovan v. Shaw*, 668 F.2d 985, 989 (8th Cir. 1982) ("[A] subpoena enforcement proceeding is not the proper forum in which to litigate the question of coverage under a particular federal statute."); *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 5 (1st Cir. 1996) ("[Q]uestions concerning the scope of an agency's substantive authority to regulate are not to be resolved in subpoena enforcement proceedings."). That principle dates back over 80 years to Supreme Court decisions rejecting efforts to contest subpoenas based on claims that the investigating agency lacked authority

4

over the matter. *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 213-14 (1946);

*Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 508-09 (1943).

That rule follows from the posture of such proceedings: "[s]ubpoena enforcement proceedings are designed to be summary in nature and an agency's investigations should not be bogged down by premature challenges to its regulatory jurisdiction." *Sturm, Ruger & Co.*, 84 F.3d at 5 (citation and quotation omitted). Were it otherwise, every subpoena recipient could seek to pre-litigate issues of potential liability or statutory coverage, which would "stop much if not all of investigation in the public interest at the threshold of inquiry." *Oklahoma Press*, 327 U.S. at 213. It is thus enough to say that "an administrative subpoena is to be enforced unless agency authority is plainly lacking." *Federal Express Corp.*, 558 F.3d at 851 n.3.

QueerDoc does not suggest that it meets this standard. It instead asserts that the investigation is proceeding on "a statutorily invalid theory," Resp. Br. 43, and proceeds to argue at length that the facts of its conduct would not fall within the FDCA's coverage, Resp. Br. 43-52. That is precisely the sort of argument based on "statutory 'coverage'" that cannot be entertained at this stage. *Karuk Tribe Hous. Auth.*, 260 F.3d at 1077. And that is all the more true where assessment of QueerDoc's arguments would occur without full knowledge of QueerDoc's conduct (or the conduct of other related actors), as QueerDoc has not responded to the subpoena.

QueerDoc's arguments fail for other reasons as well. HIPAA expressly grants authority to issue subpoenas in investigating potential violations of federal healthcare

5

laws, including the FDCA. Here, among other potential violations of federal healthcare laws, the government is investigating whether manufacturers or distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called "gender transition." ER-051 (Bondi memorandum).

As our opening brief explained (Br. 32-34), the subpoena here seeks information relevant to that investigation in two respects. First, QueerDoc itself may be engaged in conduct that implicates the FDCA, and as discussed, there is no basis to predetermine in a subpoena proceeding, without the benefit of any factual record, the potential scope of QueerDoc's activities and their relationship to the statute. We also explained that QueerDoc may have relevant information about the conduct of manufacturers and distributors of drugs that may have violated the FDCA. In particular, misbranding, via false or misleading "written, printed, or graphic matter" on a drug, container, or wrapper or that supplements, explains, or is designed for use with a drug, is a classic FDCA violation. *See, e.g.*, *United States v. Marschall*, 82 F.4th 774, 779 (9th Cir. 2023) (quotation omitted) (upholding misbranding conviction of the defendant who shipped drugs with false informational sheets). Drug manufacturers and distributors also can be convicted of FDCA violations, for example, for shipping drugs in interstate commerce intending that they be used off-label, with that intent frequently shown through evidence of promoting the drugs for such uses. *See* 21 C.F.R. § 201.128 (intent may "be shown by labeling claims, advertising matter," "oral

6

or written statements," and "circumstances in which the [drug] is, with the knowledge of" certain persons, "offered or used for a purpose for which it is neither labeled nor advertised"); *see, e.g.*, *United States v. Cephalon, Inc.*, No. 2:08-cr-598 (E.D. Pa. Oct. 10, 2008), Dkt. 11 (conviction of manufacturer for promoting three drugs for off-label uses). Thus, in such prosecutions, the government may rely on evidence of communications between pharmaceutical sales representatives and prescribing physicians and recommendations to doctors of diagnostic codes to mask off-label prescriptions to ensure payment for unapproved uses. *See, e.g.*, *Cephalon*, Dkt. 1, ¶¶ 12-18 (criminal information); Press Release, U.S. Dep't of Just., *Eli Lilly and Company to Pay U.S. $36 Million Relating to Off-Label Promotion* (Dec. 21, 2005), https://perma.cc/2Y64-FUK5 (announcing guilty plea of drug manufacturer involving illegal off-label promotion, highlighting evidence that the defendant "[e]ncourag[ed] sales representatives . . . to send unsolicited medical letters to promote the drug for an unapproved use to doctors").[1]

---

[1] There are many similar examples. *See, e.g.*, Press Release, U.S. Dep't of Just., *Genzyme Corporation to Pay $32.5 Million to Resolve Criminal Liability Relating to Seprafilm* (Sep. 3, 2015), https://perma.cc/P7AT-MUVT (highlighting evidence that manufacturer encouraged off-label uses by distributing promotional materials citing a misleading scientific study); *United States v. Endo Pharms., Inc.*, No. 1:14-CR-66 (N.D.N.Y. Feb. 21, 2014), Dkt. 2 (deferred prosecution agreement regarding drug manufacturer's off-label promotion of drug, highlighting evidence that manufacturer distributed a misleading scientific study and promoted off-label uses at educational presentations for physicians); Press Release, U.S. Dep't of Just., *Wyeth Pharmaceutical Agrees to Pay $490.9 Million for Marketing the Prescription Drug Rapamune for Unapproved Uses* (July 30, 2013), https://archives.fbi.gov/archives/oklahomacity/press-releases/

*Continued on next page.*

Although the government's investigatory steps and the ultimate evidence generated in this investigation need not mirror past investigations, the subpoena here is plainly calculated to seek this same sort of evidence, including (for example) materials from and communications with manufacturers and sales representatives regarding the use of puberty blockers or hormones (Requests 7 through 9) and evidence of manufacturers' financial incentives to prescribing physicians to prescribe puberty blockers or hormones (Request 10). Similarly, billing codes and communications with manufacturers or distributors about billing for off-label uses (Requests 3 through 6) may produce evidence of intentionally misleading coding that could, in turn, be traced to manufacturers or distributors attempting to conceal misbranding.

QueerDoc has little to say about this aspect of the subpoena, which alone would suffice to meet any heightened standard imposed to show some sort of "statutory coverage" of particular conduct. QueerDoc does not dispute that it could have information about the conduct of manufacturers and distributors that would plainly be material to potential FDCA violations. Instead, QueerDoc briefly argues (Resp. Br. 52-55) that the Department cannot use a HIPAA subpoena "to investigate unidentified entities," likening the subpoena here to "John Doe" subpoenas issued by

---

2013/wyeth-pharmaceutical-agrees-to-pay-490.9-million-for-marketing-the-prescription-drug-rapamune-for-unapproved-uses (highlighting evidence that manufacturer paid bonuses to incentivize off-label sales).

the Internal Revenue Service—subpoenas issued to third parties when the government does not know the identity of the taxpayer at issue and for which Congress has enacted special requirements.

That argument fails on multiple levels. Nothing in the text of HIPAA itself requires that the government know in advance the identity of an individual engaged in illegal conduct before issuing a subpoena. That sort of requirement would hobble the effectiveness of the subpoena power generally, as a critical purpose of a subpoena is often to ascertain the identity of an individual who is engaged in wrongdoing. And it would hobble the effectiveness of § 3486 subpoenas, which can be issued to investigate not just "Federal health care offense[s]" but also "offense[s] involving the sexual exploitation or abuse of children" and "threat[s] against a person protected by the United States Secret Service," where the conduct is commonly established but the perpetrator's identity is unknown. 18 U.S.C. § 3486(a)(1)(A). Unsurprisingly, QueerDoc cites no case remotely suggesting that HIPAA subpoenas are limited in this fashion, even as courts have noted their use, for example, to "determine who was managing the computer that distributed child pornography." *United States v. Gmoser*, 30 F.4th 646, 647-48 (7th Cir. 2022). And even if that were not the case, it is unclear on what basis QueerDoc assumes that the government does not know the identities of individuals or companies of interest to its investigation. It is no secret which companies manufacture and distribute the drugs of interest here, and in any event, HIPAA does not impose a requirement that the government reveal the details of its

9

investigation to subpoena recipients, and QueerDoc again cites no case imposing such a requirement.

QueerDoc's reliance on *Peters v. United States*, 853 F.2d 692 (9th Cir. 1988), underscores the point: there, the former Immigration and Naturalization Service (INS) issued a subpoena to a labor camp seeking information about every resident of the camp because in past years the INS had arrested illegally present aliens at the camp. *Id.* at 694. This Court held that the specific authorizing statute for the INS subpoena did not allow this sort of sweeping subpoena in aid of a "general investigation of unnamed individuals." *Id.* at 700. As this Court subsequently explained in affirming the enforcement of a subpoena for the usage records of unidentified electric customers under another statute, *Peters* simply illustrates that overly "broad and indefinite" subpoenas are not enforceable. *Golden Valley Elec. Ass'n*, 689 F.3d at 1115; *see United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950). Here, by contrast, the subpoena seeks specific information related to specific drugs in connection with specific patients, *see* pp. 5-6, *supra*, and QueerDoc does not suggest that it is in any respect confused about what the subpoena requires, *see, e.g., Walsh v. Alight Sols. LLC*, 44 F.4th 716, 724 (7th Cir. 2022) (rejecting indefiniteness challenge where subpoena was not unclear).

**II.    The district court erred in quashing the subpoena based on an ostensible improper subjective purpose.**

The district court quashed the subpoena not because the subpoena failed to comply with these established criteria but instead because it concluded that the subpoena was issued for an "improper purpose"—specifically, because (in the court's view) the subpoena was not genuinely intended to investigate federal misconduct but rather "seeks to end the very practice it claims to be merely investigating." ER-017. QueerDoc fails to rehabilitate either the court's conclusion that the government issued the subpoena for an improper purpose or its conclusion that that finding sufficed to quash the subpoena.

**A.    The government did not issue the subpoena for an improper purpose.**

Our opening brief explained (Br. 27-32) the fundamental error in the district court's analysis: an administration's policy views about a particular industry or practice cannot exempt that industry or practice from investigations into compliance with existing federal law, and there is nothing unusual or improper about a given administration prioritizing enforcement of federal law in areas of particular policy concern. Prosecutors do not become powerless to enforce the law against members of industries when the Executive Branch announces policy priorities relevant to that industry, and the district court's reasoning would contravene the Supreme Court's rejection of rules that would "thwart and defeat the appropriate investigatory powers that the Congress has" granted to the Department. *Donaldson v. United States*, 400 U.S.

11

517, 533 (1971). And the district court's sweeping logic would go far beyond the subpoenas here, calling into question any subpoena issued in aid of an investigation into industries of special concern to any given administration.

QueerDoc devotes just one paragraph to this fundamental issue. Resp. Br. 34-35. And when it finally reaches this crucial point, it apparently concedes that the Executive Branch is allowed to "express concern" about an industry while also investigating it. Resp. Br. 34. QueerDoc leaves unanswered whether that "concern" can include a policy desire for new legislation banning an industry or practice—presumably because it recognizes that a rule that forces federal officials to choose between policy advocacy and the enforcement of existing law would be nonsensical. Similarly, QueerDoc does not explain how the current administration could investigate *any* possible offenses related to gender-related care, no matter how well-founded; on QueerDoc's view, the administration's policy views would always provide a basis to conclude that an improper purpose motivated every subpoena. *See* Resp. Br. 32 (asserting that evidence of public statements "alone" suffices to show improper purpose).

Instead of grappling with this issue directly, QueerDoc chiefly responds by repeatedly eliding the basic distinction between policy advocacy and prioritizing the enforcement of existing law. For example, QueerDoc quotes (Resp. Br. 31) Attorney General Bondi's memorandum regarding steps the Department would take to implement an Executive Order regarding "gender-affirming care." That memorandum

12

not only directs undertaking investigations to enforce existing law—including the investigation at issue here, ER-050-51—but also directs the drafting of new legislative proposals at the federal level and advocacy for "the passage of similar legislation at the state level," ER-052-53.[2] Similarly, QueerDoc cites a July 9 press release stating that the Department of Justice has sent subpoenas "to doctors and clinics involved in performing transgender medical procedures on children" and that the Department is investigating "healthcare fraud, false statements, and more." Press Release, U.S. Dep't of Just., *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025), https://perma.cc/XL8X-X7J2. In the press release, the Attorney General promised to hold individuals or entities "accountable" for "healthcare fraud, false statements," or other violations of the law. *Id.* That is a core duty of the Executive Branch, not an improper purpose for an investigation. A White House press release announcing hospitals and clinics that have stopped providing puberty blockers, hormone therapy, and sex-change surgeries to children,

---

[2] QueerDoc also misleadingly quotes a Department of Justice attorney at a hearing in another subpoena quashal action as saying that the Executive Branch's policy desire "to reduce or eliminate gender-related care to minors" is "what this investigation is about." Resp. Br. 32 (quoting *In re Administrative Subpoena No. 25-1431-019*, No. 1:25-mc-91324 (D. Mass. Sep. 1, 2025), Dkt. 30, at 25). As a review of the cited transcript reveals, in making the same argument that policy views could not provide a basis to quash a subpoena advanced here, the attorney stated twice within the same sentence that the "investigation is about" the medical treatments at issue here: "medicalized gender-related care to minors" or "medicalized gender-affirming care of minors." *In re Administrative Subpoena*, Dkt. 30, at 25. That description of the scope of the investigation is plainly correct.

13

without reference to any subpoenas or investigations whatsoever, further illustrates QueerDoc's inability to grapple with the basic issue presented here. Resp. Br. 31-32.

Moreover, QueerDoc at no point addresses the fact that the Department's ability to investigate potential offenses cannot itself "end" this care or change applicable law. Opening Br. 31. Indeed, as noted, QueerDoc vigorously contends that its own conduct is lawful. QueerDoc fails to explain how a subpoena seeking the existing business records of an entity in a highly regulated industry is an improper or harassing step from which all its purported harms flow. The false dichotomy pressed by QueerDoc between freedom from any subpoena and the "end" of such care flows from its inability to distinguish between the Executive Branch's authority to engage in policy advocacy and its ability to choose how to prioritize investigations and enforce existing law.

The error in that approach is underscored by QueerDoc's failure to rehabilitate the other aspects of the district court's reasoning. The court concluded that the government pursued an improper purpose because the Attorney General directed investigation of "manufacturers and distributors engaged in misbranding" and "providers submitting false insurance claims," but QueerDoc does not fall into any of those categories. ER-017 (quotation omitted). But again, QueerDoc need not be a subject of the government's investigation to be a proper recipient of a subpoena. *See* pp. 6, 8, *supra*. Instead, the government need only show that QueerDoc may have information that is relevant to the investigation. *Morton Salt*, 338 U.S. at 642. The fact

14

that QueerDoc is not itself a manufacturer or distributor of drugs does not suggest that QueerDoc lacks information relevant to an investigation of manufacturers or distributors of drugs—and, as discussed, QueerDoc does not seriously contend that it lacks relevant information on this score. *See* pp. 5-8, *supra*.

Instead, QueerDoc says only that information about the identities of patients to whom QueerDoc provided care would be of little relevance to an investigation into misbranding, Resp. Br. 36, but at no point addresses the explanations for the need for that information articulated in our opening brief, Opening Br. 33, 37-38. As we explained, the government regularly relies on patient records in FDCA investigations and prosecutions, including because those records may contain diagnosis codes that can reflect efforts to mask manufacturers' or distributors' promotion of off-label drug uses; because the records may describe adverse events in patients who received a misbranded or adulterated drug; or simply because the records confirm that patients received a medication under investigation and describe the circumstances under which they did so. *See* pp. 7-8, *supra*. It is thus no surprise that § 3486 specifically authorizes the government to obtain patient records, *see* 18 U.S.C. § 3486(e), or that courts have resisted efforts to avoid disclosure of patient records in response to HIPAA subpoenas, *see Doe v. United States*, 253 F.3d 256, 265 (6th Cir. 2001) (enforcing subpoena that included "requests for the files of patients"); *In re Subpoena Duces Tecum*, 228 F.3d 341, 344 (4th Cir. 2000) (enforcing subpoena that requested patients' "complete medical files, patient appointment books, patient billing records, office

15

sign-in sheets, and telephone messages in any form"); *see also* pp. 25-26, *infra*. And for similar reasons, the mere fact that a subpoena seeks a large number of records—even a "large number of patient files"—does not suggest that it is overbroad compared to the needs of the investigation. *In re Subpoena Duces Tecum*, 228 F.3d at 350 (quotation omitted).

Finally, QueerDoc suggests that the government's explanation of the investigation has shifted. Resp. Br. 36-38. The government has consistently explained the basic nature and purpose of the investigation across the various memoranda and filings here. *See* ER-051 (Bondi memorandum); ER-055 (Shumate memorandum, citing Bondi memorandum); SER-012 ("The Government is conducting an investigation into, among other things, whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated federal law, including the [FDCA]."); Opening Br. 21 (citing Shumate memorandum and explaining that "[m]arketing or promoting these drugs as treating gender dysphoria in minors could therefore violate the FDCA's misbranding provisions"). But that would not matter in any event: it is of course unsurprising that the government would not reveal every aspect of its investigative plans or the theories it is pursuing at the outset, and it would not be unusual or improper for an investigation to change or develop as it unfolds.

## B. The district court's improper purpose finding would not justify quashing the subpoena in any event.

As the foregoing illustrates, the fact of an administration's policy views and its enforcement priorities cannot be a basis on which to infer improper purpose. But even if those policy views could be construed as relevant to the improper purpose inquiry, that still would not justify quashal of the subpoena here. As this Court has long held, "[i]t is not . . . a ground to deny enforcement of a subpoena that it is being employed for a wrongful purpose if there is also a legitimate purpose for the subpoena." *Lynn v. Biderman*, 536 F.2d 820, 826 (9th Cir. 1976). The same principle has been applied more broadly: in the context of tax subpoenas, for example, which may only be issued in aid of civil tax investigations (and thus not solely in aid of potential criminal charges), the Supreme Court has made clear that the coexistence of an interest in criminal prosecution with a valid civil investigatory purpose does not invalidate a subpoena. *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316-17 (1978); *see Donaldson*, 400 U.S. at 533 (inquiring whether "the sole objective of the investigation is to" impermissibly use a civil subpoena to "obtain evidence for use in a criminal prosecution").

Any other rule would impermissibly "thwart and defeat the appropriate investigatory powers that the Congress has placed in" Executive Branch agencies. *Donaldson*, 400 U.S. at 533. A contrary rule would also violate basic principles of administrative law by routinely requiring searching inquiries into and weighing of the

17

relative strength of motives of Executive Branch decisionmakers, even though "inquiry into the mental processes of administrative decisionmakers is usually to be avoided." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *see, e.g.*, *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977) (recognizing that "judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government" and are "'usually to be avoided'" (quoting *Overton Park*, 401 U.S. at 420)). A contrary rule would also contravene the principle that "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons," including being "prompted by an Administration's priorities." *Department of Com. v. New York*, 588 U.S. 752, 781 (2019). And it would threaten to "unnecessarily impair the performance of a core executive constitutional function," *United States v. Armstrong*, 517 U.S. 456, 465 (1996), choosing "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).

To the extent QueerDoc argues that *any* improper ingredient in an agency's motivations invalidates a subpoena, even if the subpoena forms part of a legitimate investigation that the agency genuinely seeks to conduct, Resp. Br. 19-20, it cites no decision embracing that standard, much less quashing a subpoena on that basis. For example, QueerDoc relies on *United States v. Powell*, 379 U.S. 48 (1964), but that case simply states that there could be some circumstances in which abuse of process

18

suffices to prevent enforcement of a subpoena, without embracing the rule QueerDoc suggests. *Id.* at 58; *cf.* Restatement (Second) of Torts § 682 cmt. b (A.L.I. 1977), Westlaw (database updated Sep. 2025) (explaining that tort of abuse of process will not lie where there is both a legitimate motive and "an incidental motive of spite or an ulterior purpose of benefit to the defendant").

Nor can QueerDoc square that approach with *Lynn*. It argues that *Lynn* considered only the government's prima facie showing that the investigation has a legitimate purpose. Resp. Br. 21. Not so. The Court in *Lynn* opined that the agency administrator had a "firm intention" to use the customer lists obtained from the subpoena to provide "erroneous" and unauthorized advice to the subpoenaed business's customers, which the Court ruled "was not a legitimate purpose." 536 F.2d at 826. *Despite* finding an improper purpose, the Court *still* ruled that the subpoena could not be quashed on the ground "that it is being employed for a wrongful purpose if there is also a legitimate purpose for the subpoena." *Id.*

Nor can QueerDoc distinguish *Lynn* by contending that the district court here concluded that there was no proper purpose for the subpoena. Resp. Br. 22. As QueerDoc elsewhere acknowledges, satisfaction of the basic requirements for issuance of a subpoena—which were uncontested here—is sufficient to establish good faith in the first instance. *See* Resp. Br. 19 (acknowledging that government first demonstrates "good faith by making a prima facie showing" on the basic requisites

for enforcement). That suffices to demonstrate that, at most, QueerDoc has made allegations of mixed motives to which *Lynn* would apply.

### C. At minimum, the district court should have given the government the opportunity to satisfy its new standard.

Even if the new heightened standard the district court imposed for the nature and consequences of an "improper purpose" were somehow legally correct, the district court still should have permitted the government an opportunity to satisfy that new standard.

QueerDoc responds only that the district court properly construed Local Rule 7(m). Resp. Br. 37 n.4. It does not contest the basic fairness of permitting a litigant to attempt to satisfy a newly announced standard through *some* procedural mechanism. Nor could it. *Cf., e.g.*, *United States v. Rodriguez*, 44 F.4th 1229, 1234 (9th Cir. 2022) (remanding for application of clarified legal standards); *Bryant v. Dupree*, 252 F.3d 1161, 1164 (11th Cir. 2001) (per curiam) (reversing denial of leave to amend complaint when plaintiffs had not "failed to correct defects *of which they had notice*" (emphasis added)); *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 550 (2010) (recognizing "the preference expressed in the Federal Rules of Civil Procedure in general . . . for resolving disputes on their merits").[3]

---

[3] QueerDoc's argument that the Gordus Declaration is not part of the record on appeal is mistaken, too. Resp. Br. 37 n.4. Appellate Rule 10 provides that the record on appeal consists of "the original papers and exhibits filed in the district court," together with transcripts and a district court certification. Fed. R. App.

*Continued on next page.*

Accordingly, if this Court does not reverse the decision below outright and permit enforcement of the subpoena, it should at minimum vacate and remand with instructions to allow the government to supplement the record to meet the district court's new, heightened standard for subpoena enforcement.

## III.   The subpoena is appropriately tailored and not unduly burdensome.

QueerDoc last seeks affirmance on the alternative grounds of overbreadth and undue burden—grounds on which the district court did not rely. *See* ER-018-19 (concluding only that "the breadth of the document requests" supported its view that the subpoena was issued for an improper purpose). The Court should reject those arguments for two reasons.

*First*, breadth and burden are not alternative grounds on which the Court could affirm the district court's decision to quash the subpoena. A finding of overbreadth or undue burden would at most be a starting point to narrow the subpoena, not quash it entirely. *See, e.g.*, *Morton Salt*, 338 U.S. at 653-54 (meritorious breadth and burden objections could support "modifications" to subpoena); *General Ins. Co. of Am. v. EEOC*, 491 F.2d 133, 136 (9th Cir. 1974) (acknowledging that agency could "amend

---

P. 10(a). The declaration was certainly "filed in the district court," *id.*, unlike in the two cases QueerDoc cites. And as innumerable evidentiary appeals of stricken trial testimony make clear, the record on appeal is not limited to items "admitted into evidence" or actually considered in rendering a ruling. *United States v. Burke*, 781 F.2d 1234, 1246 (7th Cir. 1985); *see, e.g.*, *United States v. Morris*, 827 F.2d 1348, 1351 (9th Cir. 1987) (considering stricken testimony).

its demand" in response to finding that "the demand was too broad"); SER-020-21 (offering "to meet and confer with QueerDoc counsel to hear their specific concerns about specific requests" if the district court harbored concerns about the subpoena's breadth). Any disputes about the permissible scope of the subpoena or efforts to narrow it to reduce possible burdens on QueerDoc are no basis for quashing the subpoena in its entirety.

That is especially apparent here because QueerDoc never objected to the breadth of several categories of documents. ER-088, ER-090. It has never raised— and still does not raise—breadth objections, for example, to Request 8 (which seeks "communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty blockers or hormones for gender-related care") or Request 9 (which seeks documents "received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for gender-related care"). For its part, the district court discussed the breadth of just six requests. ER-018-19 (discussing Requests 7 through 9 and 11 through 13). So neither QueerDoc nor the district court has raised breadth objections at any point to other requests, such as Request 10 (which seeks "documents relating to contracts, sponsorships, . . . grants, or financial or promotional arrangements" between QueerDoc and "any manufacturer or compounder of puberty blockers or hormones") or Request 14 (which seeks "documents reflecting communications with pharmaceutical manufacturers, compounding pharmacies, or government agencies

relating to the safety of puberty blockers or hormones used in the treatment of minor patients"). ER-028-29. QueerDoc likewise argues that complying with the subpoena in its entirety would be unduly burdensome, but it has never argued that the subpoena cannot be narrowed to a set of requests with which it could readily comply. There is no basis to facially quash a subpoena based on concerns about the breadth or burdensomeness of only some of its requests.

*Second*, the subpoena is neither overly broad nor unduly burdensome. *See* Opening Br. 36-39.

Start with breadth. Permissible breadth is measured against the needs of the investigation, not just the contemplated federal violation. *See, e.g.*, *NLRB v. North Bay Plumbing, Inc.*, 102 F.3d 1005, 1009 (9th Cir. 1996) ("[T]he focus is on relevancy to the investigation[.]" (quotation omitted)). Each of the requests QueerDoc questions is appropriately calculated to seek evidence relevant to the investigation, so none is overbroad.

QueerDoc objects that the subpoena would require it to produce "practically all" of its records, specifically highlighting Request 4. Resp. Br. 56. That is overstated. The subpoena targets only certain categories of information likely to be relevant to the investigation. For example, it seeks patient records only for patients who were prescribed puberty blockers or hormone therapy by QueerDoc practitioners and seeks only a subset of records for those patients. ER-028 (Requests 11-13). That request omits records of any patients to whom QueerDoc practitioners did not prescribe

23

those interventions, such as patients who use QueerDoc for its other offerings including a "[o]ne time visit for amending identity docs"[4] or sexually transmitted disease screening.[5] And where possible, the subpoena also limits its requests to information about minors, omitting documents about QueerDoc's adult patients. *See* ER-027-29 (Requests 2-3, 7, 9, 13-15).

Even if the subpoena did seek a substantial proportion of QueerDoc's records, that would be an artifact of QueerDoc's specialization in one particular sector, not evidence of impermissible overbreadth. A subpoena's breadth is permissible so long as it seeks documents that are relevant to the investigation, however many relevant documents a recipient may have. The overbreadth inquiry does not look to how many *nonresponsive* documents a given recipient happens to have, and QueerDoc's specialization does not render the subpoena overbroad.

QueerDoc also objects that requests about "billing or coding" are not "relevant to an FDCA investigation." Resp. Br. 57. Not so. As explained above, the Department may obtain and use evidence of billing and coding in prosecutions for misbranding by drug manufacturers and distributors for any number of reasons, including to demonstrate an intent to defraud or mislead, the scienter necessary to establish a felony violation of the FDCA. *See* pp. 6-8, *supra.* And requested evidence need not directly prove a *violation* in any event, so long as it may be relevant to the

---

[4] *See* QueerDoc, *Legal Transition Consult*, https://perma.cc/CDU7-ZHYC.
[5] *See* QueerDoc, *Sexual Health Consult*, https://perma.cc/GW6F-GKAJ.

*investigation. See, e.g.*, *Federal Express Corp.*, 558 F.3d at 854 (enforcing broad subpoena designed to "help the EEOC craft additional information requests that may produce evidence of discriminatory treatment").

The close fit between the requests in the subpoena, the nature of the investigation, and the evidence the Department regularly uses in FDCA misbranding prosecutions likewise disposes of QueerDoc's suggestion that the Department is merely engaged in a "fishing expedition." Resp. Br. 25-29. The Department does not purport to investigate "other wrongdoing, as yet unknown," *In re Sealed Case*, 42 F.3d 1412, 1418 (D.C. Cir. 1994) (quotation omitted), *cited at* Resp. Br. 25-26, or rely on a free-floating "general duty clause," *Reich v. Montana Sulphur & Chem. Co.*, 32 F.3d 440, 445 (9th Cir. 1994), *cited at* Resp. Br. 28. It is investigating within its authority, based on publicly available information and reports from whistleblowers and experts. Opening Br. 10-15; pp. 5-8, *supra*. Requiring more, at this stage, would hobble agencies' ability to investigate violations of the law by demanding that they *prove* a case in order to *investigate* it. *See, e.g.*, *Golden Valley Elec. Ass'n*, 689 F.3d at 1115 (agency need not even "have probable cause to justify issuance of a subpoena"); *Federal Express Corp.*, 558 F.3d at 854 (first subpoena permissibly requested description of computer systems solely to facilitate later investigation).

The subpoena is not unduly burdensome, either. QueerDoc spends just five sentences on burden, discussing only production of patient files. Resp. Br. 60. Aside from an unexplained reference to "costs" to QueerDoc, QueerDoc does not actually

25

explain how production of those files would be burdensome. It instead focuses on patient privacy interests. While those issues have no bearing on whether the subpoena is burdensome to QueerDoc, Congress expressly addressed those concerns in striking a balance between privacy and the subpoena power, providing that HIPAA subpoenas could obtain "[h]ealth information about an individual," 18 U.S.C. § 3486(e), limiting the uses of subpoenaed information, *id.* § 3486(a)(8), (e)(1), expressly preempting state privacy and disclosure-notification laws that could have limited disclosure in response to such subpoenas, *id.* § 3486(d), and expressly prescribing circumstances (not implicated here) in which courts must further "weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services," *id.* § 3486(e)(2); *see In re Subpoena Duces Tecum*, 228 F.3d at 351 (rejecting argument that "patients' privacy interests in their medical files outweigh the government's interest in those files").

## CONCLUSION

The Court should reverse the district court's order.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*


 */s/ Sarah Welch*
BRAD HINSHELWOOD
SARAH WELCH
    *Attorneys, Civil Division*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *(202) 514-3180*


January 2026

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellant states that it knows of no related case pending in this Court.

*/s/ Sarah Welch*
Sarah Welch

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32-1 because it contains 6,464 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

/s/ *Sarah Welch*
Sarah Welch

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Sarah Welch*
Sarah Welch